# 23-7251-cv

## United States Court of Appeals
### *for the*
## Second Circuit

———◆———

JUAN CATALA, DBA Majic Entertainment LLC,
DBA Adrawn Music Publishing,

*Plaintiff-Appellant,*

— v. —

JOOMBAS CO. LTD., JOOMBAS MUSIC INT'L, JOOMBAS LLC, JOOMBAS
MUSIC GROUP, HYUK SHIN, THE LA REID MUSIC PUBLISHING
COMPANY LLC, SONY/ATV SONGS LLC, EMI APRIL MUSIC INC.,

*Defendants-Appellees.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFF-APPELLANT

JEFFREY S. KRAMER
LOCKE LORD LLP
*Attorney for Plaintiff-Appellant*
Brookfield Place
200 Vesey Street, 20th Floor
New York, New York 10281
(212) 415-8600

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. P. 26.1, Plaintiff-Appellant Majic Entertainment LLC discloses that it is a private corporation, which has no parent company and no stock; accordingly, there is no publicly held corporation that owns 10% or more of its stock.

# TABLE OF CONTENTS

I.     JURISDICTIONAL STATEMENT ..................................................................1

II.    STATEMENT OF THE ISSUES .....................................................................1

III.   STATEMENT OF THE CASE ........................................................................2

   A.   Contract 1 .........................................................................................3

   B.   Contract 2 .........................................................................................5

   C.   Contract 3 .........................................................................................6

   D.   Shin's Breach Of Contract And Fraudulent Behavior ......................9

      1.   Shin Created A Publishing Company Called Joombas To
           Compete With Majic And Hide Interest In Compositions. ....................9

      2.   Shin Signed Writers And Acquired Interests In Compositions, Yet
           Never Shared The True 50% Ownership Interest In Compositions
           Signed By Joombas With Majic, As Required By Contract 1. ..............10

      3.   Shin Admitted To Breaching Contract 1 And That He Hid His
           Interest In Compositions By Assigning Shares To Ghostwriters
           And Not Reporting His True Interest In The Compositions To
           Majic. ........................................................................................................12

      4.   The Record Reflects Shin's Reputation In The Music Industry Of
           Dishonesty And Of Hiding Interest In Compositions. ...........................14

   E.   Reid/EMI/Sony And Shin/Hamilton's Settlement Agreement And
        Majic' Lawsuit Against Reid/EMI/Sony, Shin, And Joombas .................15

IV.   SUMMARY OF THE ARGUMENT ..............................................................16

V.    ARGUMENT....................................................................................................16

   A.   The District Court Erred In Granting Shin's Cross-Motion For
        Summary Judgment...........................................................................16

      1.   Standard of Review....................................................................................16

      2.   The District Court Failed To Properly Consider Whether Shin
           Breached Sections 9(b) And 14(c) Of Contract 1 ...................................18

      3.   The District Court Failed To Resolve All Ambiguities And Draw
           All Reasonable Inferences Against Shin On His Cross-Motion For
           Summary Judgment. .................................................................................21

i

a.      The District Court Failed To Analyze Shin's Cross-Motion For Summary Judgment Separately And To Place The Burden Of His Motion On Him...............................................................21

b.      There Is A Genuine Issue Of Material Fact As To Whether The Joombas Entities Were Shin's Affiliates............................................26

c.      There Is A Genuine Issue of Material Fact As To Whether Joombas Had Any Ownership Rights In Compositions Because Shin Admitted That Joombas (Shin's Affiliate) Had Signed Dozens Of Writers To Publishing Deals Similar to Majic. ................29

B.      The District Court Erred In Limiting Majic's Breach Of Contract Claims To The Pre-2014 Time Period. ......................................33

1.      Standard of Review...............................................................33

2.      The District Court Conflated Shin's Delivery Obligation With Majic's 50% Ownership Interest Rights..................................34

3.      The District Court Erred In Denying Majic's Motion to Amend When Majic's Claims Were Plausible And Any Deficiencies In The Pleading Could Have Been Cured Without Prejudice. .................40

C.      The District Court Erred in Dismissing Majic's Claims Against Reid/EMI/Sony. ......................................................................42

VI.      CONCLUSION.............................................................................44

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*ABKCO Music, Inc. v. Harrisongs Music, Ltd*,
  944 F.2d 971 (2d Cir. 1991) ................................................... 30

*Ackerson v. City of White Plains*,
  702 F.3d 15 (2d Cir. 2012) (per curiam) ............................... 17

*Am. Int'l Group, Inc. v. London Am. Int'l Corp.*,
  664 F.2d 348 (2d Cir. 1981) .................................................. 17

*Artists Rts. Enf't Corp. v. Est. of King*,
  No. 16-CV-1121 (JPO), 2017 WL 2062988 (S.D.N.Y. May 15, 2017) ..................................................................................... 35

*Ass'n of Int'l Auto. Mfrs., Inc. v. Abrams*,
  84 F.3d 602 (2d Cir. 1996) .................................................... 17

*Barenboim v. Starbucks Corp.*,
  698 F.3d 104 (2d Cir. 2012) ............................................. 17, 22

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) ........................... 33, 43

*Bourne v. Walt Disney Co.*,
  68 F.3d 621 (2d Cir. 1995) ............................................... 34, 38

*Catala v. Joombas Co.*,
  18 Civ. 8401 (PGG), 2019 WL 4803990 (S.D.N.Y. Sep. 23, 2019) .................... 2

*Catala v. Joombas Co.*,
  18 Civ. 8401 (PGG), 2021 WL 2012379 (S.D.N.Y. May 20, 2021) ................... 2

*Catala v. Joombas Co. Ltd.*,
  18 Civ. 8401 (PGG) (GWG), 2023 WL 6144635 (S.D.N.Y. Sep. 19, 2023) ................................................................................ 2

*Creazioni Artistiche Musicali, S.r.l. v. Carlin Am., Inc.*,
No. 14-CV-9270 (RJS), 2016 WL 7507757 (S.D.N.Y. Dec. 30,
2016) ................................................................................................30, 32

*Erickson v. Pardus*,
551 U.S. 89, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) .................................33

*Foman v. Davis*,
371 U.S. 178, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962) .........................................41

*Hutson v. Notorious B.I.G., LLC*,
No. 14-CV-2307 (RJS), 2015 WL 9450623 (S.D.N.Y. Dec. 22,
2015) ................................................................................................................30

*Kandt v. Taser Int'l, Inc.*,
527 F. App'x 51 (2d Cir. 2013) ........................................................................17

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec.*,
LLC, 797 F.3d 160 (2d Cir. 2015) ....................................................................40

*McCarthy v. Dun & Bradstreet Corp.*,
482 F.3d 184 (2d Cir. 2007) .............................................................................40

*McCarthy v. Stollman*,
No. 06CIV2613DABDF, 2010 WL 11586609 (S.D.N.Y. Feb. 23,
2010) ................................................................................................................36

*Mirkin v. Xoom Energy*,
LLC, 931 F.3d 173 (2d Cir. 2019) ....................................................................33

*N.Y. Times Co. v. Tasini*,
533 U.S. 483, 121 S.Ct. 2381, 150 L.Ed.2d 500 (2001) .....................................31

*New York v. Green*,
420 F.3d 99 (2d Cir. 2005) ...............................................................................40

*Perez v. Escobar Constr., Inc.*,
342 F.R.D. 378 (S.D.N.Y. 2022) .......................................................................41

*Regency Nyc, Inc. v. Atkinson*,
No. 23-CV-5479, 2023 WL 7529791 (S.D.N.Y. Nov. 13, 2023) ......................40

iv

*Reinhardt v. Wal-Mart Stores, Inc.*,
    547 F. Supp. 2d 346 (S.D.N.Y. 2008) ................................................34

*Rhoads v. McFerran*,
    517 F.2d 66 (2d Cir. 1975) .................................................................17

*Richardson v. Edgewell Pers. Care, LLC*,
    No. 23-128, 2023 WL 7130940 (2d Cir. Oct. 30, 2023) ....................34

*Rothenberg v. Chem. Bank N. Y. Tr. Co.*,
    400 F. Supp. 1299 (S.D.N.Y. 1975) ..................................................18

*Schwabenbauer v. Bd. of Educ.*,
    667 F.2d 305 (2d Cir. 1981) ...................................................17, 22, 33

*Scutti Enters., LLC v. Park Place Entm't Corp.*,
    322 F.3d 211 (2d Cir. 2003) ...............................................................33

*Simmons v. Stanberry*,
    810 F.3d 114 (2d Cir. 2016) ...............................................................31

*Two Farms Inc. v. Greenwich Ins. Co.*,
    628 F. App'x 802 (2d Cir. 2015) ..................................................16, 17

*U.S. Information Sys. v. Int'l Bhd. of Electrical Wkrs*,
    00 Civ. 4763 (RMB)(JCF), 31 (S.D.N.Y. Aug. 1, 2006) ..................12

*United States v. Marin*,
    669 F.2d 73 (2d Cir.1982) ..................................................................12

*Williams v. Citigroup Inc.*,
    659 F.3d 208 (2d Cir. 2011) ...............................................................40

*Yesh Music, LLC v. Amazon.com, Inc.*,
    249 F. Supp. 3d 645 (E.D.N.Y. 2017) ..........................................31, 32

## Statutes and Rules

17 U.S.C. § 106 ...................................................................................31

17 U.S.C. § 202 .............................................................................30, 36

28 U.S.C. § 1291 ..................................................................................1

Fed. R. Civ. P. 15(a)(2) ................................................................40

Fed. R. Civ. P. 56(a) ...................................................................17

Fed. R. Civ. P. 56(c)(1) ...............................................................25

Federal Rule of Evidence 801(d)(2) .............................................12

Federal Rule of Evidence 802(d)(2) .............................................24

Rule 12(b)(6) ...............................................................................33

Rule 15 ........................................................................................40

Rule 15(a) ....................................................................................40

Rule 56 ........................................................................................18

## Treatises and Commentary

Procedure on a Motion for Summary Judgment—Cross-motions, 10A
    Fed. Prac. & Proc. Civ. § 2720 § 2720 (4th ed.) ..............................18

3 Nimmer on Copyright, § 10.09 Transfer of Material Object and
    Effect on Copyright .....................................................................36

## I.  JURISDICTIONAL STATEMENT

The Plaintiff-Appellant Juan Catala d/b/a Majic Entertainment LLC d/b/a Adrawn Music Publishing ("Majic") has timely appealed the United States District Court for the Southern District of New York's (the "District Court") final order and judgment disposing of all its claims, creating final, appealable decisions as to the motions to dismiss and for summary judgment.  *See* SPA-85.  The District Court entered final judgment on September 20, 2023, and Majic filed a timely notice of appeal on September 29, 2023.  A-1091–1093.  This Court has subject matter jurisdiction over this appeal, which focuses on procedural matters and substantive breach-of-contract issues, pursuant to 28 U.S.C. § 1291.

## II.  STATEMENT OF THE ISSUES

1.  Whether the District Court erred in granting the cross-motion for summary judgment of Defendant-Appellee Hyuk Shin ("Shin") by placing the burden of Shin's motion upon Majic where genuine issues of material fact remained and by failing to even analyze some of the contract provisions relevant to Shin's breaches thereof.

2.  Whether the District Court erred in dismissing the breach of contract claims against Shin and limiting Majic's claims to the pre-2014 time period by misinterpreting the contract language and conflating the issue of Shin's obligation

1

to deliver the compositions with Majic's rights to enforce its due ownership interest in those compositions.

3.     Whether the District Court erred in dismissing the breach of contract claims against Defendants-Appellants The LA Reid Music Publishing Company LLC ("LA Reid"), EMI April Music Inc. ("EMI") and Sony/ATV Songs LLC ("Sony") (collectively, "Reid/EMI/Sony"), considering their failure to administrate the compositions for Majic as required by the contracts, and in light of Reid/EMI/Sony's settlement agreement with Shin to Majic's disadvantage.

## III.   <u>STATEMENT OF THE CASE</u>

This is an appeal from District Court Judge Paul G. Gardephe's judgment disposing of Majic's breach-of-contract claims through various decisions on motions to dismiss and for summary judgment, and for the District Court's denial of Majic's motion to amend.  *See Catala v. Joombas Co.*, 18 Civ. 8401 (PGG), 2019 WL 4803990, at *1 (S.D.N.Y. Sep. 23, 2019); *Catala v. Joombas Co.*, 18 Civ. 8401 (PGG), 2021 WL 2012379, at *1 (S.D.N.Y. May 20, 2021); *Catala v. Joombas Co. Ltd.*, 18 Civ. 8401 (PGG) (GWG), 2023 WL 6144635, at *1 (S.D.N.Y. Sep. 19, 2023).

Majic was a music publisher that identified musical talent, including composers of song music and song lyrics.  SPA-2; A-715:25-716:6.  Once Majic located musical talent, Majic proposed entering a publishing contract with that

2

talent, offering a lump sum in exchange for the exclusive right to publish or co-publish the talent's musical works and the assignment of partial ownership rights in those compositions. A-765:3-5. Once Majic secured that exclusive right to publish the works and an ownership interest in the same, Majic would partner with larger publishers and record labels to promote the talent and administer the music placements and collections thereof. A-685:4-10, 64A-715:8-13. In other words, Majic helped promote new music composers (whether writers of the music itself or of lyrics) to larger co-publishers and/or record labels. A-708 57:16-24.

## A. Contract 1

The above accurately describes Majic's relationship with Shin and Sean Hamilton (sometimes collectively, "Shin/Hamilton").[1] In 2009, Shin was a potential musical talent seeking an outlet to commercialize his works. A-699:9-10. In or around 2009, a mutual acquaintance introduced Shin to Majic as someone who could help Shin become known to larger co-publishers and record labels due to Majic's relationships in the music industry. A-695:16-22, A-699:9-10, A-701:2-5; SPA-52.

Majic entered into a publishing contract with Shin on April 1, 2009 ("Contract 1"). A-37–51; A-304:15-17, A-308:3-20, A-327:2-12; A-703:8–706:20. Pursuant

---

[1] At times, Majic will refer to Shin/Hamilton, as both were part of Contract 1 and Contract 2. However, in most instances, Majic focuses only on Shin because he breached the contracts and is the subject of this litigation and appeal. The exchangeability between these references does not make a difference in the facts or analysis.

to Contract 1, Majic paid Shin advances of future royalties, and Majic received an exclusive right to publish Shin's Interest[2] in Compositions.[3]  A-337:7-22; A-838:18–839:8.  Majic also became entitled to a fifty percent (50%) interest in all copyright ownership of and publishing income from Shin/Hamilton's Interest in the Compositions (the "50% Ownership Interest").  A-38, § 5(a) (Grant of Rights), § 6.  Contract 1 also states that Shin/Hamilton grant Majic the exclusive right to administer one hundred percent (100%) of their rights in any Compositions.  *Id.* at § 5(b).  The 50% Ownership Interest is at the heart of this appeal.

In other words, Contract 1 entitled Majic to exclusively publish and commercialize all of Shin and Hamilton's Compositions, and transferred to Majic 50% of Shin/Hamilton's ownership interest in the Compositions.  In context, if a Composition was used by a performer and/or became a hit song, both Majic, on the one hand, and Shin/Hamilton, on the other, would profit in equal shares after deductions of specified costs and expenses.

---

[2] Shin's Interest is defined in Contract 1 as "Your Interest," which means "the percentage interest in a Composition resulting from your authorship and/or ownership of rights in that Composition."

[3] "Compositions" is defined in Contract 1 as "(a) all musical compositions (or portions thereof or interests therein) written by you prior to or during the Term and (b) any and all other compositions written by you **and/or acquired by you or your Affiliate** during the Term."  (Emphasis added.)

Contract 1 also covered the logistics of how the publishing arrangement with Majic would work. When Shin or his Affiliate(s) (as defined in Contract 1) authored or otherwise acquired an ownership interest in a Composition, Shin was required to (1) assign the 50% Ownership Interest in such Composition to Majic and (2) "Deliver[ ]"[4] (as defined in Contract 1) that Composition to Majic (the "Original Delivery Obligation"). *See* A-37, A-38–39, A-41–42, §§ 5, 6, 11. Majic would then attempt to exploit that Composition through other co-publishers and/or record labels, such as Reid/EMI/Sony.

### B.    Contract 2

On May 1, 2009, Reid/EMI/Sony entered the picture through a new contract ("Contract 2"), one month after Contract 1. *See* A-52–71. Contract 2 was between Reid/EMI/Sony and Majic, but Shin/Hamilton also signed it via the Writer's Inducement—at this point, Shin/Hamilton became bound to the terms of Contract 1 and Contract 2. A-66. Contract 2 amended Contract 1 in some respects to add Reid/EMI/Sony as Majic's co-publishers regarding Compositions authored or acquired by Shin/Hamilton. *See* A-42–43, § 13(a). The intention of the parties, as stated in Contract 1, was for the terms of Contract 1 and Contract 2 to be coterminous and concurrent. *Id.*

---

[4] Contract 1 defines "Delivery" or "Delivered," in relevant part, as "actual receipt by Publisher [Majic] at EMI Music Publishing 75 9th Avenue, 4th Floor, New York, New York 10011, of all of the following…" *See* A-41–42, § 12(c).

Under Contract 2, the Contract 1 Original Delivery Obligation remained the same, except that Majic was now obligated to deliver the Compositions that he received from Shin to Reid/EMI/Sony. *See* A-52, A-53. Additionally, to the extent that Majic successfully commercialized a Composition, Contract 2 provided that those Compositions would be exclusively administered by Reid/EMI/Sony rather than Majic. A-54–55 at § 5(b). Reid/EMI/Sony would oversee the distribution of the Compositions to consumers through any media, such as the internet, radio, television, live performances, etc., and would further count and collect the appropriate amount of money owed for the number of times a Composition was played or performed. A-686:7-12. Those funds would be collected directly by Reid/EMI/Sony. *Id.* Periodically, Reid/EMI/Sony were required to disburse those funds to Majic, after keeping twenty-five percent (25%) of the revenue for Reid/EMI/Sony in exchange for its administration services. A-718:24-25, A-764:2, A-936:18-19. Majic was then required to share 50% of the revenue it received from Reid/EMI/Sony with Shin/Hamilton, per § 6 of Contract 1 (Reid/EMI/Sony's disbursement to Majic, and Majic's subsequent disbursement to Shin, the "Original Revenue Disbursement Obligations"). A-39.

## C. Contract 3

On January 1, 2014, the parties entered into a third contract, which modified "certain provisions" of Contract 2, and, in turn, Contract 1 ("Contract 3"). *See* A-

72–73, § 1.  Contract 3 did not, however, modify in any way the 50% Ownership Interest of Majic in Compositions set forth in Contract 1.  Contract 3 only added additional delivery obligations and changed the way that disbursements were made to the parties.

Specifically, Contract 3 modified the Original Delivery Obligation.  *See* A-73, § 2.  Instead of requiring Shin to deliver Compositions only to Majic, Contract 3 required Shin to also physically deliver the Compositions directly to Reid/EMI/Sony (the "Modified Delivery Obligation").  *Id.*  Contract 3 did not eliminate Contract 2's obligation that Majic deliver the Compositions from Shin to Reid/EMI/Sony.  *Id.* Even if it did, Contract 3 **did not amend or change** Majic's entitlement and right to the 50% Ownership Interest.

Contract 3 also modified the Original Revenue Disbursement Obligations.  A-75–76 at § 6.  Instead of requiring Reid/EMI/Sony to first disburse funds to Majic, who would then disburse 50% of what it received to Shin, Contract 3 required Reid/EMI/Sony to take its 25% share and disburse 50% of the remainder (37.5% of the original total) directly to Shin/Hamilton, with the remaining 50% (again, the final 37.5% of the total) disbursed directly to Majic (the "Modified Revenue Disbursement Obligations").  *Id.*

The Modified Delivery Obligation and the Modified Revenue Disbursement Obligations arising from Contract 3 did not impact the 50% Ownership Interest owed

to Majic in any way. Contract 1 was always intended to remain in full force and effect, except as logistically modified by Contract 2 and, later, Contract 3. Contract 3 also contains a preservation clause for the provisions of Contracts 1 and 2 not mentioned therein, and it states that, "[u]nless specifically provided to the contrary below, all capitalized terms used but not otherwise defined in this Modification shall have the meanings ascribed to them in the Agreement [Contract 2]." *See* A-72. The 50% Ownership Interest term of Contract 1 is not addressed in Contract 3.

In sum, Contract 1, §§ 5 and 6, deals with the transfer of ***ownership and interest*** to Majic as to the Compositions. Then, Contract 1, in conjunction with Contract 2, deals with ***Delivery of Compositions*** to Majic, and then to Reid/EMI/Sony, as defined in § 12 of Contract 1 and § 11 of Contract 2. Thereafter, § 2 of Contract 3 modified the obligation regarding Delivery of Compositions to Majic by amending the administrative task of physical Delivery to also include Shin's obligation to Reid/EMI/Sony. Although Contract 3 also changed the disbursement of royalty payments to each Majic and Shin directly rather than to Majic (for further distribution of Shin's share to Shin), it **did not** modify the assignment and transfer of the 50% Ownership Interest in the Compositions to Majic, as Contract 3 is silent on this point. Therefore, Shin continued to transfer and assign a 50% Ownership Interest in **all Compositions** to Majic under Contract 1, § 5, at all relevant times through and including the present day, and such obligation

was not amended or modified by Contract 2 and/or Contract 3.[5]  This lawsuit is about

Majic's attempt to enforce that contractual 50% Ownership Interest.

### D.  Shin's Breach Of Contract And Fraudulent Behavior

#### 1.  Shin Created A Publishing Company Called Joombas To Compete With Majic And Hide Interest In Compositions.

Shin began to hide his interest in Compositions by starting his own publishing

company and assigning interest in music he created to ghostwriters.  A-387:5-9; A-

727:3–733:11, A-621:7–628:10.  This allowed him to minimize and conceal his role

in Compositions in order to avoid sharing revenues from the success of those

Compositions with Majic.  A-772–773; A-941–944.

In July 2011, just two years after signing Contract 1, Shin co-founded a

company in Georgia and named the company, Joombas.[6]  A-383:19-23, A-952–963;

A-469 ¶ 6.   From 2011 through 2014, Shin owned and operated Joombas, which

constituted his Affiliate as defined in Contract 1 and Contract 2.  A-339:2-4, 5-9, A-

340:14- 21, A-341:7 10, A-350:1–353:11; A-515:15–516:9, A-551:11–553:12; A-

---

[5] Per the definition of "Composition" in Contract 1, all Compositions authored or acquired prior to or during the term of Contract 1 and, simultaneously, Contract 2 and Contract 3 as amendments and modifications of Contract 1, are subject to the 50% Ownership Interest; and, according to Contract 1, the Term is ongoing and obligations have not been fulfilled.  Contract 1, § 3.

[6] Joombas is composed of various entities, all of which, upon information and belief, were named as defendants in Majic's Complaint.  *See* Complaint at ¶¶ 2-5. (Joombas Co. LTD, Joombas Music Int'l, Joombas LLC, and Joombas Music Group, collectively, "Joombas").

609:24-25 (Shin owned Joombas); A-469–470 ¶6-11; A-42, § 12(e).  Shin was the

CEO of Joombas at all relevant times to the Complaint.  A-330:12-13.

> **2.**    **Shin Signed Writers And Acquired Interests In Compositions, Yet Never Shared The True 50% Ownership Interest In Compositions Signed By Joombas With Majic, As Required By Contract 1.**

Through Joombas, Shin, acting in the same capacity as Majic, signed

publishing deals with a large number of writers of musical Compositions (as defined

in Contract 1), including Edward Ross Lara.  A-515:15–516:9, A-551:11–553:12.

A-368:24–369:1.  Shin never accurately reported, or registered, or otherwise

assigned and/or transferred the true 50% Ownership Interest in these Compositions

to Majic, as required under the Contracts, or to Reid/EMI/Sony.  A-332:24–333:2,

A-334:6 19, A-387:18-22; A-387:24–388:3; A-771:6-9.  Instead, Shin began to place

large portions of his copyright ownership, publishing and administration interests in

these numerous, if not dozens or hundreds, of Compositions in the name of

ghostwriter Daniel Kim, also known as Hyeong Kyi Kim.  A-387:5-9; A-727:3–

733:11, A-621:7–628:10.  Shin never reported to Majic or Reid/EMI/Sony that,

beginning in 2011, Daniel Kim and others were assigned large portions of Shin's

copyright ownership and publishing interest in Compositions.  A-387:18-22.

Daniel Kim did not write, produce, compose or contribute any copyrightable

expression in these Compositions.  *See, e.g.*, A-389:22–390:10; A-627: 10-21.  In

order to avoid paying the royalties that he owed to Majic under Contract 1, Shin

placed a large interest in Compositions with his childhood friend, Daniel Kim, who was not under contract with Majic. A-343:14-20; A-627:10-21.

As one example, Shin wrote both the lyrics and music for a song called Dream Girl and only claimed ownership of two percent (2%) of the copyright interest in the song. A-521:9-17. Edward Ross Lara, who contributed copyrightable expression to the song, could not explain why Shin's share was as low as 2%. A-521:18-23. Lara asserted Shin's share "should have been more" than 2%. A-522:6-7. This pattern played out across dozens of other songs with Shin only taking a small interest (*i.e.*, 2%) when others familiar with those works testified Shin's interest should have been twenty to thirty percent (20-30%) or more. A-620:20–621:20.

Shin was employed and paid by Joombas for his services to Joombas, namely acquiring musical compositions starting in 2011. A-383:19-25, A-354:15-25; A-474 ¶ 27. Shin received at least sixty percent (60%) of the revenue that Joombas earned from acquiring, administering, and publishing musical Compositions. A-355:1–357:11. In breach of the three contracts, Shin never reported or paid to Majic or Reid/EMI/Sony any of the interest or income Shin received from authoring or acquiring musical Compositions through Joombas between 2011 and 2014 (the "Joombas Owned Compositions," which shall refer to all Compositions authored or acquired by Joombas as an affiliate of Shin). A-387:24–388:3; A-771:6-9.

Majic has suffered no less than $650,000 in damages as a result of Shin's breaches.  A-457–466.

> **3.      Shin <u>Admitted</u> To Breaching Contract 1 And That He Hid His Interest In Compositions By Assigning Shares To Ghostwriters And Not Reporting His True Interest In The Compositions To Majic.**

In or around January 2017, Shin confessed that he breached Contracts 1, 2, and 3 to Majic and Reid/EMI/Sony representatives in New York City at Sony's office building.  A-772:14-15, A-776–777, A-778, A-921:12-14.  Shin and his former manager, Denny Marte, who was present as well, stated that they "wanted to come clean and make everything right."  A-729–730.  Shin admitted that he did not want to share revenues with Majic from songs Shin authored.  A-772–773; A-941–944.  Shin was also motivated to admit his misdeeds to Majic in order to try and grow Joombas, which would require Shin to cleanse himself of the cloud of distrust following him in the industry.[7]  A-941–944.

Shin recognizes that Contract 1 covered "all compositions…which Shin writes or acquires…."  A-327.  Shin admitted to Majic that he, nevertheless, had

---

[7] Per Federal Rule of Evidence 801(d)(2), an admission by a party opponent is not hearsay and qualifies as admissible testimony.  *See United States v. Marin*, 669 F.2d 73, 84 (2d Cir.1982); *see also U.S. Information Sys. v. Int'l Bhd. of Electrical Wkrs*, 00 Civ. 4763 (RMB)(JCF), 31 (S.D.N.Y. Aug. 1, 2006) (deposition transcript admissible where declarant-employee's remarks to deponent are admissions of a party opponent under Fed.R.Evid. 801(d)(2), and deponent's testimony is based on his personal knowledge).

been putting songs under other names to avoid paying money to Majic under Contract 1.  A-776–777.  That allowed Shin's ghostwriter(s) to collect money otherwise owed to Majic and funnel the money back to Shin.  A-726–727.  By way of illustration, a Composition with 2% being reported to Majic is different than 50% of the Composition being reported, if Shin's actual percentage or split on a song should have been 50% (or at least something greater than, say, 2%).  A-735–738.

This is not abstract – Shin explained at his deposition exactly how this worked.  Shin admitted that, in 2011, he began having Daniel Kim claim large portions of ***Shin's own Interest*** in Compositions.  A-387–388.  Those portions claimed by Kim were often "far greater" than Shin's portions, even though Kim did not make creative contributions to those Compositions.  A-407–409.  Shin also admitted that he never reported to Majic or Reid/EMI/Sony that Kim was claiming large portions of ***Shin's own Interest*** in Compositions.  *Id.*  Additionally, Shin admitted he never otherwise paid any of the income he received from Joombas to Majic or Reid/EMI/Sony.  *Id.*

In sum, the issue in this appeal is not the Delivery of Compositions to Majic.  The breach occurred prior to the time of Delivery under Contract 1.  A-727–728.  The breach was that Shin created music and put that music in someone else's name in order to hide revenue from Majic, which Majic was entitled to under the Contracts.  A-726–727.

4.     **The Record Reflects Shin's Reputation In The Music Industry Of Dishonesty And Of Hiding Interest In Compositions.**

Multiple other individuals have accused Shin of dishonesty and breach of contractual obligations. A-617:3-7; A-618:8-12; A-620:7-19. These other allegations of dishonesty similarly involved Shin hiding ownership interests and income from business partners. A-617:14-20. Shin continuously employed ghostwriters to hide his Interest and income in Compositions by assigning large shares of the ownership rights in music compositions to the ghostwriters and only small shares to himself, with his ownership share being much smaller than it should be based on industry standard and convention. A-620, A-613–618; A-621:1-20.[8] This type of conduct was explicitly prohibited by §§ 9(b) and 14(c) of Contract 1. A-40–41, A-43.

The uncovering of Shin's schemes by Majic led to the 2017 Tolling Agreement regarding Majic's breach of contract claims against Shin for failing to

---

[8] The testimony from the Gaines deposition reveals the following: "The additional name was that so Shin could give a . . . greater percentage of his share under that particular writer's name who he used. He would take the lesser." A-622:12-16. "If Shin's percentage of a song was twenty-five percent [25%], he may collect under his name…two percent and put the other twenty-three [23%] percent under another person's name who is not actually part of the song." A-622:18-24. "This putting a percentage in a third person's name is a method of avoiding paying a royalty or having royalties collected by his own publisher." A-624:20-25; A-625:1-6. Shin admitted this to Nathan Gaines. A-625:7-12, 15-17. Dealing with Shin "wasn't fair. It wasn't fair and he was not an honest person in my personal opinion." A-621:16-20.

deliver the acquired compositions and income derived therefrom; then, to a settlement between Reid/EMI/Sony and Shin in 2018 (the "2018 Settlement Agreement") that fully preserved Majic's rights under the Contracts and removed the coterminous provisions thereof; and, ultimately, to Majic's present lawsuit. *See* A-95; A-179–180, § 4.1; A-25–36.

### E. Reid/EMI/Sony And Shin/Hamilton's Settlement Agreement And Majic' Lawsuit Against Reid/EMI/Sony, Shin, And Joombas

On September 14, 2018, Majic filed the Complaint against Shin, Joombas, and Reid/EMI/Sony for breach of contract, among other claims. *See* A-25–97. All defendants moved to dismiss the Complaint. *See* SPA-1–30. On September 23, 2019, the District Court granted the motions to dismiss in all respects, except as to Contract 1's breach of contract claim against Shin. *Id.* On May 20, 2021, the District Court also denied Majic's motion for reconsideration and to amend the Complaint. *See* SPA-31–49. After discovery, Majic and Shin submitted cross-motions for summary judgment. On September 19, 2023, the District Court denied Majic's motion, and, inexplicably, automatically granted Shin's motion for summary judgment. *See* SPA-50–84.

This appeal followed. On January 26, 2024, the parties convened for mediation, but it did not lead to any successful resolutions. Accordingly, Majic hereby continues to press its appeal.

15

## IV.   SUMMARY OF THE ARGUMENT

The crux of Majic's claims lies on Shin's failure to report all of his and his Affiliates' Interest in Compositions subject to the contracts between him and Majic, as well as Shin's failure to pay the monies due to Majic from Shin's true, full and correct Interest in the Compositions.  A-30 at ¶¶ 39, 45, 50-51.  The District Court erred procedurally and substantively in its (1) grants of the motions to dismiss claims against Shin and Reid/EMI/Sony, (2) denial of Majic's motion to amend, and (3) ruling on the cross-motions for summary judgment.  *See* SPA-1–30, SPA-31–49, SPA-50–84.

The District Court failed to correctly apply the standards and burdens of proof on each summary judgment motion, and it also misinterpreted contractual language, ignored allegations in the Complaint and evidence presented by Majic, and confused some terms and issues.  For these reasons, the District Court's decisions should be reversed, and the case remanded for further proceedings.

## V.   ARGUMENT

### A.   The District Court Erred In Granting Shin's Cross-Motion For Summary Judgment.

#### 1.   Standard of Review

This Court "review[s] de novo a district court's ruling on cross-motions for summary judgment, *in each case* construing the evidence in the light most favorable to the non-moving party."  *Two Farms Inc. v. Greenwich Ins. Co.*, 628 F. App'x 802,

804 (2d Cir. 2015) (emphasis added) (quoting *Ackerson v. City of White Plains*, 702 F.3d 15, 19 n.1 (2d Cir. 2012) (per curiam)). "Summary judgment is appropriate where 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). Further, summary judgment is a <u>drastic remedy</u>. *See Kandt v. Taser Int'l, Inc.*, 527 F. App'x 51, 53 (2d Cir. 2013).

On a motion for summary judgment, "[t]he burden is on the *moving party* 'to demonstrate the absence of any material factual issue genuinely in dispute.'" *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 313 (2d Cir. 1981) (emphasis added) (quoting *Am. Int'l Group, Inc. v. London Am. Int'l Corp.*, 664 F.2d 348 (2d Cir. 1981)). "In determining whether or not there is a genuine factual issue, the court should resolve all ambiguities and draw all reasonable inferences against the moving party." *Id.*; *see also Barenboim v. Starbucks Corp.*, 698 F.3d 104, 108 (2d Cir. 2012); *Ass'n of Int'l Auto. Mfrs., Inc. v. Abrams*, 84 F.3d 602, 611 (2d Cir. 1996).

"[T]he fact that both sides have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other." *Id.*; *see also Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir. 1975). "Rather, the court must evaluate each party's motion on its own merits, *taking care in each instance* to draw all reasonable inferences against the party whose motion is under consideration." *Schwabenbauer*, 667 F.2d at 314 (emphasis added). Indeed,

> [t]he fact that one party fails to satisfy that burden on his own Rule 56 motion does not automatically indicate that the opposing party has satisfied its burden and should be granted summary judgment on the other motion. The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.

§ 2720 Procedure on a Motion for Summary Judgment—Cross-motions, 10A Fed. Prac. & Proc. Civ. § 2720 (4th ed.); *see also Rothenberg v. Chem. Bank N. Y. Tr. Co.*, 400 F. Supp. 1299 (S.D.N.Y. 1975) ("The mere fact that plaintiff has failed to meet his burden of proof on his motion for summary judgment does not entitle the defendant to judgment on its motion for summary judgment.").

### 2. The District Court Failed To Properly Consider Whether Shin Breached Sections 9(b) And 14(c) Of Contract 1.

The District Court erred by failing to analyze and determine whether Shin's competition with Majic through Joombas breached Contract 1, §§ 9(b) and 14(c).[9] Section 9(b) prevents Shin from competing with Majic directly or through another entity. A-49–41. Section 14(c) prohibits Shin from assigning any rights under Contract 1 to any other party without Majic's consent. A-43.

This appears to have been an inadvertent oversight by the District Court. The District Court initially correctly identifies sections 9(b) and 14(c) as Contract 1

---

[9] Sections 9(b) and 14(c) of Contract remained in effect throughout Contract 2 and Contract 3.

provisions that are key to this dispute. SPA-55. The District Court, however, <u>never even reaches</u> an analysis of these relevant provisions raised by the parties, and does not otherwise explain why they are not relevant.

Section 9(b) states, in relevant part, that

> During the Term (i) ***you will not*** enter into any agreement which would ***interfere with the full and prompt performance of your obligations hereunder***, (ii) ***you will not perform or render any services for the purposes of writing musical compositions either directly or indirectly for any person or entity other than Publisher and (iii) you will not enter into my [sic] agreement with respect to any Composition(s) or rights with respect thereto***. Without limitation of the foregoing, at no time during the Term or Retention Period will you grant to any record company or others any license whatsoever with respect to any Composition, including any so-called "mechanical license" for Record use.

A-40–41, § 9(b) (the "Noncompete Provision") (emphasis added). Section 14(c) then states, in pertinent part, that,

> <u>Assignment</u>: You may not assign this Agreement, or any of your rights hereunder, or any of your rights or interests with respect to the Compositions, without the prior written consent of Publisher.

A-43.

Here, Shin competed with Majic through Joombas. There is at least a genuine issue of material fact as to whether Joombas is an Affiliate of Shin's. *See infra*, (V)(A)(3)(b). Through Joombas, Shin signed publishing deals with a large number of writers of musical Compositions, including Edward Ross Lara, and/or dozens of

other composers of music. A-515:15–516:9, A-551:11–553:12. A-368:24–369:1, A-375–382 (covering numerous artists). As a result, there is also at least a genuine issue of material fact (if not a certainty) as to whether Shin undertook to "interfere with the full and prompt performance of [his] obligations" under Contract 1 and/or to "perform or render any services for the purposes of writing musician compositions…for any person or entity other than" Majic by writing music for and publishing writers and music through Joombas, thus breaching the Noncompete Provision. *See* A-40–41, §9(b). And, for good measure, the § 14(c) "Assignment" provision leaves no doubt that Shin was unable (without breaching Contract 1) to assign any part of his rights under Contract 1 to Joombas, Daniel Kim, or anyone else. *See* A-43, §14(c).

As a result, there is a genuine issue of material fact as to whether Shin breached the Noncompete Provision which should be a question of fact for the jury. The District Court's grant of Shin's cross-motion should be reversed on this ground alone.

### 3. The District Court Failed To Resolve All Ambiguities And Draw All Reasonable Inferences Against Shin On His Cross-Motion For Summary Judgment.

#### a. The District Court Failed To Analyze Shin's Cross-Motion For Summary Judgment Separately And To Place The Burden Of His Motion On Him.

The District Court wrongfully granted Shin's motion for summary judgment as a matter of substantive law, as set forth *infra*. It also improperly granted his motion as a matter of process.

In its September 19, 2023 Memorandum Opinion and Order ("MSJ Opinion"), the District Court failed to properly and independently address and analyze Shin's cross-motion for summary judgment as follows:

- The District Court failed to provide any specific bases or grounds for granting Shin's motion;

- The District Court placed the burden of proof entirely on Majic and failed to draw all (or any) inferences in his favor as the non-movant (Majic) in connection with the separate analysis of Shin's motion;

- The District Court engaged in the weighing of evidence, which is a task for the jury; and

- The District Court wholly ignored admissible evidence offered by Majic that created a genuine issue of material fact in the face of Shin's motion.

Accordingly, the District Court's decision is procedurally deficient and should therefore be reversed and the case remanded for a new review of Shin's cross-motion.

Specifically, the District Court failed to "evaluate *each* party's motion on its *own merits*, taking care in each instance to *draw all reasonable inferences against the party whose motion is under consideration*." *Schwabenbauer*, 667 F.2d at 314 (emphasis added); *see also Barenboim*, 698 F.3d at 108 (explaining that on a cross-motion for summary judgment, the court must construe the evidence against the cross-movant). Instead, the District Court analyzed **only** Majic's motion for summary judgment, while failing to provide ***any analysis*** or basis for ***granting*** Shin's motion. Not only that, but the District Court placed the burden of both motions for summary judgment on Majic and apparently drew ***no inferences*** in favor of Majic when deciding Shin's cross motion. While the District Court provided reasons to deny Majic's motion because it allegedly failed to provide sufficient evidence to meet its high burden on summary judgment, the District Court placed that same burden of proof on Majic in its decision to grant Shin's motion when, instead, the District Court should have employed an analysis drawing all reasonable inferences in Majic's favor upon Shin's motion.

22

In the MSJ Opinion, the District Court drew inferences in Shin's favor upon his own cross-motion for summary judgment at least fifteen (15) times. Some instances of these inferences include the following:

- "Plaintiff has not demonstrated as a matter of law that any Joombas entity other than Joombas Music Group employs Shin, or that Shin controls any Joombas entity." (SPA-77)

- "In sum, from Shin's deposition, his relationship to the Joombas entities named in the Complaint is not clear." (SPA-77)

- "Plaintiff has not proffered evidence concerning these allegations sufficient to create a material issue of fact as to whether Shin breached his obligations under Contract 1." (SPA-78)

- "All of Catala's testimony about Shin's alleged breach is entirely speculative, however." (SPA-79)

- "In short, there is a complete failure of proof as to Plaintiff's claim that Shin and his Affiliates 'didn't deliver the accurate amount of ownership of a song.'" (SPA-79)

- "None of [Plaintiff's] exhibits shows an interest held by Shin or a Shin Affiliate in any composition that Defendant was required to – but did not – deliver to Majic or Sony under Contract 1, however." (SPA-80)

- "Plaintiff has not offered evidence that (1) Shin or any Joombas entity had 'authorship or ownership rights' in these compositions as of the registration dates shown, or (2) what percentage interest Shin or any Joombas entity had that resulted from those 'authorship and/or ownership rights.'" (SPA-80)

- "In support of his breach claim, Plaintiff also cites to deposition testimony taken during discovery, but none of this testimony demonstrates that Shin or his Affiliates failed to deliver any interest in any composition as was required under Contract 1." (SPA-81)

- "Plaintiff further cites to his own testimony in which he claims – in a speculative and conclusory manner – that 'Shin fraudulently placed music compositions in other people's names.'" (SPA-82)

In turn, the District Court considered Majic's testimony to be "entirely speculative" to grant its motion for summary judgment, while there was other corroborating testimony and evidence that the District Court chose to ignore, including Shin's own admissions, which are admissible evidence under Federal Rule of Evidence 802(d)(2).  It is impossible to fathom how the District Court came to this conclusion in the face of other evidence and deposition testimony from Lara and Gaines testifying to exactly the facts and circumstances that the District Court claims there was no evidence of.

Simply put, the District Court held that Majic failed to offer sufficient evidence to support his own motion. SPA-83. But on Shin's cross-motion, it was his burden to show an absence of genuine issues of material fact, which he could do by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

Nothing in the MSJ Opinion suggests that the District Court analyzed whether Shin met his burden to show an <u>absence of genuine issues</u> of material fact. SPA-74–83. To the contrary, the District Court focused on Majic's burden to present sufficient evidence as to each essential element of his claims. So much so that the end of the District Court's analysis states,

> [h]ere, it is an essential element of Plaintiff's breach of contract claim that Shin or a Shin Affiliate failed to deliver an authorship or ownership interest in a Composition that Shin or a Shin Affiliate was required to deliver under Contract 1. Because Plaintiff has not offered evidence that creates a material issue of material fact as to this 'essential element,' Plaintiff's motion for summary judgment will be denied, ***and Shin's motion for summary judgment will be granted***.

25

SPA-83 (emphasis added).

Contrary to the District Court's decision, however, Majic presented sufficient admissible evidence, which, even if not enough to power Majic's own motion to success, was at least sufficient to create a genuine issue of material fact and prevent Shin's motion from being granted.  The District Court ignored this evidence and weighed all evidence in Shin's favor, despite the burden of Shin's motion being that all inferences should be drawn in the light most favorable to the non-movant—here, Majic.  Even if, upon cross motions for summary judgment, the District Court is not required to deliver two separate decisions and is permitted to address the same issues together, the District Court is nevertheless required to apply the correct burden and standard of review upon each motion for summary judgment as if they were independent.

For this reason alone, the decision to grant summary judgment for Shin must be reversed and remanded so that Shin's motion can be independently evaluated and decided.

> **b.    There Is A Genuine Issue Of Material Fact As To Whether The Joombas Entities Were Shin's Affiliates.**

The District Court erred as a matter of law by holding that Joombas was not an "Affiliate" of Shin under Contract 1.  The District Court held that "Plaintiff has not demonstrated as a matter of law that any Joombas entity other than Joombas Music Group employs Shin, ***or that Shin controls any Joombas entity***."  SPA-77

(emphasis added). Even if that were so, it does not support the District Court's conclusion that Joombas was <u>not</u> an Affiliate as a matter of law.

Contract 1 defines "Affiliate" in section 12(e) as:

> any Person which you [Shin] own or in which you have an interest, in whole or in part, or which you employ or which ***employs you***, ***and/or*** any Person, the ***operation of which is controlled*** directly or indirectly ***by you***.[10]

A-42 (emphasis added). The District Court itself found in the MTD Opinion that Shin was the CEO of Joombas, and Shin himself admitted to that fact. SPA-76; A-330:12-13. The District Court appears to have ignored its own finding and this clear admission among other evidence. If Shin was the CEO of Joombas, it necessarily follows that Joombas employed Shin. That fact alone makes Joombas an "Affiliate" of Shin under Contract 1.

Yet, the District Court ultimately held that Majic "had not demonstrated as a matter of law that any Joombas entity other than Joombas Music Group employs Shin, or that Shin controls any Joombas entity." SPA-77. Any uncertainty raised by the District Court as to the different Joombas entities is a red herring, however. Shin admitted that there were at least two Joombas corporate entities. Both Joombas Korea and Joombas USA engaged in the publishing and administration of music written by Shin and others. A-352:1-3. These entities are all related and Shin

---

[10] The definition of "Affiliate" in Contract 2, § 11(c), is virtually identical to the definition in Contract 1, and Contract 3 does not modify this definition.

admitted that there was no corporate separation between the U.S. and Korean companies.  SPA-77; A-353:5-7.  Shin also stated that he "reach[ed] out [to artists] on behalf of Joombas as a whole, not a specific location or office."  A-353:7-8.  All of the individuals employed by or acting on behalf of Joombas acted in concert as a team, with Shin having substantial – if not dominant or even absolute – input on decisions made by and for both entities.   A-366:20–367:8.  The District Court appears to have incorrectly ignored all of the foregoing.

On Shin's cross motion for summary judgment, the District Court was required to review this evidence and draw any inferences in favor of Majic, as the non-moving party, when determining whether Shin was entitled to summary judgment on grounds that Joombas was not an Affiliate of Shin.  Because Shin was the CEO of a Joombas entity, was in charge of creative functions, participated in team decision-making about Joombas' business, and helped found Joombas, among other facts, the District Court erred in granting summary judgment to Shin on grounds that there was not sufficient evidence that Joombas was an Affiliate of Shin.  The evidence, however, shows quite the contrary: that there was at least a genuine issue of material fact as to whether Joombas was an Affiliate of Shin.[11]

---

[11] If anything, Majic has actually ***proven*** that there is no genuine issue of material fact that Joombas is, in fact, an Affiliate of Joombas, as argued in Majic's motion for summary judgment in the District Court.

        **c.**      **There Is A Genuine Issue of Material Fact As To Whether Joombas Had Any Ownership Rights In Compositions Because Shin Admitted That Joombas (Shin's Affiliate) Had Signed Dozens Of Writers To Publishing Deals Similar to Majic.**

The District Court erred as a matter of law by holding that Joombas did not have "any authorship or ownership rights" in the Joombas Owned Compositions. The District Court held that:

> "***Nothing*** in the exhibits cited by Plaintiff shows that Shin or any of his Affiliates [i.e., Joombas] had any authorship or ownership rights in the compositions referenced therein; what percentage interest Shin or his Affiliates held in those compositions, if any; whether any of these interests are subject to Contract 1; or whether any such interest was delivered to Majic or Sony."

SPA-81 (emphasis added).

The District Court's sweeping and categorical statements ("***Nothing*** . . . shows . . .") contradict its own acknowledgment in the immediately prior paragraph that there was in fact a list in the Record of numerous "other songwriters 'that Joombas had signed' or whose compositions Joombas 'published and administered,'" in other words, the Joombas Owned Compositions. *Id.* The District Court's statement also does not address other ample evidence in the record that Joombas did in fact have ownership rights in the Joombas Owned Compositions, and evidence that Shin took small interest in the songs while assigning large percentages to third-party ghostwriters to avoid reporting interests to Majic.

29

The Second Circuit recognizes that an *exclusive right* to publish music constitutes "ownership" under the Copyright Act, provided that the subject party has a legal or beneficial ownership or an exclusive license from the original copyright holder (*i.e.*, music composer). *See, e.g.*, *Creazioni Artistiche Musicali, S.r.l. v. Carlin Am., Inc.*, No. 14-CV-9270 (RJS), 2016 WL 7507757 at *2 (S.D.N.Y. Dec. 30, 2016). The Southern District of New York has held that, to have standing to sue for copyright infringement, a plaintiff must be "the legal or beneficial owner of an *exclusive right* under a copyright at the time of the alleged infringement." *Id.* (emphasis added). *Creazioni* involved claims for copyright infringement for the alleged reproduction and public distribution of recordings of a song popularized by the Muppets. *See also Hutson v. Notorious B.I.G., LLC*, No. 14-CV-2307 (RJS), 2015 WL 9450623 (S.D.N.Y. Dec. 22, 2015) (motion to dismiss granted where composers and exclusive publishers/distributors of song could not plausibly establish copyright ownership to a song sampled in a new recording). This Circuit has also held that a party could sue for copyright infringement not just due to its ownership of the copyright, but from its ownership of the accrued claims themselves which it purchased, along with the copyright. *See ABKCO Music, Inc. v. Harrisongs Music, Ltd*, 944 F.2d 971, 980 (2d Cir. 1991).

The Eastern District has also held that an exclusive right to publish music constitutes ownership under the Copyright Act:

30

> Although a copyright consists of 'a bundle of discrete exclusive rights,' (*N.Y. Times Co. v. Tasini*, 533 U.S. 483, 495–96, 121 S.Ct. 2381, 150 L.Ed.2d 500 (2001)); *see also* 17 U.S.C. § 106, this case only concerns plaintiffs' right to make and distribute phonorecords of their copyrighted musical works . . . A license granted by the copyright owner to another party to copy and distribute phonorecords containing a particular musical work is called a "mechanical license."

*Yesh Music, LLC v. Amazon.com, Inc.*, 249 F. Supp. 3d 645, 650 (E.D.N.Y. 2017).

Here, then, the key issue in determining whether Joombas had any authorship or ownership right is *whether Joombas held an exclusive right* from the original copyright holder. The District Court <u>never even addresses</u> this issue.

The Record, in turn, confirms that Joombas had an exclusive or other interest in the Joombas Owned Compositions that constitutes "ownership" under Second Circuit law. *See Simmons v. Stanberry*, 810 F.3d 114, 116 (2d Cir. 2016) (discussing how the distinction between exclusive licensee and owner of copyright was immaterial for enforcement purposes). Some of that evidence is already summarized by the District Court. SPA-81. Further, Shin himself personally signed publishing contracts on Joombas's behalf with dozens of song writers. A-341, A-352. In fact, he signed dozens of such writers to publishing contracts **with Joombas**. *Id.* For example, Shin admitted that "Joombas administer[ed] the publishing of Daniel Kim's songs." A-369:2-4. Shin admitted that he "believe[s]" that Joombas was an **<u>exclusive publisher</u>** of Daniel Kim's songs. A-369–370. There were numerous

other writers, including those named Kim Hansang (in 2012), Lemon (2013-14), Ki Bum Kim, Dae Hee Cho, M Ray, JJ Evans, Davey Nate, Dave Cook, John Major, Wonsuk Lee, Junsun Kim, Ross Lara, Brittana White, Jasemine Kearse, Sumi Kim, Hyeok Kown, and Hogon Kim. A-370–381. Shin admitted that Joombas served as a co-publisher and administrator for all of these and other writers, and an inference (which was owed to Majic) that these were all exclusive publishing arrangements, as was Daniel Kim's, would convey an ownership interest in these writers' Compositions to Joombas—more than sufficient to create a genuine issue of material fact as to Joombas' ownership.

It follows, then, in light of the foregoing and other similar evidence, that the District Court erred in holding that "***[n]othing*** in the exhibits…shows that Shin or any of his Affiliates had any authorship or ownership rights in the [third party] compositions referenced therein." SPA-81 (emphasis added). The exclusive right to publish Daniel Kim's songs (which were really Shin's songs) *alone* creates such an ownership interest. *See Creazioni*, 2016 WL 7507757 at *2. The exclusive right to publish songs is an even stronger ownership claim than the one set forth in *Yesh*, where ownership concerned only plaintiffs' right to make and distribute phonorecords of their copyrighted musical works. 249 F.Supp.3d at 650–51. Regarding the dozens of other writers signed to publishing deals with Joombas by Shin, in the absence of evidence to the contrary, Majic is at least entitled to an

*inference* that such deals were also exclusive. *See Schwabenbauer*, 667 F.2d at 313 ("In determining whether or not there is a genuine factual issue, the court should resolve all ambiguities and draw all reasonable inferences against the moving party."). In any event, Shin presented no evidence to the contrary entitling Shin to judgment as a matter of law.

Ultimately, even if Majic did not offer sufficient evidence to succeed on his own motion for summary judgment, there was at least sufficient admissible evidence to survive Shin's cross-motion for summary judgment.

### B. The District Court Erred In Limiting Majic's Breach Of Contract Claims To The Pre-2014 Time Period.

#### 1. Standard of Review

"This Court 'review[s] de novo the grant of a motion to dismiss under Rule 12(b)(6), accepting as true the factual allegations in the complaint and drawing all inferences in the plaintiff's favor.'" *See Mirkin v. Xoom Energy*, LLC, 931 F.3d 173, 176–77 (2d Cir. 2019) (quoting *Scutti Enters., LLC v. Park Place Entm't Corp.*, 322 F.3d 211, 214 (2d Cir. 2003)). "To survive a motion to dismiss, a plaintiff must allege 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)); *see also Erickson v. Pardus*, 551 U.S. 89, 93, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) ("Specific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which

it rests."). A motion to dismiss is not the time or forum for the District Court to make conclusions of fact. *See Richardson v. Edgewell Pers. Care, LLC*, No. 23-128, 2023 WL 7130940, at *2 (2d Cir. Oct. 30, 2023) ("We thus disagree with the district court's conclusion that no reasonable consumer could be misled by the labelling as a matter of law. Whether Richardson's allegations can be proved is a question to be determined on summary judgment or at trial.").

A contract must be interpreted according to its plain, unambiguous meaning. *See Reinhardt v. Wal-Mart Stores, Inc*., 547 F. Supp. 2d 346, 352 (S.D.N.Y. 2008) (in music copyright infringement action involving contract interpretation of a license, "[i]f the contract language is unambiguous and conveys a definite meaning, its interpretation is a question of law for the court."). Further, a contract is interpreted such that no parts of the contract are rendered meaningless or of no effect. *See Bourne v. Walt Disney Co*., 68 F.3d 621, 628–29 (2d Cir. 1995) ("The primary objective 'is to give effect to the intent of the [contracting] parties as revealed by the language they chose to use'").

### 2. The District Court Conflated Shin's Delivery Obligation With Majic's 50% Ownership Interest Rights.

This Court should reverse the District Court's decision on Shin's motion to dismiss ("MTD Opinion") that Majic's surviving breach of contract claims are limited to the pre-2014 time period. SPA-1–30. The District Court erred as a matter of law when it granted Shin's motion to dismiss in part, insofar as the District Court

34

limited Majic's breach of contract claims to those arising prior to 2014, based on language found in Contract 3. In essence, the District Court conflated the issue of the ***Original Delivery Obligation***, which was changed by Contract 3, with Majic's ***ownership and interest*** of or in Compositions (the 50% Ownership Interest), which was not changed by Contract 3. In fact, the District Court's own opinion confirms the Court's confusion and conflation of the two key issues, making contradictory statements that cannot be reconciled unless the Court made a mistake in reviewing and interpreting these contracts.[12]

Simply put, if Contract 3 was intended to terminate Majic's right to the 50% Ownership Interest, it would have said so. It did not. Therefore, Shin continued to owe the 50% Ownership Interest to Majic. The breach occurred <u>prior</u> to the time when Delivery would have occurred.

Ownership of the intellectual property rights in a work (such as songs), as well as the interest in income and royalties from publishing the songs, and the obligation to deliver the material copies of the work itself are separate and distinct concepts, both legally and based on industry standards. *See, e.g.*, *Artists Rts. Enf't Corp. v. Est. of King*, No. 16-CV-1121 (JPO), 2017 WL 2062988, at *3 (S.D.N.Y. May 15,

---

[12] Additionally, the 2018 Settlement Agreement between Shin and Reid/EMI/Sony terminating Contract 2 and Contract 3 as between themselves does not by its own express terms impact **in any way** the rights and obligations thereto as between Majic and Shin, on the one hand, and Majic and Reid/EMI/Sony, on the other.

2017) (Assignments of interest in royalties in songs have no relationship to the existence, scope, duration or identification of a copyright, nor to rights under a copyright); *see also McCarthy v. Stollman*, No. 06CIV2613DABDF, 2010 WL 11586609, at *7 (S.D.N.Y. Feb. 23, 2010). In *McCarthy*, the District Court distinguished between ownership of exclusive rights under a copyright versus transfer of the copyrighted work itself. 2010 WL 11586609, at *7. The District Court noted that, "[p]ursuant to [the Copyright Act, 17 U.S.C. § 202], even the transfer of an object such as a master recording, whose purpose is to produce copies, does not itself convey the [underlying] copyright." *Id*. In turn, 17 U.S.C. § 202 itself states that,

> [o]wnership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied. **Transfer of ownership of any <u>material object</u>, including the copy or phonorecord in which the work is first fixed, does not of itself convey any rights in the <u>copyrighted work</u> embodied in the object**; nor, in the absence of an agreement, does transfer of ownership of a copyright or of any exclusive rights under a copyright convey property rights in any material object.

(Emphasis added); *see also* 3 Nimmer on Copyright, § 10.09 Transfer of Material Object and Effect on Copyright ("transfer of a material object embodying a copyrighted work cannot in and of itself constitute a transfer of the ownership in such copyright"). In other words, ownership in copyright (and similarly interest in

36

publishing income flowing from such ownership) is a separate and distinct legal concept from the delivery of the copyrighted material itself.

Here, the District Court erred in holding that Majic's breach of contract claims were limited to pre-2014 conduct based on Contract 3. Majic's Complaint alleges that, under Contract 1, "Shin had a duty to provide the compositions and monies to Majic and failed to do so." A-30, ¶ 39. The Complaint alleges the same as to Contract 2. *Id.* ¶ 45. With respect to Contract 3, the Complaint alleges that "Shin. . . deprived Majic of substantial income" and that "Shin had a duty to . . . pay Majic . . . [and] failed to do so." *Id.* ¶¶ 50-51. The District Court focused on the fact that Shin was no longer required to deliver the Compositions solely to Majic pursuant to Contract 2 and Contract 3, while the Complaint alleged more than that. The Complaint alleged that Shin breached his contractual duty by acting to deprive Majic of the rights and related income he is entitled to under the Contracts from 2009 up through the present time.

Additionally, the District Court similarly did not interpret Contract 3 according to its plain, unambiguous meaning. Where Contract 3, § 2, modified the ministerial task of how and to whom Shin would ***deliver or transfer*** his Compositions, it did not modify the obligated transfer of ***ownership*** rights (the 50% Ownership Interest) from Shin to Majic, pursuant to Contract 1, § 5. Otherwise, according to the District Court, Contract 3 would have completely <u>ended</u> Majic's

relationship with Shin, which was clearly not Contract 3's intent. *See* A-72. Furthermore, the plain language in Contract 3 preserving Contract 1 except as modified by Contract 3 would be deemed irrelevant, which cannot stand under *Bourne*, 68 F.3d at 628–29. *Id.*

The District Court correctly identifies that Contract 3 modified "Delivery" or transfer obligations under Contracts 1 and 2. SPA-7, SPA-16. It also correctly states that Contract 3 modified how royalties for Compositions (under Contract 1) are paid out by Reid/EMI/Sony. SPA-8. It then identifies that, under Contract 3, "Shin no longer was required to deliver compositions to Majic; his obligation was to deliver the compositions to Reid." SPA-16. The MTD Opinion then inexplicably makes the leap that, based solely on the foregoing, Majic no longer had a claim as to ownership of and interest in Shin's Compositions (the 50% Ownership Interest) to the extent that Majic's claims "concerns conduct that took place after Contract 3 was executed in January 2014." SPA-16, SPA-17. In so doing, the Court completely ignores the presence of the 50% Ownership Interest transfer provisions of Contract 1 and the fact that Contract 3 did nothing to alter those provisions. This is a bridge too far.

As an illustration of the District Court's own confusion of the ownership and delivery concepts that continued throughout the case, the District Court, in its MSJ Opinion, on one hand stated that, "it is an essential element of Plaintiff's breach of

contract claim that Shin or a Shin Affiliate failed to ***deliver an authorship or ownership interest in a Composition*** that Shin or a Shin Affiliate was required to deliver under Contract 1." SPA-83 (emphasis added). This makes sense, and this is exactly what is at play here: Majic's ownership of and interest in the Compositions. Furthermore, the District Court itself acknowledged that "it is undisputed that, '[i]n 2011, Shin began to place large portions of his copyright, publishing and administration interest in musical compositions in the name of [Hyeong-Kyu] Kim.'" SPA-82. However, despite this, the District Court ultimately held that Shin did not owe an obligation to ***deliver*** the Compositions themselves to Majic under Contract 3, and consequently limited Majic's 50% Ownership Interest claims to the pre-2014 time period. SPA-19.

In its MTD Opinion, the District Court essentially determined that Shin no longer owed Majic the obligation of assigning his ***50% Ownership Interest*** in his Compositions following Contract 3. Nothing in Contract 3 suggests that such a conclusion should follow. Even if Shin no longer owed an obligation to Majic to physically deliver the Compositions themselves pursuant to Contract 3, which Majic does not concede,[13] Majic was still entitled to his 50% Ownership Interest, which

_____

[13] Contract 3 does not state that Shin no longer has a Delivery obligation to Majic; it merely states that Shin now has a Delivery obligation to Reid/EMI/Sony, while Majic similarly has the same obligation Delivery to Shin's Compositions to Reid/EMI/Sony. Contract 3, § 2.

39

Shin failed to assign and/or transfer through his evasive schemes. Therefore, the District Court's ruling in the MTD Opinion that Majic's claim of ownership interest in Shin's Compositions are barred beginning with the January 2014 signing of Contract 3 should be reversed.

> **3.** **The District Court Erred In Denying Majic's Motion to Amend When Majic's Claims Were Plausible And Any Deficiencies In The Pleading Could Have Been Cured Without Prejudice.**

Rule 15(a) provides that a party may amend its pleading with the "opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). "The court should freely give leave when justice so requires." *Id.*; *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec.*, LLC, 797 F.3d 160, 190 (2d Cir. 2015) (noting that Rule 15 sets forth a "liberal" standard). The "permissive standard" of Rule 15 "is consistent with [this Court's] 'strong preference for resolving disputes on the merits.'" *Williams v. Citigroup Inc.*, 659 F.3d 208, 212-13 (2d Cir. 2011) (quoting *New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005)).

The decision of whether to grant or deny leave to amend a complaint is within the discretion of the trial court. *See McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). Courts may "deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *Id.* "The party opposing the motion to amend bears the burden of showing futility, bad faith, undue delay or undue prejudice." *Regency Nyc, Inc. v. Atkinson*, No. 23-CV-5479, 2023

WL 7529791, at *2 (S.D.N.Y. Nov. 13, 2023) (citing *Perez v. Escobar Constr., Inc.*, 342 F.R.D. 378, 380 (S.D.N.Y. 2022)); *see also Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962) ("If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits.").

Here, the District Court abused its discretion by not permitting amendment and for prohibiting Majic from testing his claim on the actual merits by refining the Complaint allegations to conform more closely to the contract language. The Complaint's allegations and pleadings were sufficient to survive a motion to dismiss, but even if they were not, a simple amendment at that stage would have ameliorated any alleged deficiencies in the pleading language without any prejudice to the parties.

Additionally, the burden was on Shin and Reid/EMI/Sony to show that amendment would be futile or cause undue prejudice or delay, not on Majic. In fact, Majic presented a draft of an amended complaint with redlines to the District Court. The draft amended complaint added that Shin "failed to disclose and report song registrations . . . to Majic" and that his "breach . . . caused Plaintiff damages and lost income[.]" A-275, ¶¶ 42, 44. The draft of the amended complaint also incorporated additional facts as to Shin's breach of the contracts, such as "Shin composed, controlled and published songs with Edward Ross Lara while failing to disclose and

41

report subject songs and the related income to Plaintiff in violation of Contract 1." A-272, ¶ 16.

Given the Court's focus on the language in the original Complaint as to Shin's duty to <u>deliver</u> Compositions to Majic under Contract 3, Majic should have been allowed an amendment of the Complaint to clarify and cure any potential deficiencies in how the allegations of the Complaint were framed. The amendment would have removed the focus from the <u>Delivery</u> of Compositions to prevent further confusion on that issue versus the 50% Ownership Interest, and would have permitted the District Court to properly review the claims on their merits. Accordingly, this Court should reverse the District Court's decision denying Majic's motion to amend.

### C. The District Court Erred in Dismissing Majic's Claims Against Reid/EMI/Sony.

The District Court erred as a matter of law in dismissing Majic's claims against Reid/EMI/Sony.[14] In the Complaint, Majic alleged that, by settling with Shin and excluding Majic, Reid/EMI/Sony derived benefits from Shin that were derivative to obligations Shin owed to Majic. A-31, ¶ 61. The preservation of Majic's rights in the 2018 Settlement Agreement does not impact this conclusion.

---

[14] Majic hereby incorporates by reference the motion to dismiss standard *supra* in Section (B)(1) of the Argument.

In fact, even though this provision was added to the 2018 Settlement Agreement, Majic was still left in a position to lose leverage, bargaining power, and income. *Id.* at ¶ 63. Majic also alleged that this constituted a breach of the duty of good faith and fair dealing, bad faith, and/or unjust enrichment of Reid/EMI/Sony by settling to Majic's disadvantage. *Id.* at ¶¶ 61, 64. These plausible allegations were enough to withstand dismissal under *Twombly*.

As to the 2018 Settlement Agreement between Reid/EMI/Sony and Shin, that settlement arises from a dispute that Shin owed money to Reid/EMI/Sony that Reid/EMI/Sony would have otherwise earned for administering Compositions of Shin over the years. In other words, Reid/EMI/Sony were entitled to keep 25% of the revenues from commercialized Compositions in exchange for the administrative functions that Reid/EMI/Sony was to provide via Contracts 2 and 3. *See* A-54–55, § 5(b). Because Shin hid Compositions in the names of others, songs were commercialized and administered by other third parties, not Reid/EMI/Sony, thus depriving Reid/EMI/Sony of that revenue and, in turn, Majic. A-776–777. The 2018 Settlement Agreement purports to resolve the dispute over that missing 25% share that would have otherwise been due to Reid/EMI/Sony, as well as a buy-out to terminate Contract 2 and Contract 3. *See* A-179–180, §§ 3, 4; A-764:2.

In the event Majic's appeal of the rulings in favor of Shin are not successful, it would necessarily mean that Majic's only recourse would be against the funds that

Reid/EMI/Sony wrongfully obtained from Shin through the 2018 Settlement Agreement. Otherwise, Reid/EMI/Sony will have recovered funds from Shin to the exclusion of Majic, again, where their rights were derivative of Majic's rights in the first place. A-31 at ¶¶ 53-65. To this date, those benefits have not been shared with Majic. *Id.* at ¶¶ 61-65. Therefore, this Court should reverse the District Court's grant of Reid/EMI/Sony's motion to dismiss and remand this portion of the case for further proceedings.

## VI.     CONCLUSION

For the reasons set forth above, this Court should reverse the District Court's grant of the motions to dismiss (and/or the denial of Majic's motion to amend) and Shin's cross motion for summary judgment.

## **CERTIFICATE OF COMPLIANCE**

1)      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 10,409 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2)      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14-Point font.

February 27, 2024                    LOCKE LORD LLP

*/s/ Jeffrey S. Kramer*
Jeffrey S. Kramer
Brookfield Place
200 Vesey St., 20th Floor
New York, New York 10281-2101
Phone: (212) 415-8600
Fax: (646) 224-9598
jkramer@lockelord.com

*Attorneys for Appellant-Plaintiff Juan Catala, d/b/a Majic Entertainment LLC, d/b/a Adrawn Music Publishing*

# SPECIAL APPENDIX

i

# TABLE OF CONTENTS

**Page**

Order of the Honorable Paul G. Gardephe, U.S.D.J.,
    dated September 23, 2019, Appealed From .......... SPA-1

Memorandum Opinion of the Honorable Paul G.
    Gardephe, U.S.D.J., dated May 20, 2021 ............. SPA-31

Memorandum Opinion and Order of the Honorable
    Paul G. Gardephe, U.S.D.J., dated September 19,
    2023, and filed on September 20, 2023,
    Appealed From ...................................................... SPA-50

Judgment, dated September 20, 2023,
    Appealed From ...................................................... SPA-85

SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JUAN CATALA, d/b/a MAJIC ENTERTAINMENT LLC, d/b/a ADRAWN MUSIC PUBLISHING, | |
| Plaintiff, | **ORDER** |
| - against - | 18 Civ. 8401 (PGG) |
| JOOMBAS CO. LTD., JOOMBAS MUSIC INT'L, JOOMBAS LLC, JOOMBAS MUSIC GROUP, HYUK SHIN, THE LA REID MUSIC PUBLISHING COMPANY LLC, EMI APRIL MUSIC INC., and SONY/ATV SONGS LLC, | |
| Defendants. | |

PAUL G. GARDEPHE, U.S.D.J.:

Plaintiff Juan Catala, d/b/a Majic Entertainment LLC, d/b/a Adrawn Music

Publishing ("Majic") brings this action against songwriter Hyuk Shin and four companies that

Shin owns (Joombas Co. Ltd., Joombas Music International, Joombas LLC, and Joombas Music

Group, collectively, the "Joombas Defendants"), asserting claims for breach of contract, fraud,

tortious interference with contractual relations, violation of the Copyright Act, and for an

accounting.  Plaintiff also brings breach of contract and breach of fiduciary duty claims against

the LA Reid Music Publishing Company, LLC ("Reid"), EMI April Music Inc. ("EMI"), and

Sony/ATV Songs LLC ("Sony") (collectively, "Reid" or the "Reid Defendants").  (Cmplt. (Dkt.

No. 1))  Plaintiff's claims arise from a series of agreements between Plaintiff, Shin, the Joombas

Defendants, and the Reid Defendants – or combinations thereof – governing the rights to

compositions authored by Shin.

Shin, the Joombas Defendants, and the Reid Defendants have moved to dismiss.

For the reasons stated below, Shin's motion to dismiss will be granted in part and denied in part;

SPA-2

the Joombas Defendants' motion will be granted; and the Reid Defendants' motion will be granted.

## BACKGROUND[1]

### I.   FACTS

#### A.   Contracts 1 and 2:  The Co-Publishing Agreements

Plaintiff is a music publisher.  (Cmplt. (Dkt. No. 1) ¶ 1)  In April and May 2009, Plaintiff entered into two related co-publishing agreements.  In April 2009, Plaintiff entered into a contract with Defendant Shin, a singer and songwriter, and non-party Sean Hamilton ("Contract 1"), and in May 2009, with Defendants Reid and EMI ("Contract 2" or the "Reid Agreement").[2]  (Id. ¶¶ 10-11; Contract 1 (Dkt. No. 1-1); Contract 2 (Dkt. No. 1-2))

##### 1.   Contract 1:  The Majic-Shin Agreement

Contract 1 – which identifies Majic as "Publisher" and Shin, Hamilton, and their designees as "you" – is "an exclusive co-publishing and administration agreement . . . between you and Publisher."  (Contract 1 (Dkt. No. 1-1) at 1)  Contract 1 requires Shin to "[d]eliver to Publisher, for exclusive exploitation, all Compositions,"[3] and provides that "Publisher will be the exclusive co-publisher and exclusive administrator of all Compositions."  (Id. at 1)

---

[1]  The following facts are drawn from the Complaint and are presumed true for purposes of resolving Defendants' motion to dismiss.  See Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007).  "In assessing the legal sufficiency of [a plaintiff's] claim[s] [on a motion to dismiss,]" the court may "consider . . . the complaint and any documents attached thereto or incorporated by reference and 'documents upon which the complaint relies heavily.'"  Bldg. Indus. Elec. Contractors Ass'n v. City of N.Y., 678 F.3d 184, 187 (2d Cir.2012) (quoting In re Citigroup ERISA Litig., 662 F.3d 128, 135 (2d Cir.2011)) (internal quotation marks omitted).

[2]  Defendant Sony is not a signatory to either Contract 1 or Contract 2.

[3]  Contract 1 defines "Compositions" as "(a) all musical compositions . . . written by you prior to or during the Term [of Contract 1] and (b) any and all other compositions written by you and/or acquired by you or your Affiliates during the term [of Contract 1]."  (Id. at 1, ¶ 3)

Pursuant to Contract 1, "Publisher is granted 50% of the copyright" of each composition "written entirely by you."[4] (Id.) Contract 1 further provides that Shin "hereby sell[s], transfer[s] and assign[s] to Publisher . . . an undivided 50% interest in all of Your Interest in the Compositions, including without limitation in and to all copyrights therein . . . . It is the essence of this Agreement that Publisher acquire an undivided 50% interest in all of Your Interest in all Compositions." (Id. at 2, ¶ 5) Moreover, "it is the intent of the parties that Publisher . . . shall be the exclusive administrator of all rights in and to the Compositions and Publisher shall have . . . the broadest possible rights to administer one hundred percent (100%) of Your Interest in the Compositions and otherwise exploit the Compositions. Accordingly, with respect to Your Interest in the Compositions, Publisher . . . shall have the sole and exclusive right" to

> license the exploitation of the Compositions in all forms, media, technologies and configurations . . . ; print, publish, rent and/or sell printed editions and other reproductions of the Compositions . . . ; collect all monies whatsoever derived from exploitation of the Compositions, whenever earned; license public performance rights . . . ; make arrangements, adaptations and other changes; and otherwise administer and grant rights in, and with respect to, the Compositions to the fullest extent possible. In connection with the foregoing, you hereby appoint Publisher your true and lawful attorney to secure and renew copyrights, initiate and compromise infringement claims, and to execute in your name any and all documents reasonably necessary or desirable to accomplish the foregoing and/or effectuate Publisher's rights hereunder.

(Id.)

Contract 1 also requires Shin to "represent, warrant and covenant that," inter alia, Shin "ha[s] not entered into (and will not enter into) any agreement (including, without limitation, any license) which would interfere with any of the rights granted to Publisher pursuant to this Agreement"; and "will not perform or render any services for the purposes of

---

[4] Contract 1 terms such compositions "New Compositions" or "Full New Compositions." (Id.)

writing musical compositions either directly or indirectly for any person or entity other than

Publisher and . . . will not enter into [any] agreement with respect to any Compositions[] or

rights with respect thereto." (Id. at 4-5, ¶ 9)

Contract 1 contemplates a separate agreement – namely, Contract 2, "Publisher's

agreement (the 'Reid Agreement') with LA Reid Music Publishing Company, LLC and EMI

Music Publishing, Inc." (Id. at 1, ¶ 2)  Contract 1 provides that "[f]or purposes of clarity, the

Term of this Agreement shall be coterminous with the term of the Reid Agreement." (Id.)

Contract 1 also sets out the structure for royalty payments among Majic, Shin, and

Reid.  Contract 1 contemplates Majic's receipt of royalties from Reid pursuant to Contract 2, and

provides that "[f]rom all royalties actually received by Publisher from Reid under the Reid

Agreement [Contract 2] from the exploitation of Compositions throughout the world . . .,

Publisher shall," after making certain deductions, "pay to you an amount equal to fifty percent

(50%) of the balance remaining, and the remaining fifty percent (50%) thereof shall be retained

by Publisher for its sole use and benefit." (Id. at 3, ¶ 6)  Majic, similarly, agrees to pay Shin 50

percent of advances received from Reid pursuant to Contract 2, after making certain deductions,

and retain the remaining portion of the advances.  (Id.)

Finally, Contract 1 provides that it "shall be deemed amended in all respects

necessary to conform to the provisions of the Reid Agreement [Contract 2]," and provides that,

in entering Contract 1, Shin "agree[s] to amend or modify any provisions of [Contract 1] to

conform to the provisions of the Reid Agreement [Contract 2]," and agrees to "comply with any

other restriction, and . . . grant any additional rights, as may be required by Reid" pursuant to

Contract 2.  (Id. at 7, ¶ 13)

2.      **Contract 2:  The Reid Agreement**

Contract 2 – which identifies Reid and EMI as "Publisher"; Majic as "you"; and

Shin and Hamilton as "Writer" – is also "an exclusive co-publishing and administration

agreement." (Contract 2 (Dkt. No. 1-2) at 1)  Its terms are similar to the terms of Contract 1,

except that Majic's role in Contract 2 to is akin to Shin's role in Contract 1, while Reid's and

EMI's role in Contract 2 is akin to Majic's role in Contract 1.

The preamble to Contract 2 states that, during the term of the agreement,

Majic "shall cause Writer to Deliver to Publisher, for exclusive exploitation, all Compositions,"

and that "Publisher will be the exclusive administrator and co-publisher of Your Interest in all

Compositions. . . ."[5]  (Id.)  However, Contract 2 also states that "You" – that is, Majic – "shall

Deliver to Publisher each Composition."  (Id. at 2, ¶ 3)

Pursuant to Contract 2, Majic agreed to "sell, grant, transfer, and assign" to Reid

and EMI "an undivided 50% interest in all of [Majic's] Interest in the Compositions, including,

without limitation, the copyrights therein"; Majic would "retain the remaining 50% copyright

interest."  (Id. at 3, ¶ 5)  Majic granted to Reid and EMI – as Shin had granted to Majic – "the

sole and exclusive right and license . . . to:

> license the exploitation of the Compositions in all forms, media, technologies and
> configurations . . . ; print, publish, rent and/or sell printed editions and other
> reproductions of the Compositions . . . ; collect all monies whatsoever derived
> from exploitation of the Compositions and earned prior to or during the [Contract
> 2] Term . . . ; license public performance rights; make arrangements, adaptations
> and other changes; and otherwise administer and grant rights in, and with respect
> to, the Compositions to the fullest extent possible.  In connection with the

---

[5] Contract 2 employs slightly different terminology than Contract 1 in defining "Compositions":
"New Compositions" are "all musical compositions . . . written by Writer during the Term";
"Old Compositions" are "all musical compositions . . . written by Writer prior to the Term"; and
"Acquired Compositions" are "all musical compositions . . . in which any right or interest is
acquired by Writer or Writer's Affiliates prior to or during the Term."  (Contract 2 (Dkt. No. 1-2)
at 2 ¶ 3)

foregoing, you hereby appoint Publisher your true and lawful attorney-in-fact to: secure and renew copyrights in your, Writer's and Publisher's names, initiate and compromise infringement claims; and to execute in your and Writer's name any and all documents reasonably necessary or desirable to accomplish the foregoing and/or effectuate Publisher's rights hereunder . . . .

(Id. at 3, ¶ 5)

Contract 2 also contains terms regarding the payment of royalties and advances. As to royalties, Contract 2 describes the proportion of various categories of royalty payments that Majic and Reid will receive.  With respect to the "Publisher's [s]hare of [p]erformance [i]ncome," for example, Majic and Reid would split the proceeds equally.  (Id. at 6, ¶ 7) Royalties would be credited to "a single royalty account."  (Id. at 7, ¶ 8)  With respect to advances, Reid and EMI would pay a $125,000 advance to Majic during the initial term of the agreement, and for each subsequent term, Reid and EMI would pay Majic "[a]n [a]dvance equal to 70% of the royalties credited to [Majic's] royalty account during the immediately preceding 12-month period," subject to minimum and maximum advances.  (Id. at 4-5, ¶ 6)

Finally, Contract 2 requires Majic to "represent, warrant and covenant that," inter alia, "neither [Majic] nor Writer ha[s] entered into (and will not enter into) any agreement (including, without limitation, any license) which would interfere with any of the rights granted to Publisher pursuant to this Agreement," nor "granted any rights with respect to Composition(s) to any Person," and that "neither Majic nor Writer will . . . perform or render any services for the purposes of writing musical compositions either directly or indirectly for any person or entity other than Publisher or . . . enter into any agreement with respect to any Compositions[] or rights with respect thereto."  (Id. at 9, ¶ 10)

Attached to Contract 2 is a "Writer's Inducement" -- signed by Shin and Hamilton -- which states in relevant part:

In order to induce [Reid and EMI] (jointly, the "Publishers") to enter into the foregoing agreement . . . and make all payments as provided therein, the

6

undersigned agrees to be bound by all the terms, covenants and conditions therein
contained as if the undersigned was a party thereto. . . . [T]he undersigned grants,
transfers and assigns to the Publishers . . . all Compositions . . . and all copyrights
therein; [and] ratifies all the warranties and representations made therein by
[Majic]. . . .

(Writer's Inducement to Contract 2 (Dkt. No. 1-2) at 15)

**B.   Contract 3:  The Modification**

In January 2014, nearly five years after Contracts 1 and 2 were executed, "the

parties amended Contract 2 pursuant to a Settlement Agreement reached by third parties with

Shin, Majic, and Reid."[6]  (Cmplt. (Dkt. No. 1) ¶ 13)  This agreement is "Contract 3."[7]

According to Contract 3, "Hamilton and Shin . . . made various claims that Majic . . . failed to

make required royalty payments to them under the Writer Agreement [Contract 1]."  (Contract 3

(Dkt. No. 1-3) at 2, ¶ 1)  Consequently, Hamilton and Shin "wish[ed] to modify certain

provisions of the Agreement, including . . . certain payment and Delivery obligations."  (Id.)

Whereas Contracts 1 and 2 contemplate Shin's (and Hamilton's) delivery of

compositions to Majic, and Majic's delivery of those compositions, in turn, to the Reid

Defendants, Contract 3 requires Hamilton and Shin to perform "any and all obligations" for Reid

"which relate to the Compositions, [and] Delivery thereof," and makes them jointly and severally

---

[6]  The "Settlement Agreement reached by third parties" is an agreement between Vance Tate,
Thomas Oliveria, and their company, New East Management, on the one hand, and Hamilton,
Shin, Reid, and EMI on the other, that was executed in September 2011.  (Contract 3, Ex. B
(Dkt. No. 1-3) at 13-23)  According to this agreement, in 2008 New East Management, Shin, and
Hamilton entered into a contract by which New East would render personal management
services to Shin and Hamilton. Shin and Hamilton terminated this contract in February 2009.
(Id. at 13)  Tate, Oliveria, and New East Management contended that, under this contract, they
were entitled to certain post-term commissions on revenues Shin and Hamilton earned, and were
entitled to a portion of the copyright interest in one of Shin's and Hamilton's songs.  Tate,
Oliveria and New East Management brought suit in this District, and the Settlement Agreement
resolved that lawsuit.  (Id.)

[7]  Sony/ATV Songs LLC also appears on the signature line of Contract 3.

liable with Majic for those responsibilities, "[n]otwithstanding that all of the obligations to [Reid and EMI] under [Contract 2] are solely Majic's obligations." (Id. at 2, ¶ 2)  Contract 3 also significantly alters the payout of royalties and advances related to Shin's Compositions, such that Reid will pay directly to Shin certain royalty shares and advances, rather than routing those payments through Majic.  (Id. at 3, ¶¶ 5-6)  With respect to royalties, "the royalties otherwise accruing to Majic's credit under the [Contract 2] shall be divided among Majic's, Shin's and Hamilton's royalty accounts. . . ." (Id. at 4, ¶ 6)  Likewise," any future [a]dvances payable under [Contract 2]" would be paid out separately and "charged to their respective royalty accounts. (Id. 3, ¶ 5)

Pursuant to Contract 3, Majic, Shin, and Hamilton "fully release[d] and forever discharge[d] Reid and EMI . . . from any legal cause of action whatsoever now or hereafter existing under any law . . . any time prior to January 1, 2014."  Shin and Hamilton also "fully release[d] and forever discharge[d] Majic . . . from any legal cause of action relating to the accounting and/or payment of royalties now or hereafter existing under any law . . . any time prior to January 1, 2014." (Id. at 2, ¶ 4)  Contract 3 does not contain any release of Majic's claims against Shin, however.

C.    **The Tolling Agreement**

After the execution of Contract 3, Majic allegedly discovered that Shin had "acquired in excess of One Hundred and Fifty (150) compositions from 2009 through 2017" through various Joombas entities Shin owned, "and collected . . . over Two Million Dollars ($2,000,000) in royalties from the compositions" during that period.  (Cmplt. (Dkt. No. 1) ¶ 18) Shin "never provided the songs/compositions to Majic or Reid or any of the monies associated with the compositions." (Id.)  Instead, "Shin assigned the songs to Joombas and engaged in a publishing contract with Universal Music Publishing . . . and others," and "sought to enter into a

8

publishing deal with Warner Chappell Music, Inc., and negotiated a Seven Hundred and Fifty

Thousand Dollar ($750,000.00) [deal] for Joombas for the songs that were contractually due to

Majic." (Id. ¶¶ 19, 21)  Moreover, the Joombas Defendants "registered copyrights [in] South

Korea and the United States without identifying Plaintiff['s] interest in the copyrights."  (Id. ¶

20)  Shin also co-wrote songs that he never provided to Majic or Reid, "most of [which] reached

prominence in Asia." (Id. ¶ 27)

On April 14, 2017, Shin, Majic, and Reid[8] entered into a tolling agreement (the

"Tolling Agreement").  The Tolling Agreement – which identifies Majic, Reid, and EMI

collectively as "Publisher" – acknowledges that "Publisher has asserted claims that, beginning in

2011 and through the Effective Date hereof, Shin acquired certain musical compositions and has

delivered those compositions to Joombas Co. Ltd. ('Joombas') allegedly in breach of [Shin's

obligations under Contract 2, as modified] and failed to deliver those acquired compositions and

income derived from such compositions."  The Tolling Agreement further states that Shin denies

the breach claim, and contends that Contract 2 is unconscionable, and that he has not received

payments due under Contract 2. (Tolling Agreement (Dkt. No. 1-4))  In the Tolling Agreement,

Shin , Majic, Reid, and EMI "agree that commencing as of April 14, 2017 and continuing until

30 days after the date on which either Shin or Publisher provide . . . notice of termination [of the

Tolling Agreement], . . . the running of time under any statutes of limitation or any other time-

based limitations or defenses . . . that might be asserted as a bar, limitation, or defense to any

suit, action or claim arising out or in connection with" the claims the publishers and Shin raised

against one another would be tolled.  (Id. at 1-2)

---

[8]  Hamilton is not a party to the Tolling Agreement.

D.    **June 2018 Settlement Agreement**

On June 1, 2018 – a little more than a year after the Tolling Agreement was

executed – the Reid Defendants, Shin, and Joombas Co., Ltd. entered into a Settlement

Agreement (the "2018 Settlement Agreement").  (See Cmplt. (Dkt. No. 1) ¶ 28; 2018 Settlement

Agreement (Dkt. No. 69-1))[9]  The 2018 Settlement Agreement states that the Reid Defendants

"contend that Shin has failed to deliver certain musical compositions to them, in violation of his

obligations under [Contract 2 and Contract 3]"; that Shin denies these allegations; but that the

Reid Defendants and Shin "desire to settle their dispute amicably. . . ."  (2018 Settlement

Agreement (Dkt. No. 69-1) at 2)  Under the terms of the Settlement Agreement, Shin agreed to

pay a sum of money to the Reid Defendants, and Shin and the Reid Defendants agreed that

"[s]olely as between [them], [Contract 2] shall terminate effective as of the date of execution of

[the 2018 Settlement Agreement]," and Contract 3 "shall terminate concurrently with the

termination of [Contract 2]."  (Id. at 3, ¶¶ 3, 4)  The parties to the 2018 Settlement Agreement

also agreed to "release, acquit and forever discharge" one another from "any and all causes of

---

[9]  Although the June 12, 2018 Settlement Agreement is not attached as an exhibit to the
Complaint, the Court may consider it in resolving Defendants' motion to dismiss, because the
Settlement Agreement is "integral" to the Complaint.  See DiFolco v. MSNBC Cable L.L.C., 622
F.3d 104, 111 (2d Cir. 2010) (a court may consider a document "where the complaint 'relies
heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint."
(quoting Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006)).

For a document to be integral to a complaint, "plaintiff must have (1) 'actual notice' of the
extraneous information and (2) 'relied upon th[e] document[ ] in framing the complaint.'"
DeLuca, 695 F. Supp. 2d at 60 (quoting Chambers, 282 F.3d at 153); see also Williams v. City of
New York, No. 14 Civ. 5123 (NRB), 2015 WL 4461716, at *2 (S.D.N.Y. July 21, 2015) ("A
document is not 'integral' simply because its contents are highly relevant to a plaintiff's
allegations, but only when it is clear that the plaintiff relied on the document in preparing his
complaint." (emphasis in original)).  Here, Plaintiff's allegations against the Reid Defendants
are premised almost entirely on Reid's settlement with Shin, and the effect of that agreement on
Plaintiff.  (See Cmplt. (Dkt. No. 1) ¶¶ 28-31, 57-58, 63-64, 70-72)  Accordingly, the Complaint
"relies heavily upon [the June 2018 Settlement Agreement's] terms and effect, and is thus
"integral" to the Complaint.

action, claims for relief, lawsuits, charges or complaints" they "ever had or [have] against [the other] with respect to [Contract 2 and Contract 3]." (Id. at 5, ¶ 5)

The 2018 Settlement Agreement repeatedly states that it does not bind or otherwise affect Majic's rights under the various contracts. For example, in the Recitals section of the Settlement Agreement, the parties state that they "specifically exclud[e] from the said settlement any claims that may belong to or be separately capable of being asserted by Majic under the terms of [Contracts 1, 2, and 3]." (Id. at 2) Likewise, in the "Parties Bound" section of the 2018 Settlement Agreement, the parties state that the Settlement Agreement "specifically exclud[es] . . . Majic as to whom this Settlement Agreement is not binding. . . ." (Id. at 3, ¶ 1) And although the 2018 Settlement Agreement terminates Contracts 2 and 3 as between Shin and the Reid Defendants, "[n]otwithstanding anything to the contrary contained in [Contracts 1, 2, and 3] . . . the termination of [Contracts 2 and 3] shall not effect a termination of [Contract 1] insofar as it pertains to the rights of Majic thereunder and Majic shall retain any and all rights and claims under [Contract 1] as if [Contract 2 and Contract 3] had not been terminated." (Id. at 3-4, ¶ 4) Indeed, "[a]s between the Shin Parties and Majic, any rights, claims and defenses that Majic has or may have under [Contracts 1, 2, and 3] . . . shall survive this termination. . . ." (Id.)

## II.   PROCEDURAL HISTORY

The Complaint was filed on September 14, 2018, about three and a half months after Shin, Joombas Co., Ltd., and the Reid Defendants entered into the 2018 Settlement Agreement. (See Cmplt. (Dkt. No. 1)) Majic claims that Shin failed to provide to Majic compositions he had acquired or wrote, and thus had breached Contracts 1, 2, and 3, and violated the Copyright Act. (Id. ¶¶ 35-52; 95-103) The Complaint also asserts fraud and tortious interference with contract claims against the Joombas corporate entities, in connection with the

11

alleged existence of compositions not provided to Majic.  (Id. ¶¶ 75-89; 104-112)  Majic also seeks an accounting from Shin.[10]  (Id. ¶¶ 90-94)

The Complaint further alleges that the Reid Defendants breached Contracts 2 and 3 by "failing to demand that Shin provide . . . compositions to Majic and [the] Reid [Defendants]," and by settling with Shin without including Majic in the settlement.  (Id. ¶¶ 53-65)  The Complaint also asserts a breach of fiduciary duty claim against the Reid Defendants, contending that they "had a fiduciary duty to Majic to collect monies for compositions . . . and to perform Contract 2," and that the Reid Defendants failed to do so.  (Id. ¶¶ 66-74)

On November 26, 2018, Shin and the Joombas Defendants moved to dismiss. (Mot. (Dkt. No. 50))  The Reid Defendants moved to dismiss on February 7, 2019.  (Mot. (Dkt. No. 67))

## DISCUSSION

## I.   LEGAL STANDARDS

### A.   Rule 12(b)(6) Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted).  "In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint," Kassner v. 2nd Ave. Delicatessen,

---

[10]  Plaintiff also seeks a permanent injunction against the Joombas entities and Shin, prohibiting them from "marketing, selling, promoting, distributing, administrating or exploiting[] the acquired compositions."  (Cmplt. (Dkt. No. 1) ¶¶ 113-16)  "[I]t is well settled that a request for . . . injunctive relief is not an independent cause of action," however.  Daytree at Cortland Square, Inc. v. Walsh, 332 F. Supp. 3d 610, 627 (E.D.N.Y. 2018); see also KM Enterprises, Inc. v. McDonald, No. 11-CV-5098 ADS ETB, 2012 WL 4472010, at *20 (E.D.N.Y. Sept. 25, 2012) ("A request for injunctive relief does not constitute an independent cause of action; rather, the injunction is merely the remedy sought for the legal wrongs alleged in the . . . substantive counts." (internal quotation marks and citation omitted), aff'd, 518 F. App'x 12 (2d Cir. 2013)).

Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing Dougherty v. Town of N. Hempstead Bd. of

Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in

favor of the plaintiff." Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

 Allegations that "are no more than conclusions[] are not entitled to the assumption

of truth," however. Iqbal, 556 U.S. at 679. A pleading is conclusory "if it tenders 'naked

assertion[s]' devoid of 'further factual enhancement,'" id. at 678, offers "'a formulaic recitation

of the elements of a cause of action,'" id. (citations omitted), and does not provide factual

allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon

which it rests." Port Dock & Stone Corp. v. Oldcastle Northeast, Inc., 507 F.3d 117, 121 (2d

Cir. 2007). While legal conclusions "can provide the framework of a complaint, they must be

supported by factual allegations." Iqbal, 556 U.S. at 679.

 "In considering a motion to dismiss for failure to state a claim pursuant to Rule

12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to

the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco

v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (citing Chambers v. Time Warner,

Inc., 282 F.3d 147, 153 (2d Cir. 2002); Hayden v. County of Nassau, 180 F.3d 42, 54 (2d Cir.

1999)). Additionally, "[w]here a document is not incorporated by reference, the court may

never[the]less consider it where the complaint 'relies heavily upon its terms and effect,' thereby

rendering the document 'integral' to the complaint." DiFolco, 622 F.3d at 111 (quoting

Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006)).

**B.**   **Rule 9(b) Standard**

 "Federal Rule of Civil Procedure 9(b) sets forth a heightened pleading standard

for allegations of fraud." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006). "In

alleging fraud or mistake, a party must state with particularity the circumstances constituting

13

fraud or mistake." Fed. R. Civ. P. 9(b).  To satisfy this heightened standard, "'the complaint

must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the

speaker, (3) state where and when the statements were made, and (4) explain why the statements

were fraudulent." Lerner, 459 F.3d at 290 (quoting Mills v. Polar Molecular Corp., 12 F.3d

1170, 1175 (2d Cir. 1993)).  While Rule 9(b) provides that "[m]alice, intent, knowledge, and

other conditions of a person's mind may be alleged generally," Fed. R. Civ. P. 9(b), plaintiff

"must [nonetheless] allege facts that give rise to a strong inference of fraudulent intent." Loreley

Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 171 (2d Cir. 2015) (internal

quotation marks and citation omitted).  "'The requisite "strong inference" of fraud may be

established either (a) by alleging facts to show that defendants had both motive and opportunity

to commit fraud, or (b) alleging facts that constitute strong circumstantial evidence of conscious

misbehavior or recklessness.'" Lerner, 459 F.3d at 290-91 (quoting Shields v. Citytrust Bancorp,

Inc., 25 F.3d 1124, 1128 (2d Cir. 1994)).

## II.   ANALYSIS

### A.   Breach of Contract Claims Against Shin and the Reid Defendants

Plaintiff alleges that Shin failed to provide compositions that he was obligated to

provide to Majic, and thus breached Contracts 1, 2, and 3.  (Cmplt. (Dkt. No. 1) ¶¶ 35-52)

Plaintiff further contends that the Reid Defendants breached Contracts 2 and 3 by entering into a

settlement with Shin that did not provide for production of the withheld compositions, or for

payments to Majic in connection with withheld compositions.  (Id. ¶¶ 53-65)

To plead breach of contract under New York law, a plaintiff must allege: "(1) the

existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach

of contract by the defendant, and (4) damages." Eternity Global Master Fund Ltd. v. Morgan

Guar. Trust Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004) (internal quotation marks and citation

14

omitted).  "In pleading these elements, a plaintiff must identify what provisions of the contract were breached as a result of the acts at issue."  Wolff v. Rare Medium, Inc., 171 F. Supp. 2d 354, 358-59 (S.D.N.Y. 2001) (dismissing breach of contract claim where plaintiffs had not identified contractual provisions that defendant had breached).

### 1.   **Defendant Shin**

Plaintiff alleges that between 2009 – when Contracts 1 and 2 were executed – and 2017, "Shin acquired in excess of One Hundred and Fifty (150) compositions" through Joombas entities he controlled, "and collected . . . over Two Million Dollars ($2,000,000) in royalties from the compositions."  (Cmplt. (Dkt. No. 1) ¶ 18)  However, "Shin never provided the songs/compositions to Majic or Reid[,] [n]or [provided] any of the monies associated with the compositions."  (Id.)  Instead, Shin "assigned the songs to Joombas and engaged in a publishing contract with Universal Music Publishing . . . and others."  (Id. ¶ 19)  "Shin [also] co-wrote several songs that he never provided to Majic/Reid," most of which "reached prominence in Asia."  (Id. ¶ 27)  In failing to provide these compositions to Plaintiff, Shin violated Contracts 1, 2, and 3.  (Id. ¶¶ 37, 43, 50)

Shin argues that Plaintiff's breach of contract claims fail because "the contracts . . . establish conclusively, and as a matter of law, that [he and] the Joombas Defendants owed no obligations to Majic, only to Reid."  (Joombas Br. (Dkt. No. 50) at 6)

### a.   **Contract 1**

Contract 1 requires that Shin – among other things – "[d]eliver to [Majic], for exclusive exploitation, all Compositions," including "all musical compositions . . . written by [Shin] prior to or during the Term [of Contract 1] and . . . any and all other compositions written by [Shin] and/or acquired by [Shin] or [Shin's] Affiliates during the term [of Contract 1]."  (Contract 1 (Dkt. No. 1-1) at 1, ¶ 3)  The Complaint asserts that Shin breached this provision by

15

not providing all written or acquired compositions to Majic.  (See Cmplt. (Dkt. No. 1) ¶¶ 37-39)

The Complaint further pleads that Majic was damaged as a result of Shin's breach.

Shin maintains, however, that he was not required to deliver compositions to

Majic; instead, "the songs were to be delivered to Reid." (Joombas Br. (Dkt. No. 50) at 11)  In

making this argument, Shin cites to (1) an integration clause in Contract 2, which he contends

"supersedes Contract 1 with regard to the delivery requirement"; and (2) Contract 3, which

amends Contract 2 so as to require Shin "to perform, directly for [Reid], . . . any all obligations

which relate to the Compositions [and] Delivery thereof. . . ." (Id. at 11-12 (emphasis removed))

It is true that Contract 3 alters Shin's and Majic's delivery obligations.  Pursuant

to Contracts 1 and 2, Shin was required to deliver compositions to Majic, and Majic was required

to deliver those compositions to Reid.  (Contract 1 (Dkt. No. 1-1) at 1; Contract 2 (Dkt. No. 1-2)

at 2, ¶ 3)  After Contract 3 was executed, "[n]otwithstanding that all of the obligations to [Reid]

under [Contract 2] are solely Majic's obligations" (Contract 3 (Dkt. No. 1-3) at 2, ¶ 2), Shin was

required to perform "any and all obligations" for Reid "relat[ing] to the Compositions, [and]

[d]elivery thereof." (Id.)  Accordingly, Contract 3 expressly modifies the delivery obligations set

out in Contract 2, and -- because Contract 1 "shall be deemed amended in all respects necessary

to conform to the provisions of [Contract 2]" (Contract 1 (Dkt. No. 1-1) at 7, ¶ 13) -- Contract 3

also modifies Contract 1's delivery obligations.  After execution of Contract 3, Shin no longer

was required to deliver compositions to Majic; his obligation was to deliver the compositions to

Reid.  Accordingly, to the extent that Majic's claim for breach of Contract 1 concerns conduct

that took place after Contract 3 was executed in January 2014, Shin's motion to dismiss Majic's

breach claim will be granted.  The existence of Contract 3 does not, however, negate Majic's

claim insofar as it relates to conduct that took place before Contract 3 was executed in January

2014.

As for Shin's argument that Contract 2's integration clause supersedes any delivery obligation he had under Contract 1, that argument is not persuasive.  Although Contract 2 contains an integration clause providing that "[a]ll prior and contemporaneous conversations, negotiations, and alleged agreements, representations, covenants and warranties concerning the subject matter of this Agreement are merged herein" (Contract 2 (Dkt. No. 1-2) at 12, ¶ 12(f)) -- the subject matter of Contract 1 and Contract 2 are not the same.  The subject matter of Contract 1 is the rights and obligations Shin and Majic owe to one another with respect to Shin's compositions, including the allocation of interest in the compositions to Majic, and the allocation of royalty payments and advances from Majic to Shin.  The subject matter of Contract 2 is the rights and obligations that Majic and the Reid Defendants owe one another.  Because Contract 1 and Contract 2 do not concern the same subject matter, Contract 2's delivery provisions do not supersede Contract 1's delivery provisions.  See CreditSights, Inc. v. Ciasullo, No. 05 CV 9345 (DAB), 2007 WL 943352, at *8 (S.D.N.Y. Mar. 29, 2007) ("The Separation and Voting Agreements do not supersede the Restricted Grant Agreement because these agreements do not relate to precisely the same subject matter, and because the merger clause in the separation agreement does not indicate an intent to revoke specifically the Restricted Grant Agreement.").

Accordingly, Majic states a claim for breach of Contract 1 as to conduct that took place before Contract 3 was executed in January 2014.  Shin's motion to dismiss will be granted as to conduct that took place after Contract 3 was executed.

b.    **Contracts 2 and 3**

Majic contends that Shin "had a duty" under both Contract 2 and Contract 3 to provide compositions to Majic, and that Shin breached both contracts by "fail[ing] to provide the acquired composition[s] to Majic and fail[ing] to submit composition[s] co-written by Shin to Majic." (Cmplt. (Dkt. No. 1) ¶¶ 43, 45, 50-51)  As with Majic's Contract 1 breach claim, Shin

17

argues that he "ha[d] no obligations to Majic, only to Reid." (Joombas Br. (Dkt. No. 50) at 7)

Shin also contends that "the right of administration" under Contract 2 "resides solely with Reid,"

such that "[only] Reid, not Majic, has standing to bring a claim against Shin or any Joombas

Defendants hereunder." (Joombas Br. (Dkt. No. 50) at 12)

In arguing that, as a result of Reid's "right of administration" under Contract 2,

Majic lacks "standing to bring a claim," Shin misconstrues the relevant contractual provision.

Paragraph 5(b) of Contract 2 – entitled "Exclusive Administration Rights" – provides that during

the term of the agreement,

> Publisher and its Licensees shall have, and you hereby grant, transfer, assign, and
> license to Publisher . . . the sole and exclusive right and license throughout the
> Territory . . . to:  license the exploitation of the Compositions in all forms, medias,
> technologies[,] and configurations . . . ; print, publish, rent and/or sell printed
> editions and other reproductions of the Compositions, in any forms, media[,] or
> configurations . . . ; collect all monies whatsoever derived from exploitation of the
> Compositions . . . ; license public performance rights; make arrangements,
> adaptations[,] and other changes; and otherwise administer and grant rights in,
> and with respect to, the Compositions to the fullest extent possible.  In connection
> with the foregoing, you hereby appoint Publisher your true and lawful attorney-in-
> fact to:  secure and renew copyrights . . . ; subject to your written consent in each
> instance, initiate and compromise infringement claims; and . . . execute in your
> and Writer's name any and all documents reasonably necessary or desirable to
> accomplish the foregoing and/or effectuate Publisher's rights hereunder. . . . You
> also grant to Publisher exclusive rights . . . to use Writer's name, and approved
> likenesses and approved biographies . . . in connection with music publishing
> activities."

(Contract 2 (Dkt. No. 1-2) at 3-4, ¶ 5(b))

The administration rights Majic grants to Reid in Paragraph 5(b) concern the

licensing and exploitation of the "Compositions"; this provision does not address a party's rights

in the event of a contractual breach.  Nothing in Paragraph 5(b) suggests that Majic is granting to

Reid – and depriving itself of – the ability to seek redress for breaches of the publishing

agreements.  Accordingly, Shin's argument that – by virtue of this provision – only Reid has

authority to enforce the terms of Contract 2 is not persuasive.

18

Shin also contends that he owes no delivery obligation to Majic under Contract 2. Contract 2 constitutes an agreement between Majic and Reid in which Majic is obligated to "[d]eliver to [Reid] each Composition." (Id. at 2, ¶ 3) While Shin signed a Writer's Inducement to Contract 2, in which he "agree[d] to be bound by all of the terms, covenants and conditions" set forth in Contract 2 (id. at 15), none of those "terms, covenants, and conditions" obligate Shin to deliver compositions to Majic. Contract 3 likewise does not impose an obligation on Shin to deliver compositions to Majic. Indeed, the apparent purpose of Contract 3 is to excise Majic from the composition delivery process. Accordingly, Shin's motion to dismiss Majic's claims for breach of Contract 2 and breach of Contract 3 will be granted.[11]

## 2.  The Reid Defendants

Majic claims that the Reid Defendants breached Contracts 2 and 3 by entering into a settlement with Shin. Majic contends that, by settling with Shin, the Reid Defendants "derived benefits from Shin through Majic while leaving Majic materially damaged," and thereby "breach[ed] . . . applicable covenants of good faith and fair dealing and fiduciary obligations." Majic further contends that the Reid Defendants did not fulfill their obligation to demand that Shin deliver compositions, "administrate compositions for Majic," and collect funds for Majic. (Cmplt. (Dkt. No. 1) ¶¶ 56-57, 59-61) Finally, Majic claims that the Reid Defendants "caused . . . copyright to be registered without identifying Plaintiff." (Id. ¶ 58) For the reasons discussed below, these allegations are not sufficient to state a claim for breach of Contract 2 or Contract 3 against the Reid Defendants.

---

[11] The Complaint does not allege that Shin breached his delivery obligations to Reid under Contracts 2 and 3, and that Majic has a right to enforce that obligation.

New York law "recognizes an implied covenant of good faith and fair dealing in every contract." County of Orange v. Travelers Indem. Co., No. 13-CV-06790 NSR, 2014 WL 1998240, at *2 (S.D.N.Y. May 14, 2014). The implied covenant "'embraces a pledge that neither party shall do anything which shall have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" Id. (quoting Atmosphere Scis., LLC v. Schneider Advanced Techs. Inc., No. 12 Civ. 3223 (SAS), 2012 WL 4240759, at *5 (S.D.N.Y. Sept. 19, 2012)).

As an initial matter, the 2018 Settlement Agreement unambiguously reserves Majic's rights against the settling parties. While the Reid Defendants and Shin agree to "release, acquit and forever discharge" one another from "any and all causes of action, claims for relief, lawsuits, charges or complaints" they "ever had or [have] against [the other] with respect to [Contract 2 and Contract 3]" (2018 Settlement Agreement (Dkt. No. 69-1) at 5, ¶ 5), their settlement agreement "specifically exclud[es] from the said settlement any claims that may belong to or be separately capable of being asserted by Majic under the terms of [Contracts 1, 2, and 3]." The 2018 Settlement Agreement also states that it is "not binding" on Majic, and that "[a]s between the Shin Parties and Majic, any rights, claims and defenses that Majic has or may have under [Contracts 1, 2, and 3] . . . shall survive. . . ." (Id. at 2, 3 ¶ 1, 3-4, ¶ 4)

Accordingly, to the extent that Majic's breach of contract claim against the Reid Defendants is premised on the notion that the Reid Defendants violated the implied covenant of good faith and fair dealing by entering into the 2018 Settlement Agreement, the Reid Defendants' reservation of Majic's rights in the 2018 Settlement Agreement dooms that claim. Majic can point to no "right . . . to receive the fruits of the contract" that the Reid Defendants "destroy[ed] or injur[ed]."

While Majic asserts that the Reid Defendants failed to perform several other supposed duties owed under Contracts 2 and 3, most of these allegations are made either without reference to any contractual provision setting out such a duty, or by misconstruing the relevant provisions. Plaintiff alleges, for example, that the Reid Defendants breached Contracts 2 and 3 by failing to "demand that Shin deliver compositions," but nothing in either contract requires Reid to make such a demand. Indeed, Contracts 2 and 3 provide that it is <u>Majic</u>'s obligation to ensure the delivery of the compositions. (Contract 2 (Dkt. No. 1-2) at 2, ¶ 3; Contract 3 (Dkt. No. 1-3) at 2, ¶ 2) (Majic[] [and] Shin . . . shall be jointly and severally liable for . . . all obligations relating to the Compositions, [and] Delivery thereof. . . ."))

Majic similarly complains that the Reid Defendants did not "administrate compositions" for Majic. The Complaint does not identify which compositions the Reid Defendants did not "administrate." To the extent Majic is referring to compositions Shin never provided to Majic or Reid, Contract 2 – while granting "exclusive administration rights" to Reid to license and exploit the compositions delivered to Reid (<u>see</u> Contract 2 (Dkt. No. 1-2) at 3-4, ¶ 5(b)) – does not require the Reid Defendants to "administrate compositions" that they never received, and Contract 3 does not discuss administration of the compositions at all. (Contract 3 (Dkt. No. 1-3))

Majic likewise complains that the Reid Defendants failed to "collect funds" for Majic. Again, Majic does not identify the funds the Reid Defendants should have collected. To the extent that Majic is referring to monies that would have been produced from compositions that Shin should have, but never delivered to, the Reid Defendants, the Reid Defendants had no such obligation. While Contract 2 grants the Reid Defendants the right to "collect all monies whatsoever derived from exploitation of the Compositions," Contract 2 does not obligate the

21

Reid Defendants to "collect . . . monies" for compositions that it did not have the opportunity to "exploit[]."[12]

Finally, Majic claims that the Reid Defendants "caused . . . copyright to be registered without identifying Plaintiff." (Cmplt. (Dkt. No. 1) ¶ 58)  The Complaint asserts that "Majic's income, ownership and administrative interests in the Shin compositions must be registered with collection societies around the world, which Reid was required to do as administrator."  Majic also identifies one copyright – for a composition called "Move Over My Way" – that the Reid Defendants allegedly registered without including Plaintiff on the registration.[13]  (Id. ¶¶ 58, 62)

Contract 2 "appoint[s]" Reid as Majic's "attorney-in-fact to . . . secure and renew copyrights," and – "subject to Majic's written consent," to "initiate and compromise copyright infringement claims."  Contract 2 (Dkt. No. 1-2) at 3-4, ¶ 5(b))  Majic grants this authority to the Reid "[i]n connection with" Majic's grant to Reid of the "sole and exclusive right and license" to

> license the exploitation of the Compositions . . .; print, publish, rent and/or sell
> printed editions and other reproductions of the Compositions. . . ; collect all

---

[12]  Were this Court to interpret the Complaint as alleging that the Reid Defendants were obligated, in connection with the 2018 Settlement Agreement, to obtain settlement funds for Majic, or to provide a portion of the funds it obtained through the settlement to Majic, Majic would still have no claim.  (See Cmplt. (Dkt. No. 1) ¶ 30 ("Upon information and belief, Reid received in excess of One Hundred Thousand Dollars ($100,000.00) associated with the [2018 Settlement Agreement] from Shin and Joombas and never provided any funds to Majic or collected any monies due to Majic."))  The only funds the Reid Defendants were contractually obligated to pay Majic, however, were certain advances and royalties from exploited compositions.  The funds the Reid Defendants obtained in the settlement were provided "[i]n partial consideration for the Releases set forth below, and as settlement of the [d]ispute," and "[i]n recognition of [the Reid Defendants'] pecuniary interest in [Contracts 2 and 3], and as a buyout of said interest."  (2018 Settlement Agreement (Dkt. No. 69-1) at 3-4, ¶¶ 3, 4.2)  The monies the Reid Defendants obtained through the 2018 Settlement Agreement were not advances or royalties that the Reid Defendants owed to Majic.

[13]  The Reid Defendants assert that this composition "was never even delivered" to them and that, in any event, the registration for this composition was filed by Seven Peaks Music, an unrelated entity.  (Reid Def. Reply Br. (Dkt. No. 70) at 10 & n.4)

> monies whatsoever derived from exploitation of the Compositions . . . ; license
> public performance rights; make arrangements, adaptations[,] and other changes;
> and otherwise administer and grant rights in, and with respect to, the
> Compositions to the fullest extent possible.

(Id.)

      The Reid Defendants contend that this provision does not impose any obligation

on the Reid Defendants to register copyrights for any composition.  (Reid Def. Br. (Dkt. No. 68)

at 22-23)  According to the Reid Defendants, this provision "provides [the Reid Defendants]

with the right, but not the obligation, to register copyrights for the compositions at issue."  (Reid

Def. Reply (Dkt. No. 70) at 10 (emphasis removed))  The Court agrees:  Majic has not pointed to

any language in Contract 2 (or Contract 3) that requires Reid to register copyrights for the

compositions Majic or Shin deliver, much less register Majic's interest in the copyrights.

Accordingly, the Reid Defendants' alleged failure to register Majic's interest in copyrights

cannot support a breach of contract claim.

      The Reid Defendants' motion to dismiss Majic's breach of contract claims against

them will be granted.

## B.    <u>Breach of Fiduciary Duty Claim Against the Reid Defendants</u>

      Majic contends that Reid "had a fiduciary duty to Majic to collect monies for

compositions," and that Reid failed to do so.  (Cmplt. (Dkt. No. 1) ¶¶ 68-69, 74)

      "In order to establish a breach of fiduciary duty, a plaintiff must prove the

existence of a fiduciary relationship, misconduct by the defendant, and damages that were

directly caused by the defendant's misconduct."  Kurtzman v. Bergstol, 40 A.D.3d 588, 590 (2d

Dept. 2007) (citing Ozelkan v. Tyree Bros. Envtl. Servs., 29 A.D.3d 877, 879 (2d Dept. 2006));

see also Kidz Cloz, Inc. v. Officially For Kids, Inc., No. 00 CIV. 6270 (DC), 2002 WL 392291,

at *4 (S.D.N.Y. Mar. 13, 2002).  "A fiduciary relationship exists under New York law 'when one

[person] is under a duty to act for or to give advice for the benefit of another upon matters within

the scope of the relation.'" Kidz Cloz, Inc., 2002 WL 392291, at *4 (quoting Flickinger v.

Harold C. Brown & Co., 947 F.2d 595, 599 (2d. Cir. 1991)); see also Compania Sud-Americana

de Vapores, S.A. v. IBJ Schroder Bank & Tr. Co., 785 F. Supp. 411, 425-26 (S.D.N.Y. 1992)

("[A] fiduciary relationship is one founded on trust or confidence reposed by one person in the

integrity and fidelity of another. . . . A fiduciary relation exists when confidence is reposed on

one side and there is resulting superiority and influence on the other." (citation omitted)). "New

York law is . . . quite clear . . . that 'a conventional business relationship, without more, does not

become a fiduciary relationship by mere allegation.'" Compania Sud-Americana de Vapores,

S.A., 785 F. Supp. at 426 (quoting Oursler v. Women's Interart Ctr., Inc., 170 A.D.2d 407, 407

(1st Dept. 1991)).

      The Complaint does not plead facts sufficient to demonstrate that Majic had a

fiduciary relationship with the Reid Defendants.  Indeed, Majic makes no effort in its briefing to

demonstrate that such a relationship existed.  Accordingly, the Reid Defendants' motion to

dismiss Majic's breach of fiduciary duty claim will be granted.

    **C.**    **Tortious Interference with Contract Claim Against the Joombas Entities**

      Majic alleges that the Joombas entities are "alter egos of each other" (Cmplt.

(Dkt. Nos. 1) ¶¶ 76-77), and that they tortiously interfered with Contracts 1, 2, and 3 by inducing

Shin to breach these contracts.  (Cmplt. (Dkt. No. 1) ¶¶ 104-112)

      "Under New York law, the elements of tortious interference with contract are (1)

'the existence of a valid contract between the plaintiff and a third party'; (2) the 'defendant's

knowledge of the contract'; (3) the 'defendant's intentional procurement of the third-party's

breach of the contract without justification'; (4) 'actual breach of the contract'; and (5) 'damages

resulting therefrom.'" Kirch v. Liberty Media Corp., 449 F.3d 388, 401-02 (2d Cir. 2006)

(quoting Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 424 (1996)).  Moreover, "the

third party's breach must have been caused by the defendant, meaning that the breach would not have occurred but for the defendant's acts." Wolff v. Rare Medium, Inc., 210 F. Supp. 2d 490, 498 (S.D.N.Y. 2002), aff'd, 65 F. App'x 736 (2d Cir. 2003).

Here, the Complaint does not adequately plead a tortious interference claim against the Joombas Defendants, because Plaintiff has not alleged facts sufficient to show that they procured Shin's breach. "With respect to [this] element[,] . . . 'it is not enough that a defendant engaged in conduct with a third-party that happened to constitute a breach of the third party's contract with the plaintiff; instead, the evidence must show that the defendant's objective was to procure such a breach.'" Wellington Shields & Co. LLC v. Breakwater Inv. Mgmt. LLC, No. 14-CV-7529 (RJS), 2016 WL 5414979, at *5 (S.D.N.Y. Mar. 18, 2016) (quoting Roche Diagnostics GmbH v. Enzo Biochem, Inc., 992 F. Supp. 2d 213, 221 (S.D.N.Y. 2013) (emphasis in Wellington Shields)). "Put simply, a defendant must specifically intend to interfere with the relevant contract [to be liable for tortious interference]." Roche Diagnostics GmbH, 992 F. Supp. 2d at 221.

Here, Plaintiff contends that "the Joombas entities were at all times aware that Shin was a party to" Contracts 1, 2, and 3, and were "aware that Shin has breached" those contracts. (Cmplt. (Dkt. No. 1) ¶¶ 106-07, 111) Plaintiff also contends that the Joombas entities have "exploited the copyrights and collected funds associated with the . . . compositions that [are] the subject of Contracts 1 and 2," and "ha[ve] not provided the copyrights associated with . . . [the] compositions to Majic, nor . . . the funds or complete statements to Majic associated with the . . . compositions relating to [the 2018 Settlement Agreement]." (Id. ¶¶ 108-09) These allegations, at best, suggest that the Joombas Defendants were aware of Contracts 1, 2, and 3, and knew of Shin's breach. But no facts alleged in the Complaint suggest that it was the objective of the Joombas Defendants to procure Shin's breach of Contracts 1, 2, and 3. See

25

Wellington Shields & Co. LLC , 2016 WL 5414979, at *5.  Accordingly, the Joombas

Defendants' motion to dismiss Plaintiff's tortious interference with contract claim will be

granted.

   **D.** **Fraud Claim Against Shin and the Joombas Defendants**

      Plaintiff asserts that Shin and the Joombas defendants hid the existence of

additional compositions from Majic, and that this conduct amounts to fraud.

      "To state a claim for fraud under New York law, a plaintiff must allege (1) a

material misrepresentation or omission of fact; (2) which the defendant knew to be false; (3)

which the defendant made with the intent to defraud; (4) upon which the plaintiff reasonably

relied; and (5) which caused injury to the plaintiff."  Fin. Guar. Ins. Co. v. Putnam Advisory Co.,

LLC, 783 F.3d 395, 402 (2d Cir. 2015).  However, "a fraud claim does not lie where it 'is

premised upon an alleged breach of contractual duties and the supporting allegations do not

concern representations which are collateral or extraneous to the terms of the parties'

agreement.'"  Guilbert v. Gardner, 480 F.3d 140, 148 (2d Cir. 2007) (quoting McKernin v.

Fanny Farmer Candy Shops, Inc., 176 A.D. 233 (2d Dept. 1991))  "To maintain a claim of fraud

in such a situation, a plaintiff must either: (i) demonstrate a legal duty separate from the duty to

perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or

extraneous to the contract."  Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d

13, 20 (2d Cir. 1996) (citations omitted)).

      In support of its fraud claim, Plaintiff alleges that Shin "misrepresented and

omitted the . . . existence of the compositions from Majic with the intent of depriving Majic of

intellectual property and monies," and "hid all the compositions in his [Joombas] entities . . . in

order to keep Majic in the dark."  (Id. ¶¶ 82-85)  According to the Complaint, Shin operated the

Joombas entities from 2009 to 2017, and ". . . was a principal/owner in all the Joombas entities"

during that time.  (Cmplt. (Dkt. No. 1) ¶¶ 76-77)  Plaintiff further alleges that "[t]he Joombas

entities are alter egos of each other."  (Id. ¶ 78)

These allegations do not demonstrate a "legal duty separate from" Shin's

obligations under Contracts 1, 2, and 3, nor do they make out "a fraudulent misrepresentation

[that is] collateral or extraneous to" these contracts[14]  Indeed, the Complaint links Shin's

"contractual duty" to "inform[] Majic of the existence of the . . . compositions" to Shin's alleged

"misrepresent[ation] and omi[ssion] [of] the fact of the existence of the compositions from

Majic."  (Cmplt. (Dkt. No. 1) ¶¶ 82, 85)

The Complaint also does not adequately plead facts that make out the elements of

fraud, much less comply with the heightened pleading standards of Fed. R. Civ. P. 9(b).  Majic

does not, for example, identify misrepresentations made by the Joombas Defendants.  And while

the Complaint speaks generally of omissions on Shin's part, it does not specify when or where

the misleading statements were made.  Nor does the Complaint plead reasonable reliance on any

such misrepresentations.

Accordingly, Shin and the Joombas Defendants' motion to dismiss Plaintiff's

fraud claim will be granted.

---

[14]  In its opposition brief, Majic attempts to clarify its fraud claim, arguing that Shin's
misrepresentations about the compositions were made "during the negotiation[] of [Contract 3],"
and were necessary to secure Plaintiff's agreement to enter into Contract 3; accordingly, they
amounted to fraud in the inducement.  (Pltf. Opp. Br. (Dkt. No. 52) at 15-16)  These allegations
are not set forth in the Complaint, however, and a "complaint cannot . . . be amended by the
briefs in opposition to a motion to dismiss."  In re Livent, Inc. Noteholders Sec. Litig., 151 F.
Supp. 2d 371, 432 (S.D.N.Y. 2001); see also Fadem v. Ford Motor Co., 352 F. Supp. 2d 501,
516 (S.D.N.Y.) ("It is long-standing precedent in this circuit that parties cannot amend their
pleadings through issues raised solely in their briefs." (collecting cases)), aff'd, 157 F. App'x
398 (2d Cir. 2005).

**E.**   <u>**Copyright Act Claim Against Shin**</u>

Plaintiff alleges that "Shin, in violation of his contract, failed to include Majic on all copyright registrations," and did not "provide[] the copyrights associated with all the compositions from 2009-2017 to Majic. . . ." (Cmplt. (Dkt. No. 1) ¶¶ 98-99)  As a result, "Majic was deprived of the right to register the copyrights."  (Id. ¶ 100)

Although Plaintiff styles this claim as a "violation of the United States Copyright Act" (id. ¶ 103), the Complaint does not identify what provision or provisions of the Copyright Act Shin allegedly violated.  Plaintiff also does not explain how the Copyright Act addresses the conduct about which Plaintiff complains, whether characterized as "depriv[ing] [someone] of the right to register copyrights"; failing to "include [someone] on . . . copyright registrations"; or failing to "provide[] . . .copyrights" to someone.  Accordingly, Shin's motion to dismiss Plaintiff's "Copyright Act" claim will be granted.

**F.**   <u>**Request for an Accounting From Shin**</u>

Plaintiff alleges that "Shin has collected monies from the sale of music created under Contract 1 and Contract 2 and has failed to account to Majic for the monies he collected." Plaintiff goes on to assert that "Shin must account to Majic for all earnings associated with the musical composition[s] that are the subject of Contract 2 and Contract 3." (Cmplt. (Dkt. No. 1) ¶¶ 92-93)

"To state a claim for an accounting under New York law, a plaintiff must establish: (1) relations of a mutual and confidential nature; (2) money or property entrusted to the defendant imposing upon him a burden of accounting; (3) that there is no adequate legal remedy; and (4) in some cases, a demand for an accounting and a refusal." Rosa v. TCC Commc'ns, Inc., No. 15CV1665, 2016 WL 67729, at *7 (S.D.N.Y. Jan. 5, 2016).

28

SPA-29

Here, the Complaint does not assert – much less plead facts suggesting – that Plaintiff and Shin had "relations of a mutual and confidential nature." Instead, the Complaint merely alleges that Plaintiff and Shin were signatories to various publishing agreements. The parties to "a typical, arms-length business relationship" generally do not have the "confidential" relationship necessary to satisfy the first element of an accounting claim, however. See Stadt v. Fox News Network LLC, 719 F. Supp. 2d 312, 319 (S.D.N.Y. 2010) (owner of video footage licensed to Fox News sued Fox News for violating license agreement; claim for an accounting dismissed because "the Complaint does not allege adequate facts to suggest that the parties were in a relationship of sufficient trust to create . . . a confidential relationship" ); Gate Techs., LLC v. Delphix Capital Markets, LLC, No. 12 CIV. 7075 JPO, 2013 WL 3455484, at *8 (S.D.N.Y. July 9, 2013) ("[Even] a confidential relationship born out of a standard contractual provision will nevertheless fail to give rise to [t]he required fiduciary relationship."); Almazan v. Almazan, No. 14-CV-311 AJN, 2015 WL 500176, at *13 (S.D.N.Y. Feb. 4, 2015) ("Simply stated, a party may not maintain an action for an accounting . . . if the parties enjoyed merely a contractual, as opposed to fiduciary, relationship." (internal quotation marks and citation omitted)).

Accordingly, Shin's motion to dismiss Plaintiff's claim for an accounting will be granted.[15]

---

[15] Even if Plaintiff had pled facts demonstrating the requisite confidential relationship, its accounting claim likely would fail, "as 'Plaintiff[] ha[s] sought money damages in [its] breach of contract claim.'" "'[B]ecause discovery as to the measure of damages would be available to [it] if [Plaintiff] were to prevail on that claim, [Plaintiff] can obtain all the information [it] seek[s] in [its] existing claim at law.'" Gate Techs., LLC, 2013 WL 3455484, at *8 (quoting Banks v. Correctional Servs. Corp., 475 F. Supp. 2d 189, 202 (E.D.N.Y. 2007)).

29

SPA-30

## CONCLUSION

Defendant Shin's motion to dismiss is granted in part and denied in part as set forth above. The Joombas Defendants' motion to dismiss is granted in its entirety, and the Reid Defendants' motion to dismiss is granted in its entirety. The Clerk of Court is directed to terminate the motions (Dkt. Nos. 50, 67).

Dated: New York, New York
      September 23, 2019

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge

SPA-31

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JUAN CATALA, d/b/a MAJIC ENTERTAINMENT LLC, d/b/a ADRAWN MUSIC PUBLISHING, | **MEMORANDUM OPINION** |
| Plaintiff, | 18 Civ. 8401 (PGG) |
| - against - | |
| JOOMBAS CO. LTD., JOOMBAS MUSIC INT'L, JOOMBAS LLC, JOOMBAS MUSIC GROUP, HYUK SHIN, THE LA REID MUSIC PUBLISHING COMPANY LLC, EMI APRIL MUSIC INC., and SONY/ATV SONGS LLC, | |
| Defendants. | |

PAUL G. GARDEPHE, U.S.D.J.:

      In this action, Plaintiff Juan Catala, d/b/a Majic Entertainment LLC, d/b/a Adrawn

Music Publishing ("Majic"), asserts claims for breach of contract, fraud, tortious interference

with contract, violations of the Copyright Act, and for an accounting against songwriter Hyuk

Shin and four companies that Shin owns (Joombas Co. Ltd., Joombas Music International,

Joombas LLC, and Joombas Music Group, collectively, the "Joombas Defendants").[1]  Plaintiff

also asserts breach of contract and breach of fiduciary duty claims against the LA Reid Music

Publishing Company, LLC ("Reid"), EMI April Music Inc. ("EMI"), and Sony/ATV Songs LLC

("Sony") (collectively, "Reid" or the "Reid Defendants").  (Cmplt. (Dkt. No. 1))  Plaintiff's

claims arise from a series of agreements between Plaintiff, Shin, the Joombas Defendants, and

---

[1]  Joombas Co. Ltd., Joombas Music International, Joombas LLC, and Joombas Music Group are
referred to as the "Joombas Entities."

SPA-32

the Reid Defendants – or combinations thereof – governing the rights to compositions authored by Shin.

Plaintiff moves for reconsideration of this Court's September 23, 2019 Order (Dkt. No. 80), which grants the Joombas and Reid Defendants' motions to dismiss and grants in part Shin's motion to dismiss.[2]  Plaintiff also moves to amend the Complaint.  In a March 31, 2021 Order (Dkt. No. 93), this Court denied Plaintiff's motion for reconsideration and motion to amend.  The purpose of this memorandum opinion is to explain the Court's reasoning.

## **BACKGROUND**

In a thirty-page opinion, this Court granted (1) Shin's motion to dismiss Plaintiff's claim for breach of Contract 1 as to conduct that took place after Contract 3 was executed in January 2014; (2) Shin's motion to dismiss Plaintiff's claims for breach of Contracts 2 and 3; (3) the Reid Defendants' motion to dismiss Plaintiff's breach of contract claims; (4) the Reid Defendants' motion to dismiss Plaintiff's breach of fiduciary duty claim; (5) the Joombas Entities' motion to dismiss Plaintiff's tortious interference with contract claim; (6) the Joombas Defendants' motions to dismiss Plaintiff's fraud claim; (7) Shin's motion to dismiss Plaintiff's Copyright Act claim; and (8) Shin's motion to dismiss Plaintiff's claim for an accounting.  (Sept. 23, 2019 Order (Dkt. No. 80) at 17-29)  The motions to dismiss filed by the Joombas Entities and the Reid Defendants were granted in their entirety.  (Id. at 30)  Shin's motion to dismiss was denied as to Plaintiff's claim for breach of Contract 1 for conduct related to Contract 1 that took place before Contract 3 was executed in January 2014.  (Id. at 17)

---

[2] The factual and procedural background of this case is set forth in the September 23, 2019 Order, and familiarity with this order is assumed.  All nomenclature and defined terms used herein, such as "Contracts 1, 2, and 3," have the meaning ascribed to them in the Court's September 23, 2019 Order.

In seeking reconsideration, Plaintiff argues that the Court must (1) "vacate the [d]ecision that limits Plaintiff's Contractual 1 rights to conduct that occurred before Contract 3 was executed"; (2) "reconsider and clarify its interpretation of Contract 2 and 3, vacate the order of dismissal, and reinstate Plaintiff's Contract 2 & 3 breach of contract claims because the [d]ecision presents a misapprehension of the facts" and reconsider its ruling that "Shin was no longer obligated to deliver compositions to Majic"; and (3) "vacate the dismissal and reinstate the breach of contract claim as [to the Reid Defendants]" because, "[p]ursuant to [t]he Settlement Agreement, the [Reid Defendants] no longer administer the publishing rights of the Plaintiff." (Pltf Br. (Dkt. No. 83) at 9, 14-15, 25-26)

Plaintiff also moves to amend the Complaint to add a claim for fraud in the inducement against Defendant Shin.  (Id. at 19-23)

Finally, Plaintiff asks the Court "to allow Plaintiff to clarify his contractual rights under Contract 1[, which was] signed by Plaintiff and Shin in 2009."  (Id. at 4)

## DISCUSSION

I.   **LEGAL STANDARDS**

"Motions for reconsideration are governed by Local Rule 6.3 and are committed to the sound discretion of the district court."  Liberty Media Corp. v. Vivendi Universal, S.A., 861 F. Supp. 2d 262, 265 (S.D.N.Y. 2012).  "Reconsideration of a previous order by the court is an 'extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources.'"  RST (2005) Inc. v. Research in Motion Ltd., 597 F. Supp. 2d 362, 365 (S.D.N.Y. 2009) (quoting In re Health Mgmt. Sys., Inc. Sec. Litig., 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000) (citations and quotation marks omitted)).  "A motion for reconsideration may not be used to advance new facts, issues or arguments not previously presented to the Court, nor

3

may it be used as a vehicle for relitigating issues already decided by the Court." <u>Davidson v. Scully</u>, 172 F. Supp. 2d 458, 461 (S.D.N.Y. 2001).

Reconsideration may be granted only where a court has overlooked "'controlling decisions or factual matters that were put before it on the underlying motion'" and which, if examined, might reasonably have led to a different result. <u>Eisemann v. Greene</u>, 204 F.3d 393, 395 n.2 (2d Cir. 2000) (quoting <u>Shamis v. Ambassador Factors Corp.</u>, 187 F.R.D. 148, 151 (S.D.N.Y. 1999)). "The major grounds justifying reconsideration are 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" <u>Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.</u>, 956 F.2d 1245, 1255 (2d Cir. 1992) (quoting 18 C. Wright, A. Miller & E. Cooper, <u>Fed. Prac. & Proc.</u> § 4478). "To these ends, a request for reconsideration under Rule 6.3 must demonstrate controlling law or factual matters put before the court in its decision on the underlying matter that the movant believes the court overlooked and that might reasonably be expected to alter the conclusion reached by the court." <u>RST (2005) Inc.</u>, 597 F. Supp. 2d at 365 (citing <u>Shrader v. CSX Transp., Inc.</u>, 70 F.3d 255, 257 (2d Cir. 1995)).

"[Local] Rule 6.3 is intended to ""ensure the finality of decisions and to prevent the practice of a losing party . . . plugging the gaps of a lost motion with additional matters."'" <u>Id.</u> (second alteration in original) (quoting <u>S.E.C. v. Ashbury Cap. Partners, L.P.</u>, No. 00 Civ. 7898, 2001 WL 604044, at *1 (S.D.N.Y. May 31, 2001) (quoting <u>Carolco Pictures, Inc. v. Sirota</u>, 700 F. Supp. 169, 170 (S.D.N.Y. 1988))). "A court must narrowly construe and strictly apply Rule 6.3 so as to avoid duplicative rulings on previously considered issues and to prevent Rule 6.3 from being used to advance different theories not previously argued, or as a substitute for appealing a final judgment." <u>Id.</u> (citations omitted).

"Reconsideration should not be granted where the moving party seeks solely to relitigate an issue already decided; in addition, the moving party may not 'advance new facts, issues or arguments not previously presented to the Court.'" Christoforou v. Cadman Plaza N., Inc., No. 04 Civ. 08403 (KMW), 2009 WL 723003, at *7 (S.D.N.Y. Mar. 19, 2009) (quoting Shamis, 187 F.R.D. at 151). "The decision to grant or deny a motion for reconsideration or reargument is in the 'sound discretion of a district court judge and will not be overturned on appeal absent an abuse of discretion.'" Wechsler v Hunt Health Sys., Ltd., 186 F. Supp. 2d 402, 410 (S.D.N.Y. 2002) (quoting Davidson, 172 F. Supp. 2d at 462) (citing McCarthy v. Manson, 714 F.2d 234, 237 (2d Cir. 1983)).

## II.   ANALYSIS

### A.   Breach of Contract Claims Against Shin and the Reid Defendants

Plaintiff alleges that Shin failed to provide compositions that he was obligated to provide to Majic, and thus breached Contracts 1, 2, and 3. (Cmplt. (Dkt. No. 1) ¶¶ 35-52) Plaintiff further contends that the Reid Defendants breached Contracts 2 and 3 by entering into a settlement with Shin that did not provide for production of the withheld compositions, or for payments to Majic in connection with withheld compositions. (Id. ¶¶ 53-65)

Plaintiff's motion for reconsideration does not present any intervening change in controlling law. Nor does Plaintiff offer new evidence in support of his claims. Instead, Plaintiff merely repeats arguments previously raised and rejected, contending that the Court "misapprehend[s] the facts of this case." (Pltf. Br. (Dkt. No. 83) at 5) Plaintiff's motion presents no basis for this Court to grant reconsideration.

SPA-36

    1.    **Shin and the Joombas Entities**

    a.    **Contract 1**

Contract 1 requires that Shin, inter alia, "[d]eliver to [Majic], for exclusive exploitation, all Compositions," including "all musical compositions . . . written by [Shin] prior to or during the Term [of Contract 1] and . . . any and all other compositions written by [Shin] and/or acquired by [Shin] or [Shin's] Affiliates during the Term of [Contract 1]." (Contract 1 (Dkt. No. 1-1) at 1)  Shin argued that – as a result of Contract 3 – he was not required to deliver compositions to Majic, because Contract 3 provides that "the songs were to be delivered to Reid." (Joombas Br. (Dkt. No. 50) at 11)  After analyzing (1) an integration clause in Contract 2; and (2) Contract 3, which amends Contract 2 so as to require Shin "to perform, directly for [Reid], any and all obligations which relate to the Compositions [and] Delivery thereof" (Contract 3 (Dkt. No. 1-3) at 2 ¶ 2), the Court held that "Contract 3 expressly modifies the delivery obligations set out in Contract 2[.]  [B]ecause Contract 1 'shall be deemed amended in all respects necessary to conform to the provisions of [Contract 2,] . . . Contract 3 also modifies Contract 1's delivery obligations.  After execution of Contract 3, Shin no longer was required to deliver compositions to Majic; his obligation was to deliver the compositions to Reid." (Sept. 23, 2019 Order (Dkt. No. 80) at 16)  This Court went on to hold, however, that Plaintiff "states a claim for breach of Contract 1 as to conduct that took place before Contract 3 was executed in January 2014." (Id. at 17)

    Plaintiff now argues that because "[t]he terms of Contract 1 have yet to be fulfilled, . . . all songs acquired by Shin or his affiliates are to be delivered to Majic. . . . The Court's interpretation of the interplay between Contract[s] 1 and 3 is erroneous and the Decision on this issue must be vacated." (Pltf. Br. (Dkt. No. 83) at 8-9)  Plaintiff does not present "'controlling decisions or factual matters'" that the Court overlooked in the September 23, 2019

6

Opinion, however.  Eisemann, 204 F.3d at 395 n.2 (quoting Shamis, 187 F.R.D. at 151).  Instead, Plaintiff "seeks solely to relitigate an issue already decided."  Christoforou, 2009 WL 723003, at *7.  Moreover, Plaintiff does not explain why he believes "[t]he Court's interpretation of the interplay between Contract[s] 1 and 3 is erroneous."  See Pltf. Br. (Dkt. No. 83) at 8-9.  Accordingly, Plaintiff's motion for reconsideration will – as to Contract 1-based claims against Shin and the Joombas Entities – be denied.

<blockquote>b.      <u>Contracts 2 and 3</u></blockquote>

In the Complaint, Plaintiff alleges that Shin "had a duty" under both Contract 2 and Contract 3 to provide compositions to Plaintiff, and that Shin breached both contracts by "fail[ing] to provide the acquired composition[s] to Majic and fail[ing] to submit composition[s] co-written by Shin to Majic."  (Cmplt. (Dkt. No. 1) ¶¶ 43, 45, 50-51)  As with Plaintiff's Contract 1 breach claim, Shin argues that he "ha[d] no obligations to Majic, only to Reid." (Joombas Br. (Dkt. No. 50) at 7)  As this Court explains in the September 23, 2019 Order, Contract 2 is an agreement between Majic and Reid in which Majic is obligated to "[d]eliver to [Reid] each Composition . . . ."  (Contract 2 (Dkt. No. 1-2) at 2, ¶ 3)  Contract 2 does not impose an obligation on Shin to deliver compositions to Majic:

> While Shin signed a Writer's Inducement to Contract 2, in which he "agree[d] to
> be bound by all of the terms, covenants and conditions" set forth in Contract 2
> . . . , none of those "terms, covenants, and conditions" obligate Shin to deliver
> compositions to Majic.  Contract 3 likewise does not impose an obligation on
> Shin to deliver compositions to Majic.  Indeed, the apparent purpose of Contract 3
> is to excise Majic from the composition delivery process.  Accordingly, Shin's
> motion to dismiss Majic's claims for breach of Contract 2 and breach of Contract
> 3 will be granted.

(Sept. 23, 2019 Order (Dkt. No. 80) at 19)

Plaintiff now contends that this "Court's [d]ecision that Shin did not have the contractual obligation to deliver[] composition[s] to Majic pursuant to Contract 2 is a clear error that wrongfully cuts of[f] Plaintiff's rights to Contract[s] 1 and 2."  (Pltf. Br. (Dkt. No. 83) at 10)

7

Plaintiff further argues that the September 23, 2019 Order "contradicts itself," because, inter alia, "[o]n page 21 of the [d]ecision, the Court states that pursuant to Contract[s] 2 and 3 Majic had an obligation to deliver Shin's compositions to the [Reid] Defendants, which is inconsistent with the Court's statement on page 19 that Shin has no express or implied obligation to deliver the compositions for Majic." (Id. at 10-11)  Plaintiff also contends that "[b]ecause Contract 1 and Contract 2 do not concern the same subject matter, Contract 2's delivery provisions do not supersede Contract 1's delivery provisions." (Id. at 10)

> While Plaintiff disagrees with this Court's interpretation of the three contracts, that disagreement provides no basis for granting reconsideration.  A party who "seeks solely to relitigate an issue already decided" has provided no basis for reconsideration.  Christoforou, 2009 WL 723003, at *7.  Plaintiff has not raised either controlling decisions or factual matters that were overlooked by the Court.  See Eisemann, 204 F.3d at 395 n.2.  And while Plaintiff repeatedly asserts that the September 23, 2019 Order is internally contradictory, there is in fact no internal contradiction.  For example, Plaintiff claims that the Court's finding that "Contract 2 constitutes an agreement between Majic and Reid in which Majic is obligated to '[d]eliver to [Reid] each Composition' . . . [and that] Contract 3 . . . does not impose an obligation on Shin to deliver compositions to Majic" (Sept. 23, 2019 Order (Dkt. No. 80) at 19) – contradicts the Court's later finding that "Contracts 2 and 3 provide that it is Majic's obligation to ensure the delivery of the compositions."  (Id. at 21) (emphasis in original).[3]  (See Pltf. Br. (Dkt. No. 83) at

---

[3]  In the September 23, 2019 Order, the Court discusses in detail the delivery obligations of the three contracts:  "Pursuant to Contracts 1 and 2, Shin was required to deliver compositions to Majic, and Majic was required to deliver those compositions to Reid. . . . After Contract 3 was executed, . . . Shin was required to perform 'any and all obligations' for Reid 'relat[ing] to the Compositions, [and] [d]elivery thereof.' . . . Accordingly, Contract 3 expressly modifies the delivery obligations set out in Contract 2, and – because Contract 1 'shall be deemed amended in all respects necessary to conform to the provisions of [Contract 2]' . . . – Contract 3 also modifies Contract 1's delivery obligations.  After execution of Contract 3, Shin no longer was

11)  These findings are not contradictory.  While Majic was obligated to ensure delivery of compositions to Reid, Shin had no obligation – under Contract 3 – to deliver compositions to Majic.  Plaintiff's motion for reconsideration will – as to Contract 2 and Contract 3-based claims against Shin and the Joombas Entities – be denied.

### 2.   Reid Defendants

#### a.   Contracts 2 and 3

Plaintiff alleges that the Reid Defendants breached Contracts 2 and 3 by entering into a settlement with Shin.  (Cmplt. (Dkt. No. 1) ¶¶ 53-65)  Plaintiff contends that the Reid Defendants did not fulfill their obligations to demand that Shin deliver compositions to Majic, "administrate the compositions for Majic," and "collect funds for Majic."  (Id. ¶¶ 56-57, 59-61)  Plaintiff further claims that the Reid Defendants "caused . . . copyright[s] to be registered without identifying Plaintiff."  (Id. ¶ 58)  In the September 23, 2019 Order, this Court dismissed Plaintiff's Contract 2 and Contract 3 breach claims against the Reid Defendants.  (Sept. 23, 2019 Order (Dkt. No. 80) at 19)

Plaintiff now repeats his assertions that the "Settlement Agreement in 2018 between Shin and [the Reid] Defendants contains an express breach of Contract 2 and Contract 3. . . . The Court's [d]ecision ignores the necessity of affirmative administration of the compositions, especially to collect royalties, which was Reid/EMI/Sony's obligation to

---

required to deliver compositions to Majic; his obligation was to deliver the compositions to Reid."  (Sept. 23, 2019 Order (Dkt. No. 80) at 16)  "Contract 2 constitutes an agreement between Majic and Reid in which Majic is obligated to '[d]eliver to [Reid] each Composition.' . . . [N]one of th[e] 'terms, covenants, and conditions' [in Contract 2] obligate Shin to deliver compositions to Majic.  Contract 3 likewise does not impose an obligation on Shin to deliver compositions to Majic.  Indeed, the apparent purpose of Contract 3 is to excise Majic from the composition delivery process."  (Id. at 19)

administer. . . . Further[], the 2018 Settlement Agreement did not address the re-registration of compositions necessary to implement Majic's rights in the future."  (Pltf. Br. (Dkt. No. 83) at 25)

As the Court explains in the September 23, 2019 Order, (1) the Reid Defendants were not required to demand that Shin deliver compositions to Majic; (2) the Complaint does not identify which compositions the Reid Defendants did not "administrate"; and (3) Plaintiff does not identify the funds the Reid Defendants allegedly should have collected.  (Sept. 23, 2019 Order (Dkt. No. 80) at 21)

In his motion for reconsideration, Plaintiff offers a new argument:  that the Reid Defendants were obligated to re-register copyrights.  But Plaintiff does not allege in the Complaint that the Reid Defendants failed to re-register copyrights.  And Plaintiff cannot now "plug[] the gaps of a lost motion" with new allegations.  See RST (2005) Inc., 597 F. Supp. 2d at 365 ("[A] motion under Rule 6.3 should not be used to advance theories not previously argued."); see also Davidson, 172 F. Supp. 2d at 461 ("A motion for reconsideration may not be used to advance new facts, issues or arguments not previously presented to the Court, nor may it be used as a vehicle for relitigating issues already decided by the Court.").

As with Plaintiff's other arguments for reconsideration, Plaintiff cites no controlling decisions or factual matters that this Court overlooked.  See Eisemann, 204 F.3d at 395 n.2.  Accordingly, Plaintiff's motion for reconsideration will – as to the Reid Defendants – be denied.

**B.**     **Plaintiff's Motion to Amend**

Plaintiff seeks leave to amend the Complaint to add a claim for fraud in the inducement against the Joombas Defendants.  Plaintiff also seeks permission to "refile" his

10

tortious interference claim against the Joombas Entities.  (Pltf. Br. (Dkt. No. 83) at 20; Pltf. Ltr. (Dkt. No. 90))[4]

Plaintiff contends that Shin "continued to hide the real facts from Majic and the [Reid] Defendants in order to keep the scheme and his prior breaches secret," which "allowed Shin to secure . . . Contract 3."  (Pltf. Br. (Dkt. No. 83) at 22)  Plaintiff further contends that "Shin knowingly misrepresented facts leading up to the 2014 Modification."  According to Plaintiff, because Shin "hid . . . facts during the negotiation[] of [Contract 3]," and because "[s]uch action w[as] necessary to secure [Contract 3]," Plaintiff may assert a claim for fraud in the inducement against the Joombas Defendants.  (Pltf. Ltr. (Dkt. No. 90) at 2)

As to tortious interference, Plaintiff asserts that the Joombas Entities "had an objective to secure [a] breach [of the contracts between Majic and Shin] in order to provide the compositions to Universal or other publishers[, and] . . . to deprive Majic of the funds associated with the compositions written by Shin and other writers."  (Id. at 3)

1.   **Legal Standard**

Under the Federal Rules of Civil Procedure, leave to amend should be "freely give[n] . . . when justice so requires."  Fed. R. Civ. P. 15(a)(2).  District courts "ha[ve] broad discretion in determining whether to grant leave to amend."  Gurary v. Winehouse, 235 F.3d 792, 801 (2d Cir. 2000).  A court may properly deny leave to amend in cases of "'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of

_____

[4]  This Court's Individual Rules require that a pre-motion letter be submitted to the Court before a motion to amend is filed.  (Individual Rules of Prac. of Judge Paul G. Gardephe, Civil Cases, IV.A.)  Plaintiff filed his motion to amend without submitting the required pre-motion letter.  Although this violation alone justifies denial of Plaintiff's motion to amend, the Court addresses the merits of the motion below.

11

the amendment, futility of amendment, etc.'" Ruotolo v. City of New York, 514 F.3d 184, 191

(2d Cir. 2008) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)); see also Murdaugh v. City

of New York, No. 10 Civ. 7218 (HB), 2011 WL 1991450, at *2 (S.D.N.Y. May 19, 2011)

("Although under Rule 15(a) of the Federal Rules of Civil Procedure leave to amend complaints

should be 'freely given,' leave to amend need not be granted where the proposed amendment is

futile." (citations omitted)).

       An amendment is futile where it is legally insufficient on its face such that the

amended claim could not survive a motion to dismiss.  Lucente v. IBM Corp., 310 F.3d 243, 258

(2d Cir. 2002).  Accordingly, where a defendant contends that proposed amendments are futile, a

court must consider "the proposed amendments through the prism that would apply to a Rule

12(b)(6) motion." BLT Rest. Grp. LLC v. Tourondel, 855 F. Supp. 2d 4, 14 (S.D.N.Y. 2012)

(citing Nettis v. Levitt, 241 F.3d 186, 194 n.4 (2d Cir. 2001), overruled on other grounds by

Slayton v. Am. Exp. Co., 460 F.3d 215 (2d Cir. 2006)).

       "To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v.

Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

These factual allegations must be "sufficient 'to raise a right to relief above the speculative

level.'" ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting

Twombly, 550 U.S. at 555).  "In considering a motion to dismiss . . . the court is to accept as true

all facts alleged in the complaint," Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d

Cir. 2007) (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87

(2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff." Id. (citing

Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555).

### 2.   **Futility**

The Joombas Defendants argue that leave to amend should be denied because Plaintiff's "'fraudulent inducement' theory fails under New York law, and thus amendment would be futile." (Joombas Br. (Dkt. No. 86) at 12)  The Joombas Entities do not address Plaintiff's request to "refile" his tortious interference claim.

### 3.   **Background**

In the Complaint, Plaintiff alleges that Shin "misrepresented and omitted the . . . existence of the compositions from Majic with the intent of depriving Majic of intellectual property and monies," and "hid all the compositions in his [Joombas] entities . . . in order to keep Majic in the dark." (Cmplt. (Dkt. No. 1) ¶¶ 82-85)  In granting the Joombas Defendants' motion to dismiss, this Court concluded that

> [t]hese allegations do not demonstrate a "legal duty separate from" Shin's obligations under Contracts 1, 2, and 3, nor do they make out "a fraudulent misrepresentation [that is] collateral or extraneous to" these contracts.  Indeed, the Complaint links Shin's "contractual duty" to "inform[] Majic of the existence of the . . . compositions" to Shin's alleged "misrepresent[ation] and omi[ssion] [of] the fact of the existence of the compositions from Majic." (Cmplt. (Dkt. No. 1) ¶¶ 82, 85)

> The Complaint also does not adequately plead facts that make out the elements of fraud, much less comply with the heightened pleading standards of Fed. R. Civ. P. 9(b).  Majic does not, for example, identify misrepresentations made by the Joombas Defendants.  And while the Complaint speaks generally of omissions on Shin's part, it does not specify when or where the misleading statements were made.  Nor does the Complaint plead reasonable reliance on any such misrepresentations.

(Sept. 23, 2019 Order (Dkt. No. 80) at 27 (footnote omitted))

Acknowledging that Plaintiff had put forth additional allegations in its opposition brief, this Court noted that these new allegations – not pled in the Complaint – could not be considered:

> In its opposition brief, Majic attempts to clarify its fraud claim, arguing that Shin's misrepresentations about the compositions were made "during the negotiation[] of [Contract 3]," and were necessary to secure Plaintiff's agreement to enter into Contract 3; accordingly, they amounted to fraud in the inducement. (Pltf. Opp. Br. (Dkt. No. 52) at 15-16)  These allegations are not set forth in the Complaint, however, and a "complaint cannot . . . be amended by the briefs in opposition to a motion to dismiss."  In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d 371, 432 (S.D.N.Y. 2001); see also Fadem v. Ford Motor Co., 352 F. Supp. 2d 501, 516 (S.D.N.Y.) ("It is long-standing precedent in this circuit that parties cannot amend their pleadings through issues raised solely in their briefs." (collecting cases)), aff'd, 157 F. App'x 398 (2d Cir. 2005).

(Sept. 23, 2019 Order (Dkt. No. 80) at 27 n.14)

### 4.    Discussion

#### a.    Fraud in the Inducement Claim

Plaintiff now seeks to add a fraud in the inducement claim against the Joombas Defendants premised on the following factual allegations:  (1) that Shin "continued to hide the real facts from Majic and the [Reid] Defendants in order to keep the scheme and his prior breaches secret," which "allowed Shin to secure . . . Contract 3" (Pltf. Br. (Dkt. No. 83) at 22); (2) that "Shin knowingly misrepresented facts leading up to [Contract 3]" (Pltf. Ltr. (Dkt. No. 90) at 2); and (3) that Shin "hid . . . facts during the negotiation[] of [Contract 3]" and that "[s]uch action w[as] necessary to secure [Contract 3]." (Id.)

> New York law specifically recognizes causes of action for fraud in the inducement when the misrepresentation is collateral to the contract it induced. See WIT Holding Corp. v. Klein, 282 A.D.2d 527, 528, 724 N.Y.S.2d 66 (2d Dep't 2001) ("[A] misrepresentation of material fact, which is collateral to the contract and serves as an inducement for the contract, is sufficient to sustain a cause of action alleging fraud.").  Furthermore, a promise to take some future action which is collateral to the contract can be considered a "misrepresentation" for purposes of a fraud in the inducement cause of action.  See Deerfield Comms.

14

Corp. v. Chesebrough-Ponds, Inc., 68 N.Y.2d 954, 956, 502 N.E.2d 1003, 1004, 510 N.Y.S.2d 88, 89 (1986) (holding that "a promise [not contained in the written agreement] made with a preconceived and undisclosed intention of not performing it . . . constitutes a misrepresentation" for purposes of a fraud in the inducement cause of action (quoting Sabo v. Delman, 3 N.Y.2d 155, 160, 143 N.E.2d 906, 908, 164 N.Y.S.2d 714, 716 (1957)) (internal quotation marks omitted)).

Wall v. CSX Transp., Inc., 471 F.3d 410, 416 (2d Cir. 2006); see also NRW, Inc. v. Bindra, 775 F. App'x 22, 24 (2d Cir. 2019) ("[T]o state a claim for fraudulent inducement under New York law, a plaintiff must show that '(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance.'" (quoting Wall v. CSX Transp., Inc., 471 F.3d 410, 415-16 (2d Cir. 2006))).

However, "where a fraud claim arises out of the same facts as plaintiff's breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties, the fraud claim is redundant and plaintiff's sole remedy is for breach of contract." Telecom Int'l Am., Ltd. v. AT & T Corp., 280 F.3d 175, 196 (2d Cir. 2001) (quotation marks and citation omitted); see also Spellman v. Columbia Manicure Mfg. Co., 111 A.D.2d 320, 324 (2d Dept. 1985).

In the September 23, 2019 Order, this Court ruled that Plaintiff's allegations that Shin "'misrepresented and omitted the . . . existence of the compositions from Majic with the intent of depriving Majic of intellectual property and monies,' and 'hid all the compositions in his [Joombas] entitities . . . in order to keep Majic in the dark,'" "do not demonstrate a 'legal duty separate from' Shin's obligations under Contracts 1, 2, and 3, nor do they make out 'a fraudulent misrepresentation [that is] collateral or extraneous to' these contracts." (Sept. 23, 2020 Order (Dkt. No. 80) at 26-27 (first quoting Cmplt. (Dkt. No. 1) ¶¶ 82-85; then quoting Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996))

SPA-46

In seeking leave to amend, Plaintiff does not detail any specific misrepresentations made by Shin during the negotiations regarding Contract 3.  Nor does Plaintiff make a claim that is distinct from his breach of contract claim.  Instead, Plaintiff argues that Shin breached the contract and then did not disclose his breach.  This alleged misrepresentation is not collateral to the breach of contract.  Plaintiff's fraud in the inducement claim is thus duplicative of his breach of contract claims.  Leave to amend to add a fraud in the inducement claim will be denied.

### b. Tortious Interference Claim

Plaintiff contends that he should be permitted to "refile the tortious interference claim" because the Joombas Entities "had an objective to secure [a] breach [of the contracts between Majic and Shin] in order to provide the compositions to Universal or other publishers[, and] . . . to deprive Majic of the funds associated with the compositions written by Shin and other writers."  (Pltf. Ltr. (Dkt. No. 90) at 3)

As explained in the September 23, 2019 Order, under New York law, the elements of tortious interference with contract are "(1) 'the existence of a valid contract between the plaintiff and a third party'; (2) the 'defendant's knowledge of the contract'; (3) the 'defendant's intentional procurement of the third-party's breach of the contract without justification'; (4) 'actual breach of the contract'; and (5) 'damages resulting therefrom.'"  Kirch v. Liberty Media Corp., 449 F.3d 388, 401-02 (2d Cir. 2006) (quoting Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 424 (1996)).  Moreover, "the third party's breach must have been caused by the defendant, meaning that the breach would not have occurred but for the defendant's acts."  Wolff v. Rare Medium, Inc., 210 F. Supp. 2d 490, 498 (S.D.N.Y. 2002), aff'd, 65 F. App'x 736 (2d Cir. 2003).

16

SPA-47

In granting the Joombas Entities' motion to dismiss Plaintiff's tortious interference claim, this Court concluded that Plaintiff had not alleged facts sufficient to show that the Joombas Entities had procured Shin's breach. (Sept. 23, 2019 Order (Dkt. No. 80) at 25) Plaintiff now merely asserts that the Joombas Entities "had an objective to secure the breach . . . [,] intended to interfere with . . . Contract 1 and Contract 2[, . . . and] intended to obtain the royalties that would have been due [to] Majic." (Pltf. Ltr. (Dkt. No. 90) at 3) These additional allegations are not sufficient to adequately plead that the Joombas Entities procured Shin's breach. Plaintiff's motion to "refile" his tortious interference claim will be denied.

**C.    Plaintiff's Request for "Clarification"**

Plaintiff states that he seeks "clarification in regard to Contract 1," "as the compositions written after January 2014 would still be the subject of Contract 1 because the parties still remained in the Initial Contract Period of Contract 1. The Court's [d]ecision eliminates Majic's contractual rights to the First Option Period, Second Option Period, and Third Option Period in Contract 1. Shin must fulfill the terms of Contract 1, which conduct extends well beyond January 2014." (Pltf. Br. (Dkt. No. 83) at 26-27) "If Contract 1 is the only enforceable contract as suggested in the [d]ecision, the terms of the Contract must be complied with and cannot be limited to Shin's conduct up to the execution of Contract 3. Furthermore, as Contract 3 (i) may not be enforceable due to the fraud in the inducement of Contract 3 and (ii) is the sole reason the Court believes Contract 1 is limited in time, the Court must allow the amendment to the Complaint and clarify Plaintiff's Contract 1 rights." (Id. at 28 (footnote omitted))

Plaintiff is not truly seeking a clarification in the September 23, 2019 Order. Plaintiff is instead expressing disagreement with the Court's ruling.

17

As stated in the September 23, 2019 Order (see Sept. 23, 2019 order (Dkt. No. 80) at 15-16), Contract 1 requires that Shin – among other things – "[d]eliver to [Majic], for exclusive exploitation, all Compositions," including "all musical compositions . . . written by [Shin] prior to or during the Term [of Contract 1] and . . . any and all other compositions written by [Shin] and/or acquired by [Shin] or [Shin's] Affiliates during the term [of Contract 1]." (Contract 1 (Dkt. No. 1-1) at 1, ¶ 3)  Contract 3 alters Shin's and Majic's delivery obligations. Pursuant to Contracts 1 and 2, Shin was required to deliver compositions to Majic, and Majic was required to deliver those compositions to Reid.  (Contract 1 (Dkt. No. 1-1) at 1; Contract 2 (Dkt. No. 1-2) at 2, ¶ 3)  After Contract 3 was executed, "[n]otwithstanding that all of the obligations to [Reid] under [Contract 2] are solely Majic's obligations" (Contract 3 (Dkt. No. 1-3) at 2, ¶ 2), Shin was required to perform "any and all obligations" for Reid "relat[ing] to the Compositions, [and] [d]elivery thereof."  (Id.)  Accordingly, Contract 3 expressly modifies the delivery obligations set out in Contract 2, and because Contract 1 "shall be deemed amended in all respects necessary to conform to the provisions of [Contract 2]" (Contract 1 (Dkt. No. 1-1) at 6-7 ¶ 13), Contract 3 also modifies Contract 1's delivery obligations.

In sum, after Contract 3 was executed, Shin was no longer required to deliver compositions to Majic; his obligation was to deliver the compositions to Reid.  Accordingly, this Court dismissed Plaintiff's breach claim against Shin to the extent that Plaintiff's claim for breach of Contract 1 concerns conduct that took place after Contract 3 was executed in January 2014.  (Sept. 23, 2019 Order (Dkt. No. 80) at 15-16)  While Contract 1 is not the "only enforceable contract" (Pltf. Br. (Dkt. No. 83) at 28), it is the only contract as to which Plaintiff can assert a breach claim against Shin.

SPA-49

## CONCLUSION

It was for the reasons stated above that this Court issued its March 31, 2021 Order

denying (1) Plaintiff's motion for reconsideration; and (2) Plaintiff's motion for leave to amend.

Dated: New York, New York
       May 20, 2021

SO ORDERED.

_____

Paul G. Gardephe
United States District Judge

SPA-50

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUAN CATALA, d/b/a MAJIC
ENTERTAINMENT LLC, d/b/a
ADRAWN MUSIC PUBLISHING,

                              Plaintiff,

         - against -

JOOMBAS CO LTD, JOOMBAS MUSIC
INT'L, JOOMBAS LLC, JOOMBAS
MUSIC GROUP, HYUK SHIN, THE LA
REID MUSIC PUBLISHING COMPANY
LLC, EMI APRIL MUSIC INC., and
SONY/ATV SONGS LLC,

                              Defendants.

**MEMORANDUM
OPINION & ORDER**

18 Civ. 8401 (PGG) (GWG)

PAUL G. GARDEPHE, U.S.D.J.:

        Plaintiff Juan Catala, d/b/a Majic Entertainment LLC ("Majic"), d/b/a Adrawn

Music Publishing (collectively, "Catala") brings this action against Defendant Hyuk Shin;

Defendants Joombas Co. LTD., Joombas Music Int'l, Joombas LLC, and Joombas Music Group

(collectively, the "Joombas Defendants"); and the LA Reid Music Publishing Company, LLC

("Reid"), EMI April Music Inc. ("EMI"), and Sony/ATV Songs LLC ("Sony") (collectively, the

"Reid Defendants").  The Complaint asserts claims for breach of contract, breach of fiduciary

duty, fraud, tortious interference with contractual relations, violation of the Copyright Act, and

for an accounting.  (Cmplt. (Dkt. No. 1) ¶¶ 35-112)

        Shin, the Joombas Defendants, and the Reid Defendants moved to dismiss the

Complaint.  (Dkt. Nos. 50, 67)  On September 23, 2019, this Court granted the motions to

dismiss submitted by the Joombas Defendants and the Reid Defendants.  This Court granted in

part and denied in part Shin's motion to dismiss.  (Sept. 23, 2019 Order (Dkt. No. 80))

On April 30, 2022, Catala moved for summary judgment on his remaining claim against Shin (Pltf. Mot. (Dkt. No. 145)), and Shin cross-moved for summary judgment on May 2, 2022. (Shin Mot. (Dkt. No. 155)) Catala has also moved to strike Shin's affirmative defenses. (See Pltf. Br. (Dkt. No. 152) at 19-25)[1]

For the reasons stated below, Plaintiff's motion for summary judgment will be denied, and Defendant Shin's motion for summary judgment will be granted. Plaintiff's motion to strike Defendant's affirmative defenses will be denied as moot.

## BACKGROUND

I.   ## FACTS[2]

A.   ## The Parties and the Co-Publishing Agreements

Shin is a musician and executive producer (Pltf. Subm., Ex. 11 ("Shin Dep.") (Dkt. No. 146-1) at 14-15) Juan Catala is a music producer, and he owned Majic and was its sole

---

[1] The page numbers of documents referenced in this opinion correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

[2] In his Local Rule 56.1 Statement, Plaintiff states that "Defendant did not provide a timely response to . . . Plaintiff's Request for Admissions" and that, accordingly, "the Admissions identified in [Plaintiff's Request for Admissions] are admitted." Plaintiff cites to these "Admissions" as evidence supporting his statement of facts. (Pltf. R. 56.1 Stmt. (Dkt. No. 165) at 2 n.1) Shin argues that "all references to the 'Shin Admissions' [ ] are improper." (Shin Opp., Ex. 21 ("Shin Resp. R. 56.1 Stmt.") (Dkt. No. 166-21) at 2; see also Shin Opp. (Dkt. No. 166) at 5 n.2 ("Plaintiff asserts in his [Rule 56.1 Statement] (but not in his brief) that Defendant [Shin] admitted all of the Requests for Admission served upon him. This is incorrect, for the reasons detailed in Defendant's [Response and Counterstatement to Plaintiff's Rule 56.1 Statement]." (citation omitted)); Shin Reply (Dkt. No. 167) at 11 ("Plaintiff takes the unsupportable position that all of his Requests were admitted, but that is simply incorrect." (emphasis omitted))

It is undisputed that Plaintiff emailed the Request for Admissions to Defendant Shin on February 9, 2022. (Pltf. Subm., Ex. 33 ("White Decl.") (Dkt. No. 150-5) ¶ 3; Shin Opp., Ex. 1 ("Hochberg Decl.") (Dkt. No. 166-1) ¶ 23) According to Shin, he emailed his responses to Plaintiff on March 14, 2022. (Hochberg Decl. (Dkt. No. 166-1) ¶ 24)

employee. Majic is now defunct. (Pltf. Subm., Ex. 12 ("Catala Dep.") (Dkt. No. 146-2) at 58-

63, 196)  Juan Catala and Shin met in approximately 2008 or 2009. (Pltf. R. 56.1 Stmt. (Dkt.

No. 165) ¶ 1)[3]

On April 1, 2009, Majic entered into a "Co-Publishing/Exclusive Administration

Agreement" with Shin and non-party Sean Hamilton ("Contract 1"). (Shin R. 56.1 Stmt. (Dkt.

---

Fed. R. Civ. P. Rule 36(a)(3) states that "[a] matter is admitted unless, within 30 days after being
served, the party to whom the request is directed serves on the requesting party a written answer
or objection . . . . A shorter or longer time for responding may be stipulated to under Rule 29 or
be ordered by the court." Fed. R. Civ. P. Rule 36(a)(3). Because Plaintiff served Shin with the
Request for Admissions on February 9, 2022, Shin's response was due on Friday, March 11,
2022. Shin emailed his response on Monday, March 14, 2022, however. (See Shin Opp., Ex. J
(Dkt. No. 166-11) at 2)

"[T]he failure to respond in a timely fashion does not require the court automatically to deem all
matters admitted." Loc. Union No. 38, Sheet Metal Workers' Int'l Ass'n, AFL-CIO v. Tripodi,
913 F. Supp. 290, 294 (S.D.N.Y. 1996). "Rather, Rule 36(b) provides that the Court, on motion,
may permit an admission to be withdrawn or amended if (1) 'it would promote the presentation
of the merits of the action' (2) without 'prejudic[ing] the requesting party in maintaining or
defending the action on the merits.'" Paniagua v. Walter Kidde Portable Equip., Inc., 183 F.
Supp. 3d 473, 482 (S.D.N.Y. 2016) (alteration in original) (quoting Fed. R. Civ. P. 36(b);
Donovan v. Carls Drug Co., Inc., 703 F.2d 650, 652 (2d Cir. 1983)).

This Court construes Shin's papers as requesting a ruling that his response to Plaintiff's Request
for Admissions be deemed timely. (See Shin Opp. (Dkt. No. 166) at 5 n.2; Shin Reply (Dkt. No.
167) at 11) The Court finds that such a ruling promotes "presentation of the merits of the
action." Moreover, Plaintiff has not suffered unfair prejudice, given Shin's three-day (one
business day) delay in responding to Plaintiff's Request for Admissions. Accordingly, Shin will
not be deemed to have admitted all of Plaintiff's Requests for Admissions as a result of his late
response.

[3] To the extent that this Court relies on facts drawn from a party's Local Rule 56.1 statement, it
has done so because the opposing party has either not disputed those facts or has not done so
with citations to admissible evidence. See Giannullo v. City of New York, 322 F.3d 139, 140
(2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving
party's Rule 56.1 statement, that fact will be deemed admitted."); Local Civ. R. 56.1(d) ("Each
statement by the movant or opponent . . . , including each statement controverting any statement
of material fact, must be followed by citation to evidence which would be admissible."). Where
the opposing party disputes the moving party's characterization of cited evidence, and has
presented an evidentiary basis for doing so, the Court relies on the opposing party's
characterization of the evidence. See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001)

No. 159) ¶ 1; see also Shin Decl., Ex. 1 ("Contract 1") (Dkt. No. 157-1))  On May 1, 2009, Majic

entered into an "Exclusive Co-Publishing and Administration Agreement" with Defendants Reid

and EMI ("Contract 2").  (Shin R. 56.1 Stmt. (Dkt. No. 159) ¶ 8; see also Shin Decl., Ex. 2

("Contract 2") (Dkt. No. 157-2))

1.   **Contract 1:  The Majic-Shin Agreement**

Contract 1 – which identifies Majic as "Publisher" and Shin, Hamilton, and their

designees and Affiliates[4] as "you" – requires Shin to "Deliver to Publisher, for exclusive

exploitation, all Compositions,"[5] and provides that "Publisher will be the exclusive co-publisher

and exclusive administrator of all Compositions."  (Contract 1 (Dkt. No. 157-1) at 2)

---

("In ruling on a motion for summary judgment, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.").

Because "a Rule 56.1 statement 'is not itself a vehicle for making factual assertions that are otherwise unsupported in the record,' . . . 'where the record does not support the assertions in a Local 56.1 statement, those assertions [have been] disregarded and the record reviewed independently.'" Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, 138 F. Supp. 3d 352, 394 (S.D.N.Y. 2015), aff'd sub nom. Congregation Rabbinical Coll. of Tartikov,Inc. v. Vill. of Pomona, NY, 945 F.3d 83 (2d Cir. 2019) (quoting Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 74 (2d Cir. 2001)).

[4]  Contract 1 defines "Affiliates" as "any Person which you own or in which you have interest, in whole or in part, or which you employ or which employs you, and/or any Person, the operation of which is controlled directly or indirectly by you." (Contract 1 (Dkt. No. 157-1) § 12(e)) Contract 1 defines "Person" to mean "any individual, corporation, partnership, association or other organized group of persons of whatever nature, or legal successors or representatives of the foregoing." (Id. § 12(g))

[5]  Contract 1 defines "Compositions" as "(a) all musical compositions . . . written by you prior to or during the Term [of Contract 1] and (b) any and all other compositions written by you and/or acquired by you or your Affiliates during the term [of Contract 1]." (Contract 1 (Dkt. No. 157-1) § 3) Contract 1 defines "Delivery" and "Delivered" as "the actual receipt by Publisher at EMI Music Publishing[,] 75 9th Avenue, 4th Floor, New York, New York 10011." (Id. § 12(c))

Pursuant to Contract 1, "Publisher is granted 50% of the copyright" of each

composition "written entirely by you."[6]  (Id. § 3)  Contract 1 further provides that Shin

> hereby sell[s], transfer[s] and assign[s] to Publisher . . . an undivided 50% interest
> in all of Your Interest in the Compositions, including without limitation in and to
> all copyrights therein . . . . It is the essence of this Agreement that Publisher
> acquire an undivided 50% interest in all of Your Interest in all Compositions.

(Id. § 5(a))  Contract 1 defines "Your Interest" as "that percentage interest in a Composition

resulting from your authorship and/or ownership of rights in that Composition."  (Id. § 3)

Contract 1 further provides that

> it is the intent of the parties that Publisher . . . shall be the exclusive administrator
> of all rights in and to the Compositions and Publisher shall have . . . the broadest
> possible rights to administer one hundred percent (100%) of Your Interest in the
> Compositions and otherwise exploit the Compositions.  Accordingly, with respect
> to Your Interest in the Compositions, Publisher . . . shall have the sole and
> exclusive right . . . to:  license the exploitation of the Compositions in all forms,
> media, technologies and configurations . . . ; print, publish, rent and/or sell printed
> editions and other reproductions of the Compositions . . . ; collect all monies
> whatsoever derived from exploitation of the Compositions, whenever earned;
> license public performance rights . . . ; make arrangements, adaptations and other
> changes; and otherwise administer and grant rights in, and with respect to, the
> Compositions to the fullest extent possible.  In connection with the foregoing, you
> hereby appoint Publisher your true and lawful attorney to secure and renew
> copyrights, initiate and compromise infringement claims, and to execute in your
> name any and all documents reasonably necessary or desirable to accomplish the
> foregoing and/or effectuate Publisher's rights hereunder.

(Id. § 5(b))

Contract 1 further provides that "[d]uring each Contract Period, you shall Deliver

to Publisher ('Minimum Delivery and Release Commitment' or 'MDRC') at least four (4) Full

New Compositions, or the fractional equivalent."[7]  (Id. § 4)

---

[6] Contract 1 terms such compositions "New Compositions" or "Full New Compositions."
(Contract 1 (Dkt. No. 157-1) § 3)

[7] Contract 1 defines "Contract Period" as "the First Contract Period, or any Option Period, of the
Term of this Agreement."  (Contract 1 (Dkt. No. 157-1) § 12(d))

Contract 1 also requires Shin to "represent, warrant and covenant that," inter alia, he "ha[s] not entered into (and will not enter into) any agreement (including, without limitation, any license) which would interfere with any of the rights granted to Publisher pursuant to this Agreement." (Id. § 9(a))  Contract 1 provides that Shin "will not perform or render any services for the purposes of writing musical compositions that either directly or indirectly for any person or entity other than Publisher and . . . will not enter into [any] agreement with respect to any Compositions[] or rights with respect thereto." (Id. § 9(b))

Contract 1 also sets out the structure for royalty payments among Majic, Shin, and Reid.  It contemplates Majic's receipt of royalties from Reid pursuant to Contract 2, and provides that "[f]rom all royalties actually received by Publisher from Reid under [Contract 2] from the exploitation of Compositions throughout the world . . . , Publisher shall," after making certain deductions, "pay to you an amount equal to fifty percent (50%) of the balance remaining, and the remaining fifty percent (50%) thereof shall be retained by Publisher for its sole use and benefit." (Id. § 6(a))  Majic, similarly, agrees to pay Shin fifty percent of advances received from Reid

---

The Term of this Agreement ("Term") shall consist of a First Contract Period beginning as of [April 1, 2009] with Publisher having the options to extend the Term for additional, immediately consecutive Contract Periods (the "First Option Period," the "Second Option Period," the "Third Option Period" and so forth; each, an "Option Period"), if any, as set forth by Publisher's agreement (the "Reid Agreement") with LA Reid Music Publishing Company, LLC and EMI Music Publishing, Inc. ("Reid"). Each Contract Period shall continue until the later of: (i) one year following commencement of such Contract Period; or (ii) thirty (30) days following Reid's receipt of written notice accurately reflecting complete fulfillment of the Minimum Delivery Commitment for such Contract Period.  Publisher may exercise each such option by sending written notice to you at any time prior to the expiration of the then-current Contract Period.  Each such option shall be deemed automatically exercised by Publisher unless Publisher shall give you written notice to the contrary at any time prior to the date that the applicable Contract Period would otherwise expire.  For purposes of clarity, the Term of this Agreement shall be cotermin[o]us with the term of the Reid Agreement.

(Id. § 2)

pursuant to Contract 2, after making certain deductions, and retain the remaining portion of the advances.  (Id. § 6(b))

Finally, Contract 1 provides that it "shall be deemed amended in all respects necessary to conform to the provisions of [Contract 2]," and provides that, in entering Contract 1, Shin "agree[s] to amend or modify any provisions of [Contract 1] to conform to the provisions of [Contract 2]," and agrees to "comply with any other restriction, and . . . grant any additional rights, as may be required by Reid" pursuant to Contract 2.  (Id. § 13)

### 2.    Contract 2:  The Reid Agreement

Contract 2 – which identifies Reid and EMI as "Publisher," Majic as "you," and Shin and Hamilton each as "Writer" – is also "an exclusive co-publishing and administration agreement."  (Contract 2 (Dkt. No. 157-2) at 2)  Contract 2 states that, during the term of the agreement, Majic "shall cause Writer to Deliver to Publisher, for exclusive exploitation, all Compositions," and that "Publisher will be the exclusive administrator and co-publisher of Your Interest in all Compositions."[8]  (Id.)  However, Contract 2 also states that "You" – that is, Majic – "shall Deliver to Publisher" – that is, Reid and EMI – "each Composition."  (Id. § 3)  Pursuant

---

[8]  Contract 2 employs different terminology than Contract 1 in defining "Compositions":  "New Compositions" are "all musical compositions . . . written by Writer during the Term"; "Old Compositions" are "all musical compositions . . . written by Writer prior to the Term"; and "Acquired Compositions" are "all musical compositions . . . in which any right or interest is acquired by Writer or Writer's Affiliates prior to or during the Term."  (Contract 2 (Dkt. No. 157-2) § 3)  Contract 2 defines "Affiliates" as "any Person which you or Writer own or in which you or Writer have an interest, in whole or in part, or which you or Writer employ or which employs you or Writer, and/or any Person, the operation of which is controlled directly or indirectly by you or Writer."  (Id. § 11(c))

Contract 2 defines "Delivery" or "Delivered" as "the actual receipt by Publisher at its offices in New York, New York."  (Id. § 11(b))  Contract 2 provides that "[a]ll notices to Publisher shall be sent c/o EMI April Music Inc., 75 Ninth Avenue, Fourth Floor, New York, NY 10011."  (Id. § 12(b))

to Contract 2, Majic agrees to "sell, grant, transfer and assign" to Reid and EMI "an undivided 50% interest in all of [Majic's] Interest in the Compositions, including, without limitation, the copyrights therein." Majic "retain[s] the remaining 50% copyright interest." (Id. § 5)

### B.   **Contract 3:  The Modification**

On January 1, 2014, nearly five years after Contracts 1 and 2 were executed, Reid, EMI, Majic, Shin, and Hamilton amended Contract 2 pursuant to a Settlement Agreement that Reid, EMI, Shin, and Hamilton had entered into with third parties.[9] This agreement is "Contract 3." (Shin Decl., Ex. 3 ("Contract 3") (Dkt. No. 157-3) at 2) According to Contract 3, "Hamilton and Shin . . . made various claims that Majic . . . failed to make required royalty payments to them under [Contract 1]." (Id. § 1(d)) Consequently, Hamilton and Shin "wish[ed] to modify certain provisions of [Contract 2], including . . . certain payment and Delivery obligations." (Id. § 1(e))

Whereas Contracts 1 and 2 contemplate Shin's (and Hamilton's) delivery of Compositions to Majic, and Majic's delivery of those Compositions, in turn, to Reid and EMI, Contract 3 requires Shin and Hamilton to perform "any and all obligations" for Reid and EMI "which relate to the Compositions, [and] Delivery thereof," and makes them jointly and severally liable with Majic for those responsibilities, "[n]otwithstanding that all of the obligations to [Reid

---

[9] The Settlement Agreement was entered into by Vance Tate, Thomas Oliveria, and their company, New East Management, on the one hand, and Reid, EMI, Hamilton, and Shin on the other, and was fully executed in October 2011. (Contract 3 (Dkt. No. 157-3) at 14-24) According to the Settlement Agreement, in August 2008, New East Management, Shin, and Hamilton entered into a contract, pursuant to which New East Management would render personal management services to Shin and Hamilton. Shin and Hamilton terminated this contract in February 2009. (Id. at 14) Tate, Oliveria, and New East Management contended that, under this contract, they were entitled to certain post-term commissions on revenues Shin and Hamilton earned, and were entitled to a portion of the copyright interest in one of Shin's and Hamilton's songs. In March 2011, Tate, Oliveria, and New East Management brought suit in this District, and the Settlement Agreement resolved that lawsuit. (Id.)

and EMI] under [Contract 2] are solely Majic's obligations." (Id. § 2)  Contract 3 also

significantly alters the payout of royalties and advances related to Shin's Compositions, such that

Reid is obligated to pay directly to Shin certain royalty shares and advances, rather than routing

those payments through Majic.  (Id. §§ 5-6)  With respect to royalties, "the royalties otherwise

accruing to Majic's credit under [Contract 2] shall be divided among Majic's, Shin's, and

Hamilton's royalty accounts." (Id. § 6)  Likewise, "any future [a]dvances payable under

[Contract 2]" would be paid out separately and "charged to their respective royalty accounts."

(Id. § 5)

        In Contract 3, Majic, Shin, and Hamilton "fully release and forever discharge

Reid and EMI . . . from any legal cause of action whatsoever now or hereafter existing under any

law . . . any time prior to January 1, 2014."  Shin and Hamilton also "fully release and forever

discharge Majic . . . from any legal cause of action relating to the accounting and/or payment of

royalties now or hereafter existing under any law . . . any time prior to January 1, 2014."  (Id. §

4)  Majic does not release any claims against Shin in Contract 3, however.

    **C.**    **The Tolling Agreement**

        On April 14, 2017, Shin, Majic, Reid, and EMI entered into a tolling agreement

(the "Tolling Agreement").  The Tolling Agreement – which identifies Majic, Reid, and EMI

collectively as "Publisher" – acknowledges that

> Publisher has asserted claims that, beginning in 2011 and through [April 14,
> 2017], Shin acquired certain musical compositions and has delivered those
> compositions to Joombas Co. Ltd. ("Joombas") allegedly in breach of [Shin's
> obligations under Contract 2, as modified] and failed to deliver those acquired
> compositions and income derived from such compositions.

(Shin Decl., Ex. 5 ("Tolling Agreement") (Dkt. No. 157-5) at 2)  The Tolling Agreement further

states that Shin denies the breach claim, and contends that Contract 2 is unconscionable, and that

he has not received payments due under Contract 2.  (Id.)

9

In the Tolling Agreement, Shin, Majic, Reid, and EMI

> agree that commencing as of April 14, 2017 and continuing until 30 days after the date on which either Shin or Publisher provide . . . notice of termination [of the Tolling Agreement], . . . the running of time under any statutes of limitation or any other time-based limitations or defenses . . . that might be asserted as a bar, limitation, or defense to any suit, action or claim arising out or in connection with [the claims the Publishers and Shin raised against one another would be tolled].

(Id.)

On June 29, 2018, Sony – which "at some point" acquired EMI (Catala Dep. (Dkt. No. 146-2) at 35) – provided notice of termination of the Tolling Agreement.  (Shin R. 56.1 Stmt. (Dkt. No. 159) ¶ 22)

### D.   June 2018 Settlement Agreement

On June 1, 2018, Reid, EMI, Shin, and Joombas Co., Ltd. entered into a Settlement Agreement (the "2018 Settlement Agreement").  (Simonian Decl., Ex. A ("2018 Settlement Agreement") (Dkt. No. 69-1) at 2, 11)  The 2018 Settlement Agreement states that Reid and EMI "contend that Shin has failed to deliver certain musical compositions to them, in violation of his obligations under [Contract 2 and Contract 3]"; that Shin denies these allegations; but that Reid, EMI, Shin, and Joombas Co., Ltd. "desire to settle their dispute amicably."  (Id. at 2)  Under the terms of the 2018 Settlement Agreement, Shin and Joombas Co., Ltd. agree to pay a sum of money to Reid and EMI.  Shin, Reid, and EMI agree that "[s]olely as between [them], [Contract 2] shall terminate effective as of the date of execution of [the 2018 Settlement Agreement]," and Contract 3 "shall terminate concurrently with the termination of [Contract 2]."  (Id. §§ 3.1, 4.1)  The parties to the 2018 Settlement Agreement also agree to "release, acquit and forever discharge" one another from "any and all causes of action, claims for relief, lawsuits, charges or complaints" they "ever had or [have] against [the other] with respect to [Contract 2 and Contract 3]."  (Id. §§ 5.1-5.2)

10

The 2018 Settlement Agreement repeatedly states that it does not bind or otherwise affect Majic's rights under the various contracts. For example, in the Recitals section of the 2018 Settlement Agreement, the parties state that they "specifically exclud[e] from the said settlement any claims that may belong to or be separately capable of being asserted by Majic under the terms of [Contracts 1, 2, and 3]." (Id. at 2) Likewise, in the "Parties Bound" section, the parties state that the 2018 Settlement Agreement "specifically exclud[es] . . . Majic as to whom this Settlement Agreement is not binding." (Id. § 1) And although the 2018 Settlement Agreement terminates Contracts 2 and 3 as between Reid, EMI, and Shin, "[n]otwithstanding anything to the contrary contained in [Contracts 1, 2, and 3] . . . the termination of [Contracts 2 and 3] shall not effect a termination of [Contract 1] insofar as it pertains to the rights of Majic thereunder and Majic shall retain any and all rights and claims under [Contract 1] as if [Contract 2 and Contract 3] had not been terminated." (Id. § 4.1) Indeed, "[a]s between [Shin and Joombas, Co., Ltd.] and Majic, any rights, claims and defenses that Majic has or may have under [Contracts 1, 2, and 3] . . . shall survive this termination." (Id.)

### E.   **Compositions and Delivery**

In the Complaint, Plaintiff alleges that "Shin acquired in excess of One Hundred and Fifty (150) compositions from 2009 through 2017," and Plaintiff lists 122 of these compositions in exhibits to the Complaint. (Shin R. 56.1 Stmt. (Dkt. No. 159) ¶¶ 27-28; Cmplt. (Dkt. No. 1) ¶ 18; id., Exhs. E, H, I (Dkt. Nos. 1-5, 1-8, 1-9)) This Court dismissed Plaintiff's breach of contract claim "as to conduct that took place after Contract 3 was executed," however, and Contract 3 was "effective as of January 1, 2014." (Sept. 23, 2019 Order (Dkt. No. 80) at 17; Contract 3 (Dkt. No. 157-3) at 2) Accordingly, Plaintiff cannot recover for Compositions written or acquired by Shin after January 1, 2014.

In moving for summary judgment, Shin contends that only 14 of the 122 listed Compositions were released before January 1, 2014.  (Shin R. 56.1 Stmt. (Dkt. No. 159) ¶ 29)  He further contends that "[t]he scope of any cognizable breach of the 'delivery' provision of Contract 1 is . . . limited to these . . . compositions."[10]  (Shin Br. (Dkt. No. 158) at 21)  Plaintiff admits these facts, "with the additional clarifying assertion that this list is illustrative, not exhaustive of the compositions where Defendant failed to Deliver his entire interest to Plaintiff or Sony."  (Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 164) ¶¶ 30-32)  But in stating that Shin's "list is illustrative, not exhaustive," Plaintiff cites deposition testimony that does not name any other compositions that were released before January 1, 2014 in which "Defendant failed to Deliver his entire interest."  (See Pltf. Subm., Ex. 9 (Dkt. No. 145-11) at 28-29, 64-66); Shin Dep. (Dkt. No. 146-1) at 48-50, 84-100, 103, 122, 124)  Because Catala does not name any other compositions that Shin was required to deliver under Contract 1, the Court concludes that Shin's list of fourteen Compositions is in fact "exhaustive" as to the number of Compositions in which Shin and his Affiliates allegedly "failed to Deliver [their] entire interest to Plaintiff and Sony" as required under Contract 1.  (See Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 164) ¶¶ 30-32)

---

[10]  These compositions are:  "Black Pearl," "Don't Go," "Dream Girl," "G.R.8.U.," "Growl," "Hello," "Light Up The Darkness," "Pretty Girl," "Real 100%," "Romantic St.," "Say U Say Me," "Voodoo Doll," "Want You Back," and "We Don't Stop."  (Shin R. 56.1 Stmt. (Dkt. No. 159) ¶ 30)

Shin also addresses two additional compositions – "Eternity" and "Heaven's Day" – that were released after January 1, 2014, but before July 1, 2014, "out of an abundance of caution and solely for the purposes of [his] motion, as it is within the realm of possibility that these compositions were 'written or acquired' before January 1, 2014, even though they were released months later."  (Id. ¶¶ 31-32; Shin Br. (Dkt. No. 158) at 9, 21 n.3)  As discussed above, because this Court dismissed Plaintiff's breach of contract claim "as to conduct that took place after Contract 3 was executed," and because Contract 3 was "effective as of January 1, 2014" (Sept. 23, 2019 Order (Dkt. No. 80) at 17; Contract 3 (Dkt. No. 157-3) at 2), only the fourteen Compositions that were released before January 1, 2014 are at issue.

12

Shin contends that he and his Affiliates did in fact deliver to Plaintiff their entire

interest in these fourteen Compositions that were released before January 1, 2014.  (See Shin Br.

(Dkt. No. 158) at 21 ("Each of these [fourteen] [C]ompositions . . . was delivered." (emphasis

omitted))  Indeed, Shin claims that these fourteen Compositions "'were [later] delivered by

Majic . . . to [Sony], or to an entity for whom [Sony] or its predecessors acted as administrator.'"

(Shin R. 56.1 Stmt. (Dkt. No. 159) ¶¶ 37-38 (quoting Hochberg Decl., Ex. C (Dkt. No. 156-3) at

5-6))

Plaintiff contends, however, that there is a much larger category of songs that

Shin failed to deliver in a proper fashion.  According to Catala, Shin was required to deliver

hundreds of other songs to Majic or Sony that he had created or acquired but registered under the

names of other writers signed to his company, in order to avoid his obligations under Contract 1.

(See Pltf. Br. (Dkt. No. 152) at 14-15 ("But the Defendant didn't just fail to comply with his

contractual duty, the Defendant took additional steps to conceal his interest in musical

compositions by registering his publishing interest in subject compositions to other writers that

he controlled through a separate company."); Pltf. Opp. (Dkt. No. 162) at 16 ("The Defendant

never complied with [Contract 1's] requirement [to deliver Defendant's entire interest in all

musical compositions that were written or acquired by Defendant or Defendant's Affiliates to

Plaintiff] because the Defendant transferred the majority of his interest in musical compositions

to his company, Joombas, between 2011 and 2014."))

In the Complaint, Catala alleges that "Shin purposely and knowingly attempted to

defraud Majic of revenue associated with the songs/compositions Shin acquired and authored,

and hid the songs from Majic for several years."  (Cmplt. (Dkt. No. 1) ¶ 22; see also id. ¶ 25

("Shin and Joombas defrauded Majic by hiding the compositions and failing to provide them to

Majic and Reid.")) When asked at deposition to identify "one song that Shin did not deliver

pursuant to [Contract 1]," Catala testified that "[i]f you actually go to the [C]omplaint, I believe

there's 150 songs that I listed that were not being collected until after we listed them." (Catala

Dep. (Dkt. No. 146-2) at 120) Catala further testified that

> there's over 150 songs that I believe that should fall under Contract 1, that are out
> there, that I'm not being paid on.
>
> And those songs are not part of an exhibit [to the Complaint], because they might
> be songs that I haven't even discovered yet. This man has been stealing,
> fraudulently putting songs in other names, reducing the – the amount of
> percentages on the royalties.
>
> I don't know how much there is. I think there might be 300 songs. There's a lot
> of songs out there that – upwards to a couple hundred that I have not received a
> penny on. That's my testimony, and that's my belief.

(Id. at 259-60)

Catala explained that "'[i]t's not that [Shin] didn't deliver [the songs], he didn't

place them in his name, so that – so it's not that he didn't deliver. It's that he fraudulently put a

different name on the song. The songs were delivered, but they were delivered in someone else's

name.'" (Shin R. 56.1 Stmt. (Dkt. No. 159) ¶ 40 (quoting Catala Dep. (Dkt. No. 146-2) at 80))

According to Catala, Shin "didn't fail to deliver compositions that were in his name," but he only

"delivered 2 percent in his name. He delivered small portions of the song in his name. He just

didn't deliver the accurate amount of the ownership of the song." (Catala Dep. (Dkt. No. 146-2)

at 76-77) Catala contends that Shin

> would go the studio. He would create music that's supposed to funnel through
> our agreements, but instead, he would place the music in [Shin's friend's] name,
> or another name that – of someone who's not even in the country, who was not
> present at the recording session, so that they could collect and that they could pick
> up the money and then funnel it back to Shin.

14

(Id. at 75-76)[11]

**F.   Payments to Majic**

Between June 3, 2009 and May 2, 2022, Sony paid Majic $503,039.82 in advances, royalties, and other unspecified credit card balance and cash payments. (Shin R. 56.1 Stmt. (Dkt. No. 159) ¶¶ 43-44) Plaintiff acknowledges that Majic has received approximately $225,000 in royalties for "'musical compositions that Sony administers on behalf of Plaintiff in the contractual relationship between all parties identified in Contract 1.'" (Id. ¶ 45 (quoting Hochberg Decl., Ex. E (Dkt. No. 156-5) at 4))

**G.   Plaintiff's Expert Report**

Plaintiff has proffered an expert report from Gary W. Cohen concerning the "damages related to [Plaintiff's] breach of contract claims." (Pltf. Subm., Ex. 35 ("Cohen Report") (Dkt. No. 150-7) at 3) Cohen is a certified public accountant and the founder and president of Gary Cohen Corporation, which has "conducted over 1,000 royalty audits on behalf of recording artists, songwriters, producers, and other music entertainment companies." Cohen has "conducted many valuations of both music publishing and recorded music catalogs," and has "over 35 years of experience in the entertainment industry as a forensic accountant and business manager." (Id.)

According to Cohen, "the best way to determine the amount that Shin owes Catala is to tabulate the royalties and other consideration received by Shin from the exploitation of the relevant compositions." (Id. at 6) Cohen "requested, but did not receive, documentation detailing the total amount of revenue collected by Shin from 2009 to the present. Accordingly,

---

[11] As discussed below, this Court dismissed Catala's fraud claims against Shin and the Joombas Defendants for failure to state a claim. (See Sept. 23, 2019 Order (Dkt. No. 80) at 26-27)

[Cohen] cannot accurately determine the amount due Catala." (Id.)  In his report, Cohen

"provides a floor for the amount owed by Shin to Catala." (Id. at 7)

        Based on the documents available to him, Cohen has determined that "Catala is

due 50% of the royalties attributable to Shin," which amount to at least $603,654.  (Id.)

"Alternately, . . . [if] the [r]atio [applied in the 2018 Settlement Agreement were applied

here,] . . . Catala is due at least $675,000." (Id. at 8)

        Cohen's calculations are based on the following:

> Shin entered into an administration agreement with Warner/Chappell Music
> [("WCM")], dated January 20, 2017[ ]and received advances totaling . . .
> [$]667,500[];

> Shin entered into an administration agreement with Universal Music Publishing
> Kora ("UMPK") which preceded the administration agreement with [WCM].  The
> WCM Agreement refers to the UMPK agreement.  [Cohen] received one royalty
> statement rendered by UMPK to Shin which stated that Shin earned . . . [$]471[].
> [Cohen] did not receive any other UMPK royalty statements or the agreement
> between UMPK and Shin;

> Shin produced a royalty statement for 10 compositions from an unspecified
> source for the period [from November 2012 through January 2014] totaling . . .
> [$]136,487[];

> Shin produced a royalty statement for 10 compositions from an unspecified
> source for the period [from November 2012 through January 2014] stating that
> Shin's share of writer royalties total . . . [$]1,835[];

> Shin produced a summary of royalties paid by KOMCA (Korean Music
> Copyright Association) to Joombas for the period [June 2012 through April 2017]
> and the amount of these royalties attributable to Shin.  These documents indicate
> that Shin's share of profits from this source for this period, after payment of
> writers and fees, is . . . [$]107,052[];

> Shin produced royalty statements rendered by [Reid and EMI] to Shin for the
> semiannual periods [from the second half of 2016 through the first half of 2021].
> Shin's royalties on these statements total $8,963;

> Shin produced various lists of compositions which indicate that Shin wrote or
> acquired many more compositions than those detailed in the statements cited in
> [the documents discussed above];

SPA-66

Catala and Shin entered into a co-publishing agreement with EMI in 2009 that contemplated two option advances. The first option advance would have been at least $135,000 and at most $270,000 and the second option advance would have been at least $150,000 and at most $300,000. Since these amounts would have been split evenly between Catala [and Shin] if Shin had not breached his agreement with Catala, [a]s a result Catala missed out on at least $142,500 in additional advances and at most $285,000 in additional advances from Contract 2.

(Id. at 7 (citations omitted))

## II.    **PROCEDURAL HISTORY**

The Complaint was filed on September 14, 2018. (See Cmplt. (Dkt. No. 1)) In the Complaint, Catala contends that Shin did not provide Catala with compositions he had acquired or wrote, and thus breached Contracts 1, 2, and 3, committed fraud, and violated the Copyright Act. (Id. ¶¶ 35-52, 75-89, 95-103) Catala also seeks an accounting from Shin. (Id. ¶¶ 90-94) The Complaint also asserts fraud and tortious interference with contract claims against the Joombas Defendants (id. ¶¶ 75-89, 104-112), and breach of contract and breach of fiduciary duty claims against the Reid Defendants. (Id. ¶¶ 53-74)

Shin and the Joombas Defendants moved to dismiss on November 26, 2018 (Mot. (Dkt. No. 50)), and the Reid Defendants moved to dismiss on February 7, 2019. (Mot. (Dkt. No. 67))

In a September 23, 2019 order, this Court granted the motions to dismiss filed by the Joombas Defendants and the Reid Defendants. (Sept. 23, 2019 Order (Dkt. No. 80) at 30) Shin's motion to dismiss was granted in part and denied in part. (Id. at 17, 30)

In dismissing Plaintiff's breach of contract claims against the Reid Defendants, this Court concluded that "most of the[] allegations [in the Complaint] are made either without reference to any contractual provision setting out [any] duty [owed under Contract 2 or 3], or by misconstruing the relevant provisions." (Id. at 20-23) The Court also dismissed Plaintiff's breach of fiduciary duty claim against the Reid Defendants, finding that "[t]he Complaint does

17

not plead facts sufficient to demonstrate that [Plaintiff] had a fiduciary relationship with the Reid Defendants." (Id. at 24)

In dismissing Plaintiff's tortious interference with contract claim against the Joombas Defendants, this Court concluded that "Plaintiff has not alleged facts sufficient to show that [the Joombas Defendants] procured Shin's breach." (Id. at 25)  And in dismissing Plaintiff's fraud claim against the Joombas Defendants and Shin, this Court found that the Complaint's allegations "do not demonstrate a 'legal duty separate from' Shin's obligations under Contracts 1, 2, and 3, nor do they make out 'a fraudulent misrepresentation [that is] collateral or extraneous to' these contracts."  This Court further concluded that "[t]he Complaint . . . does not adequately plead facts that make out the elements of fraud, much less comply with the heightened pleading standards of Fed. R. Civ. P. 9(b)." (Id. at 27 (alteration in original) (quoting Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996); Guilbert v. Gardner, 480 F.3d 140, 148 (2d Cir. 2007)))

The Court also dismissed Plaintiff's Copyright Act claim against Shin, finding that Plaintiff "does not identify what provision or provisions of the Copyright Act Shin allegedly violated," and "does not explain how the Copyright Act addresses the conduct about which Plaintiff complains." (Id. at 28)

The Court dismissed Catala's claim for an accounting because "the Complaint does not assert – much less plead facts suggesting – that Plaintiff and Shin had 'relations of a mutual and confidential nature,'" and instead "merely alleges that Plaintiff and Shin were signatories to various publishing agreements," which does not satisfy the first element of an accounting claim. (Id. at 29 (quoting Rosa v. TCC Commc'ns, Inc., No. 15 Civ. 1665, 2016 WL 67729, at *7 (S.D.N.Y. Jan. 5, 2016)))

This Court also dismissed Catala's claims that Shin breached Contracts 2 and 3, finding that "none of th[e] 'terms, covenants, and conditions' [in Contract 2] obligate Shin to deliver compositions to Majic," and "Contract 3 likewise does not impose an obligation on Shin to deliver compositions to Majic." (Id. at 19 (quoting Cmplt., Ex. B (Dkt. No. 1-2) at 15))

As to Catala's claim that Shin breached Contract 1, this Court found that "Contract 3 expressly modifies the delivery obligations set out in Contract 2, and – because Contract 1 'shall be deemed amended in all respects necessary to conform to the provisions of [Contract 2]' – Contract 3 also modifies Contract 1's delivery obligations." (Id. at 16 (alteration in original) (citation omitted) (quoting (Cmplt., Ex. A (Dkt. No. 1-1) at 7, § 13)) The Court concluded that, "[a]fter execution of Contract 3, Shin no longer was required to deliver compositions to Majic; his obligation was to deliver the compositions to Reid." Accordingly, "to the extent that [Catala]'s claim for breach of Contract 1 concerns conduct that took place after Contract 3 was executed in January 2014, Shin's motion to dismiss [Catala]'s breach claim will be granted." (Id.)

As a result of this Court's September 23, 2019 order, the Complaint's only surviving claim is for breach of Contract 1 against Shin, and then only as to conduct that took place prior to the execution of Contract 3 on January 1, 2014.

On October 7, 2019, Catala moved for reconsideration of the September 23, 2019 order, and to amend the Complaint. (Pltf. Mot. (Dkt. No. 82)) This Court denied Plaintiff's motion on March 31, 2021. (Mar. 31, 2021 Order (Dkt. No. 93); see also May 20, 2021 Mem. (Dkt. No. 100))

On April 30, 2022, Catala moved for summary judgment on his surviving breach

of contract claim, and on May 2, 2022, Shin cross-moved for summary judgment on that claim.

(Mot. (Dkt. No. 145); Mot. (Dkt. No. 155))

## DISCUSSION

## I.      LEGAL STANDARDS

### A.      Summary Judgment Standard

Summary judgment is warranted where the moving party "shows that there is no

genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes

where the evidence is such that a reasonable jury could decide in the non-movant's favor."

Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Guilbert, 480 F.3d at 145).

"When no rational jury could find in favor of the nonmoving party because the evidence to

support its case is so slight, there is no genuine issue of material fact and a grant of summary

judgment is proper."  Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d

Cir. 1994) (citing Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)).  "'[T]hat

opposing parties assert competing versions of the same event is not in itself sufficient to preclude

summary judgment,' in that contradictory testimony only establishes a 'genuine' issue for trial if

it 'lead[s] to a different legal outcome.'"  Yi Fu Chen v. Spring Tailor, L.L.C., No. 14 Civ. 218

(PAE), 2015 WL 3953532, at *4 (S.D.N.Y. June 29, 2015) (alterations in original) (quoting

Krynski v. Chase, 707 F. Supp. 2d 318, 322 (E.D.N.Y. 2009)).

In deciding a summary judgment motion, a court must "'resolve all ambiguities,

and credit all factual inferences that could rationally be drawn, in favor of the party opposing

summary judgment.'"  Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting

Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)).  However, "'[a] party may not rely on

20

mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (second alteration and omissions in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)). A moving party can demonstrate the absence of a genuine issue of material fact "'in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim.'" Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 114 (2d Cir. 2017) (quoting Farid v. Smith, 850 F.2d 917, 924 (2d Cir. 1988)).

"'The principles governing admissibility of evidence do not change on a motion for summary judgment' and district courts need only consider admissible evidence in ruling on a motion for summary judgment." I.M. v. United States, 362 F. Supp. 3d 161, 174 n.9 (S.D.N.Y. 2019) (quoting Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997)).

"The same standard[s] appl[y] where, as here, the parties file[] cross-motions for summary judgment." Morales v. Quintel Ent., Inc., 249 F.3d 115, 121 (2d Cir. 2001). "[W]hen both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party. Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Id. (citation omitted) (citing Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993); Schwabenbauer v. Bd. of Ed. of City Sch. Dist. of City of Olean, 667 F.2d 305, 314 (2d Cir. 1981)).

SPA-71

### B.    Principles of Contract Law

Under New York law,[12] the elements of a breach of contract claim include "'(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'" Mindspirit, LLC v. Evalueserve Ltd., 346 F. Supp. 3d 552, 574 (S.D.N.Y. 2018) (quoting Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc., 837 F. Supp. 2d 162, 188-89 (S.D.N.Y. 2011)). "[W]hether the contract is ambiguous is a question of law for the court." Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp., 595 F.3d 458, 465 (2d Cir. 2010). "Contract provisions are unambiguous if they 'have a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion.'" LVP Assocs. L.L.C. v. Bank of China, N.Y. Branch, No. 17 Civ. 5274 (SHS), 2017 WL 5514523, at *4 (S.D.N.Y. Nov. 16, 2017) (omission in original) (quoting Breed v. Ins. Co. of N. Am., 46 N.Y.2d 351, 355 (1978)). By contrast, a contract is ambiguous "where its language is susceptible to multiple reasonable interpretations." Summit Health, Inc. v. APS Healthcare Bethesda, Inc., 993 F. Supp. 2d 379, 391 (S.D.N.Y. 2014) (citing Brad H. v. City of N.Y., 17 N.Y.3d 180, 186 (2011)). "Ambiguity will not be found," however, "'where one party's view strains the contract language beyond its reasonable and ordinary meaning.'" Governmental Emps. Ins. Co. v. Ohio Cas. Grp., 47 F. Supp. 3d 190, 194 (S.D.N.Y. 2014) (internal quotation marks omitted) (quoting Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992)). "[A]mbiguity does not exist 'simply because the parties urge

---

[12] Contract 1 provides that it "shall be governed by New York law." (Contract 1 (Dkt. No. 157-1) § 14(a))

22

different interpretations.'" Hugo Boss Fashions, Inc. v. Fed. Ins. Co., 252 F.3d 608, 616 (2d Cir.

2001) (quoting Seiden Assocs., 959 F.2d at 428).

"'[E]xtrinsic evidence may not be considered unless the [contract] itself is

ambiguous.'" Summit Health, 993 F. Supp. 2d at 390 (first alteration in original) (quoting

Kasowitz, Benson, Torres & Friedman, LLP v. Duane Reade, 98 A.D.3d 403, 406 (1st Dep't

2012)); see also Int'l Multifoods Corp. v. Com. Union Ins. Co., 309 F.3d 76, 83 (2d Cir. 2002)

(quoting Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London,

Eng., 136 F.3d 82, 86 (2d Cir. 1998)) ("'[I]f the court finds that the contract is not ambiguous[,]

it should assign the plain and ordinary meaning to each term and interpret the contract without

the aid of extrinsic evidence.'"). "When a contract is ambiguous and there is relevant extrinsic

evidence as to the parties' intent, the proper interpretation of the disputed language [is generally]

a question of fact for the jury." Summit Health, 993 F. Supp. 2d at 391 (citing Seiden Assocs.,

959 F.2d at 428); see also Fed. Ins. Co. v. Am. Home Assur. Co., 639 F.3d 557, 567 (2d Cir.

2011) ("[C]ontract claims are generally not subject to summary judgment if the resolution of the

dispute turns on the meaning of an ambiguous term or phrase.").

"Although a determination that a contract is ambiguous ordinarily requires denial

of summary judgment, the court may nonetheless grant summary judgment where the extrinsic

evidence illuminating the parties' intended meaning of the contract is 'so one-sided that no

reasonable person could decide to the contrary.'" N.Y. Marine & Gen. Ins. Co. v. Lafarge N.

Am., Inc., 599 F.3d 102, 115 (2d Cir. 2010) (quoting Compagnie Financiere de CIC et de

L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 232 F.3d 153, 158 (2d Cir.

2000)). "Similarly, summary judgment may be granted despite any ambiguities in the contract

'where there is no extrinsic evidence that would support a resolution of [the] ambiguities in favor

23

of the nonmoving party's case.'" Id. (alteration in original) (quoting Topps Co., Inc. v. Cadbury

Stani S.A.I.C., 526 F.3d 63, 68 (2d Cir. 2008)). "These apparent exceptions merely reinforce the

principle that the lynchpin of a summary judgment determination is, in most cases, the existence

vel non of genuine issues of material facts." Id.

## II.    ANALYSIS

It is undisputed here that Contract 1 is an enforceable contract, and Shin does not

contend that Plaintiff did not adequately perform his duties under Contract 1. (See Shin R. 56.1

Stmt. (Dkt. No. 159) ¶ 1; Shin Br. (Dkt. No. 158); Shin Opp. (Dkt. No. 166))

Catala argues that he is entitled to summary judgment because "it is undisputed

that between September 14, 2012 and December 31, 2013, the Defendant breached a valid

contract with the Plaintiff and caused the Plaintiff damages."[13] (Pltf. Br. (Dkt. No. 152) at 6)

---

[13] "The parties are in agreement for purposes of [Plaintiff's summary judgment] motion that
'[p]ursuant to the date the Complaint in this case was filed (9/14/2018), the Court's prior Order
dated September 23, 2019 and the applicable six-year statute of limitations, the breach of
contract claims that are actionable occur between September 14, 2012 and December 31, 2013.'"
(Shin Opp. (Dkt. No. 166) at 15 (second alteration in original) (quoting Pltf. Br. (Dkt. No. 152)
at 18); see also Pltf. Br. (Dkt. No. 152) at 19 ("Plaintiff's claims for breach of contract are
limited to the Defendant's conduct from September 14, 2012.'"))

Because the parties agree that any actionable claim for breach of Contract 1 arose between
September 14, 2012 and December 31, 2013, and because neither party argues that any claim
arose before September 14, 2012, this Court finds that the six-year statute of limitations (see
N.Y. C.P.L.R. § 213(2) ("[A]n action upon a contractual obligation or liability, express or
implied" "must be commenced within six years.") does not bar Plaintiff's claims for breach of
Contract 1.

Shin argues, however, that "[t]here is an argument to be made that Plaintiff is completely out of
time, as his rights were extinguished on May 1, 2009, when he assigned exclusive administration
rights with regard to [Shin's] compositions to Sony via Contract 2." (Shin Opp. (Dkt. No. 166)
at 15 n.11) Shin does not brief this argument, however, and in any event, in the September 23,
2019 order, this Court found "not persuasive" Shin's argument that – by virtue of the Exclusive
Administrative Rights provision in Contract 2 – only Reid has authority to enforce the terms of
Contract 2. (Sept. 23, 2019 Order (Dkt. No. 80) at 18)

Catala further argues that Shin's "[a]ffirmative [d]efenses should be stricken because there is no question of fact which might allow any of the defenses to succeed, there is no question of law which might allow any of the defenses to succeed[,] and the plaintiff would be prejudiced by inclusion of the defenses." (Id. at 19)

In cross-moving for summary judgment, Shin argues that

[t]here is no question of material fact as to any of the following: (i) Plaintiff has identified 122 musical compositions as those that he claims Defendant failed to deliver in accordance with Contract 1; (ii) only 14 of those musical compositions were released after December 31, 2013, and if, out of an abundance of caution, we include musical compositions released through June 30, 2014, the list grows to 16 musical compositions; (iii) each of the 16 identified musical composition[s] was delivered, as reflected both in Sony . . . royalty statements produced by Plaintiff, and as further confirmed by Sony['s] . . . response to the third-party subpoena served upon it by Defendant; and (iv) [Plaintiff] cannot substantiate any damages suffered [by] any alleged failure of delivery, as he admits to being paid more than his purported fair share of royalties, once obvious errors in his damages expert's report are corrected.

(Shin Br. (Dkt. No. 158) at 17-18 (emphasis omitted))  Shin further argues that Catala "presents no basis for striking any of the affirmative defenses." (Shin Opp. (Dkt. No. 166) at 26)

### A.      Plaintiff's Summary Judgment Motion and Opposition

Plaintiff argues that Shin did not comply with Contract 1's "Delivery" requirement, and "took additional steps to conceal his interest in musical compositions by registering his publishing interest in subject compositions to other writers that he controlled through a separate company." (Pltf. Br. (Dkt. No. 152) at 14-15)

In response, Shin argues that his "delivery obligation" under Contract 1 "is strictly limited to 'Your Interest in each Composition' . . . to the clear exclusion of portions of each Composition that were not 'Your Interest' – i.e., the interests held by others, including any 'Affiliates,' outside of 'that percentage interest in a Composition resulting from your authorship and/or ownership of rights in that Composition.'" (Shin Opp. (Dkt. No. 166) at 19) (emphasis

25

omitted) (citing Contract 1 (Dkt. No. 157-1) § 3))  Shin contends that "there is no dispute that [he] delivered his share ('Your Interest') in each [q]ualifying [c]omposition, and there can be no dispute that [that] is all that Contract 1 required."  (Id. at 19-20 (emphasis omitted))  Shin further argues that "[e]ven if one were to misread Contract 1 as requiring delivery of 'Compositions,' as opposed to 'Your Interest' in those Compositions, the breach of contract claim would also fail, as there is no dispute that all of the [q]ualifying [c]ompositions were in fact delivered."  (Id. at 22 (emphasis omitted))

Shin misreads the term "Your Interest" as used in Contract 1, however.  Contract 1 defines "you" to include, inter alia, "HIUK SHIN individually and d/b/a THE PUBLISHING DESIGNEE OF HIUK SHIN and any and all Affiliates, currently collectively professionally known as 'A Rex Productions.'"  (Contract 1 (Dkt. No. 157-1) at 1 (emphasis in original))  And Shin executed Contract 1 "[f]or himself and [on behalf of] any [and] all Affiliates."  (Id. at 10)  Contract 1 further defines "Affiliates" to mean "any Person which you own or in which you have an interest, in whole or in part, or which you employ or which employs you, and/or any Person, the operation of which is controlled directly or indirectly by you."  Contract 1 defines "Person" to mean "any individual, corporation, partnership, association or other organized group of persons of whatever nature, or legal successors or representatives of the foregoing."  (Id. §§ 12(e), (g))  "Your Interest" in a Composition means "that percentage interest in a Composition resulting from your authorship and/or ownership of rights in that Composition."  (Id. § 3)  Accordingly, "you" means Shin and any of Shin's Affiliates, and "Your Interest" includes the percentage interest that results from Shin's authorship or ownership of a Composition, and the authorship or ownership interest of any of Shin's Affiliates in a Composition.

26

The parties appear to dispute whether the Joombas entities named in the Complaint – Joombas Co. LTD., Joombas Music Int'l, Joombas LLC, and Joombas Music Group (see Cmplt. (Dkt. No. 1) ¶¶ 2-5) – are "Affiliates" of Shin within the meaning of Contract 1. Catala refers to "Joombas" generally throughout his submissions, without identifying any of the Joombas entities (see, e.g., Pltf. Br. (Dkt. No. 152); Pltf. Opp. (Dkt. No. 162); Pltf. R. 56.1 Stmt. (Dkt. No. 165)), and maintains that "Defendant operated Joombas as an Affiliate to Defendant, as defined in Contract 1." (Pltf. Br. (Dkt. No. 152) at 8) Shin asserts that "Plaintiff's use of the term 'Joombas' throughout its Rule 56.1 statement is vague, as it is unclear to which entity or entities Plaintiff means to refer." (Shin Resp. R. 56.1 Stmt. (Dkt. No. 166-21) ¶¶ 12, 14, 18) In Shin's submissions, he refers to the "Joombas Defendants" as those Joombas entities named in the Complaint. (See, e.g., Shin Br. (Dkt. No. 158); Shin Opp. (Dkt. No. 166)) For purposes of Contract 1, however, Shin contends that he "is not his affiliates, nor was he required to deliver his affiliates' shares of any compositions." (Shin Br. (Dkt. No. 158) at 21 (emphasis omitted))

At deposition, Shin testified that he was an "executive producer" at "Joombas," and received income from "Joombas" for his work as executive producer. It is not clear from the deposition transcript, however, which Joombas entity Shin was referring to. (Shin Dep. (Dkt. No. 146-1) at 15, 46, 58) Later in the deposition, Shin testified that "[i]t's important to clarify that I was acting as CEO on behalf of the Joombas USA entity and not the main Joombas headquarter entity. As the face of the company, it was imperative that this structure be established as such so that I would be able to sign writers." (Id. at 68) Again, however, Shin does not make clear which Joombas entity is "the Joombas USA entity" and which is "the main Joombas headquarter entity." According to Shin, "[w]hile there was a separation between the actual entities and some of these titles, because we were a smaller company, there was no

27

corporate, per se, separation between the two territories. I did reach out on behalf of Joombas as a whole, not a specific location or office." (Id. at 69) In sum, from Shin's deposition, his relationship to the Joombas entities named in the Complaint is not clear.

For his part, Catala asserts that "[i]n July 2011, Shin formed a company in Georgia and named the company[] Joombas ('Joombas')," citing Articles of Organization for a limited liability company in Georgia called "Joombas, LLC." (Pltf. R. 56.1 Stmt. (Dkt. No. 165) ¶ 12; Pltf. Subm., Ex. 8 (Dkt. No. 145-10)) Plaintiff further asserts that, in March 2012, "Shin identified himself as the Chief Executive Officer of Joombas," citing screenshots from a series of emails that do not specify any particular Joombas entity. (Pltf. R. 56.1 Stmt. (Dkt. No. 165) ¶ 13 (citing Pltf. Subm., Ex. 17 (Dkt. No. 147-5)) The exhibit Plaintiff cites in support of this factual assertion, however, shows that Shin's email signature identifies him as the Chief Executive Officer of Defendant "Joombas Music Group." (Pltf. Subm., Ex. 17 (Dkt. No. 147-5) at 9, 15)

Although it appears that (1) Shin is the chief executive officer of Defendant Joombas Music Group and thus that this entity is an Affiliate for purposes of Contract 1; and (2) that Shin may serve as the executive producer for one or more Joombas entities, Plaintiff has not demonstrated as a matter of law that any Joombas entity other than Joombas Music Group employs Shin, or that Shin controls any Joombas entity.

Even if Plaintiff had offered evidence that all of the named Joombas entities are Shin's Affiliates – which he has not – Plaintiff has not offered evidence sufficient to demonstrate as a matter of law that Shin breached Contract 1.

As discussed above, Catala contends that Shin did not deliver to Majic or Sony the percentage interests that resulted from his individual authorship or ownership of the Compositions, or the percentage interests that resulted from the authorship or ownership interest

of any of his Affiliates in the Compositions.  (See Contract 1 (Dkt. No. 157-1) § 3)  Plaintiff

further contends that Shin "fraudulently" delivered songs "in someone else's name," in order to

avoid his obligations to Plaintiff under Contract 1.[14]  (Catala Dep. (Dkt. No. 146-2) at 75-77;

Cmplt. (Dkt. No. 1) ¶ 22 ("Shin purposely and knowingly attempted to defraud Majic of revenue

associated with the songs/compositions Shin acquired and authored, and hid the songs from

Majic for several years."))  Plaintiff has not shown that he is entitled to summary judgment as a

matter of law on his breach claim, however.  Indeed, Plaintiff has not proffered evidence

concerning these allegations sufficient to create a material issue of fact as to whether Shin

breached his obligations under Contract 1.

       As an initial matter, Plaintiff does not dispute that Shin delivered Compositions

that resulted from Shin's individual authorship or ownership.  (See Shin R. 56.1 Stmt. (Dkt. No.

159) ¶¶ 30, 39-40; Catala Dep. (Dkt. No. 146-2) at 76 ("[Shin] didn't fail to deliver compositions

that were in his name."))  As discussed above, however, Catala contends that Shin fraudulently

minimized his percentage interest in the Compositions in order to deprive Catala of his rights

under Contract 1.

---

[14]  As to Plaintiff's allegation that Shin fraudulently attributed songs he delivered to unrelated
people or entities, Shin argues that "[n]o provision of Contract 1 prohibits Defendant from
assigning writing credit to others[,] [and] no provision of Contract 1 addresses assignment of
writing credit whatsoever."  (Shin Opp. (Dkt. No. 166) at 20-21)  This assertion is not correct.
Contract 1 provides that "[y]ou may not assign this Agreement, or any of your rights hereunder,
or any of your rights or interests with respect to the Compositions, without the prior written
consent of Publisher."  (Contract 1 (Dkt. No. 157-1) § 14(c))  As discussed, "Composition"
means "(a) all musical compositions (or portions thereof or interests therein) written by you prior
to or during the Term and (b) any and all other compositions written by you and/or acquired by
you or your Affiliates during the Term."  (Id. § 3)  Accordingly, absent Majic's written consent,
Contract 1 prohibits Shin from assigning his "rights or interests" in any musical compositions
that were written or acquired by him or by his Affiliates.

Catala testified that "[Shin] delivered 2 percent in his name. He delivered small portions of the song in his name. He just didn't deliver the accurate amount of the ownership of the song." (Catala Dep. (Dkt. No. 146-2) at 76-77) As discussed above, Catala asserts that

> [Shin] would go the studio. He would create music that's supposed to funnel through our agreements, but instead, he would place the music in [Shin's friend's] name, or another name that – of someone who's not even in the country, who was not present at the recording session, so that they could collect and that they could pick up the money and then funnel it back to Shin.

(Id. at 75-76)

Catala further contends that "there's over 150 songs that [Catala] believe[s] . . . should fall under Contract 1, that are out there, that [Catala is] not being paid on," and that "there might be 300 songs. There's a lot of songs out there that – upwards to a couple hundred that [Catala] ha[s] not received a penny on." (Id. at 259-60)

All of Catala's testimony about Shin's alleged breach is entirely speculative, however. He has not offered evidence that Shin "didn't deliver the accurate amount of . . . ownership of [a] song," nor has he offered evidence that Shin fraudulently attributed to other individuals or entities songs that he or his Affiliates had created or acquired. Catala likewise does not identify what Compositions Shin mischaracterized, let alone demonstrate whether these Compositions are subject to Contract 1. Nor does Catala offer evidence as to what "amount . . . of ownership" Shin was required to deliver, but did not. In short, there is a complete failure of proof as to Plaintiff's claim that Shin and his Affiliates "didn't deliver the accurate amount of . . . ownership of [a] song [subject to Contract 1]."

In support of his breach claim, Plaintiff cites to several exhibits that he contends reference compositions for which Shin "never [d]elivered, reported or registered his Affiliate's administration rights or publishing interest . . . to Catala or Sony." (Pltf. R. 56.1 Stmt. (Dkt. No. 165) ¶¶ 19-23 (citing Pltf. Subm., Ex. 13 (Dkt. No. 147-1); Pltf. Subm., Ex. 15 (Dkt. No. 147-3);

Pltf. Subm., Ex. 16 (Dkt. No. 147-4); Pltf. Subm., Ex. 26 (Dkt. No. 149-1); Pltf. Subm., Ex. 27

(Dkt. No. 149-2))) None of these exhibits shows an interest held by Shin or a Shin Affiliate in

any composition that Defendant was required to – but did not – deliver to Majic or Sony under

Contract 1, however.

 Plaintiff's Exhibit 13 is an unexecuted "writer agreement" between Joombas Co.,

Ltd. and Edward Ross Lara, a non-party songwriter. Although the agreement states that Lara

"sells, assigns, transfers and sets over to [Joombas Co., Ltd.,] free and clear of any encumbrance

whatsoever fifty percent (50%) of all right, title and interest in and to the [c]ompositions [that are

listed in Schedule A]," and that the agreement "regards only those certain songs listed in

Schedule A," Schedule A is blank. (See Pltf. Subm., Ex. 13 (Dkt. No. 147-1) at 1, 12)

 Plaintiff's Exhibit 15 appears to show the "shares" of several compositions that

are credited to several songwriters and publishers. (See Pltf. Subm., Ex. 15 (Dkt. No. 147-3)) In

this document, "shares" of each composition are credited to Shin as a songwriter, and none are

credited to a Joombas entity. (Id.) Among the compositions listed in this exhibit are

compositions that Catala has admitted Shin properly delivered his individual authorship and

ownership interests in. (See Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 164) ¶ 30; Catala Dep. (Dkt. No.

146-2) at 76) Although some shares of some compositions are credited to songwriters for whom

"Joombas publish[ed] and administer[ed] the publishing," and who were "sign[ed] . . . to

Joombas Publishing" generally (see, e.g., Shin Dep. (Dkt. No. 146-1) at 73, 85, 90, 93-94, 96-

97), Plaintiff has not offered evidence that (1) Shin or any Joombas entity had "authorship and/or

ownership rights" in these compositions as of the registration dates shown, or (2) what

percentage interest Shin or any Joombas entity had that resulted from those "authorship and/or

ownership rights." Accordingly, Plaintiff has not shown that he is entitled to any of these

"shares." And even if Plaintiff had made such a showing, Plaintiff has not shown (1) what

percentage interest he is owed or (2) that this interest was not delivered under Contract 1.

Plaintiff's Exhibit 16 is a list of compositions that Hyeong-Kyu Kim – who was

chief executive officer of an unspecified Korean Joombas entity from 2009 to 2017 (see Shin

Dep. (Dkt. No. 146-1) at 46, 59, 68) – and other songwriters "that Joombas had signed" or whose

compositions Joombas "published and administered" (see id. at 84-90, 93-98), are credited with

writing. (See Pltf. Subm., Ex. 16 (Dkt. No. 147-4)) Plaintiff's Exhibit 26 is a list of

compositions and the "[d]istributed [r]oyalty" for each composition. (See Pltf. Subm., Ex. 26

(Dkt. No. 149-1)) Plaintiff's Exhibit 27 – entitled "Joombas 2012-2017 Royalties" – is a

spreadsheet reflecting the "[f]inal [p]ublishing [i]ncome" for "Joombas." The spreadsheet does

not indicate what Joombas entity or entities are addressed in the spreadsheet. The spreadsheet

appears to list royalties by songwriter by year, but does not show on which compositions

royalties were earned. (See Pltf. Subm., Ex. 27 (Dkt. No. 149-2))

Nothing in the exhibits cited by Plaintiff shows that Shin or any of his Affiliates

had any authorship or ownership rights in the compositions referenced therein; what percentage

interest Shin or his Affiliates held in those compositions, if any; whether any of these interests

are subject to Contract 1; or whether any such interest was delivered to Majic or Sony.

In support of his breach claim, Plaintiff also cites to deposition testimony taken

during discovery, but none of this testimony demonstrates that Shin or his Affiliates failed to

deliver any interest in any composition as was required under Contract 1.

Plaintiff points to Shin's deposition testimony that he "had no contact with Majic

or LA Reid when [certain] songs were released" (Shin Dep. (Dkt. No. 146-1) at 48-49); that he

did not "understand [Section 12(c)] of [Contract 1] . . . to mean that [he] had to deliver songs at

32

SPA-82

[the listed] address [for EMI]" (id. at 50); that he did not "report to . . . Catala, . . . Reid, EMI or

Sony that [Hyeong-Kyu] Kim was claiming large portions of [Shin's] interest in songs" (id. at

103); and that he did not "pay any of the income [Shin] received from Joombas to . . . Catala, . . .

Reid, EMI or Sony." (Id. at 103-04)  Plaintiff further cites his own testimony in which he claims

– in a speculative and conclusory manner – that "[Shin] fraudulently placed music compositions

in other people's names." (Catala Dep. (Dkt. No. 146-2) at 120)  None of this testimony shows

that Shin or any Shin Affiliate had any interest in Compositions that were not delivered under

Contract 1, however.

        Although it is undisputed that, "[i]n 2011, Shin began to place large portions of

his copyright, publishing and administration interest in musical compositions in the name of

[Hyeong-Kyu] Kim" (Pltf. R. 56.1 Stmt. (Dkt. No. 165) ¶ 24), Plaintiff has not proffered

evidence that any Joombas entity had any "authorship and/or ownership rights" in these

compositions.  Although "Joombas publish[ed] and administer[ed] the publishing of [Hyeong-

Kyu] Kim" generally (Shin Dep. (Dkt. No. 146-1) at 73), Plaintiff has not shown (1) that any

such composition published by a Joombas entity was subject to Contract 1; (2) that Shin or any

Joombas entity had authorship or ownership rights in any such compositions at that time; (3)

what percentage interest resulted from any such authorship or ownership right; or (4) that any

such interest was not properly delivered to Majic or Sony pursuant to Contract 1.[15]

---

[15] Catala argues that Shin breached Contract 1's Minimum Delivery and Release Commitment
("MDRC") provision.  The MDRC provision provides that "[d]uring each Contract Period, you
shall Deliver to Publisher ('Minimum Delivery and Release Commitment' or 'MDRC') at least
four (4) Full New Compositions, or the fractional equivalent." (Contract 1 (Dkt. No. 157-1) § 4)
According to Plaintiff, "[b]y falsely reporting his creative and publishing interest in musical
compositions that Defendant acquired, the Defendant prevented the Plaintiff from advancing
through the options of the MDRC." (Pltf. Br. (Dkt. No. 152) at 15; see also Pltf. Opp. (Dkt. No.
162) at 15)  Shin responds that "despite numerous opportunities to do so, Plaintiff has never

\*      \*      \*      \*

As discussed above, under Fed. R. Civ. P. 56, a moving party can demonstrate the absence of a genuine issue of material fact "'in either of two ways:  (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim.'"  Nick's Garage, 875 F.3d at 114 (quoting Farid, 850 F.2d at 924).  Here, it is an essential element of Plaintiff's breach of contract claim that Shin or a Shin Affiliate failed to deliver an authorship or ownership interest in a Composition that Shin or a Shin Affiliate was required to deliver under Contract 1.  Because Plaintiff has not offered evidence that creates a material issue of fact as to this "essential element," Plaintiff's motion for summary judgment will be denied, and Shin's motion for summary judgment will be granted.

---

identified a single musical composition where the manner in which writing credits were distributed violated Contract 1," and "[b]ecause all of the qualifying compositions were in fact delivered to Sony . . . Plaintiff can identify no more than a theoretical, technical violation of protocol, but no material breach of Contract 1."  (Shin Br. (Dkt. No. 158) at 23; see also Shin Opp. (Dkt. No. 166) at 23-24)

While Plaintiff asserts – in a conclusory manner – that "[a]s of January 1, 2014, Shin had not fulfilled the terms of [the MDRC provision] under the First Contract Period in Contract 1 and was still under contract with Catala and . . . [Sony]," (Pltf. R. 56.1 Stmt. (Dkt. No. 165) ¶ 10), he has not offered evidence that Shin failed to deliver four new compositions or the fractional equivalent.  Catala merely offers Shin's deposition testimony that he did not "understand [Section 12(c)] of [Contract 1] . . . to mean that [he] had to deliver songs at [the listed] address [for EMI]" (Shin Dep. (Dkt. No. 146-1) at 50), and his own speculative testimony that "[Shin] fraudulently placed music compositions in other people's names."  (Catala Dep. (Dkt. No. 146-2) at 120)  Accordingly, Catala has not set forth evidence sufficient to create a material issue of fact as to whether Shin breached this provision.

34

SPA-84

## **CONCLUSION**

For the reasons stated above, Plaintiff's motion for summary judgment is denied, and Defendant Shin's motion for summary judgment is granted.  Plaintiff's motion to strike Defendant's affirmative defenses is denied as moot.

The Clerk of Court is directed to terminate the motions (Dkt. Nos. 145, 155) and to close this case.

Dated:  New York, New York
        September 19, 2023

SO ORDERED.

Paul G. Gardephe
United States District Judge

SPA-85

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
JUAN CATALA, d/b/a MAJIC
ENTERTAINMENT LLC, d/b/a ADRAWN
MUSIC PUBLISHING,

                 Plaintiff,                 18 **CIVIL** 8401 (PGG)(GWG)

       -against-                    **<u>JUDGMENT</u>**

JOOMBAS CO. LTD., JOOMBAS MUSIC INT'L,
 JOOMBAS LLC, JOOMBAS MUSIC GROUP,
 HYUK SHIN, THE LA REID MUSIC
PUBLISHING COMPANY LLC, EMI APRIL
 MUSIC INC., and SONY/ATV SONGS LLC,

                 Defendants.
--------------------------------------------------------X

      It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Opinion and Order dated September 20, 2023, Plaintiff's motion for

summary judgment is DENIED, and Defendant Shin's motion for summary judgment is

GRANTED. Plaintiff's motion to strike Defendant's affirmative defenses is denied as moot;

accordingly, the case is closed.

**Dated:** New York, New York
      September 20, 2023

                          **RUBY J. KRAJICK**

                            **Clerk of Court**

        **BY:**

                            **Deputy Clerk**